# Exhibit A

**EXECUTION VERSION**

SHARE PURCHASE AGREEMENT

by and among

BRIGHTSTAR ASIA LTD.,

HARVESTAR SOLUTIONS LIMITED,

TYLER MILLER

and

OMAR ELMI

Dated as of April 9, 2018

17660649-v18

TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS...................................................................................3
    1.1        Defined Terms ..............................................................................3
    1.2        Construction.................................................................................12

ARTICLE II       PURCHASE AND SALE OF SHARES..............................................13
    2.1        Purchase and Sale of Subject Securities .......................................13
    2.2        Shareholder Loan.........................................................................14
    2.3        Closing.........................................................................................14
    2.4        Transfer Taxes .............................................................................15

ARTICLE III      REPRESENTATIONS AND WARRANTIES CONCERNING THE
               COMPANY AND ITS SUBSIDIARIES...........................................15
    3.1        Organization.................................................................................15
    3.2        Authorization ...............................................................................16
    3.3        No Conflict...................................................................................16
    3.4        Consents and Approvals ...............................................................16
    3.5        Capitalization ...............................................................................17
    3.6        Absence of Certain Changes.........................................................18
    3.7        Title to Assets; Condition and Sufficiency of Assets ...................20
    3.8        Real and Personal Property...........................................................20
    3.9        Material Company Contracts ........................................................21
    3.10       Compliance with Laws; Permits ..................................................23
    3.11       Financial Statements ....................................................................23
    3.12       Absence of Undisclosed Liabilities ..............................................24
    3.13       Books and Records .......................................................................24
    3.14       Litigation; Government Orders......................................................24
    3.15       Employee Matters.........................................................................25
    3.16       Employment and Labor Matters ...................................................27
    3.17       Personal Information.....................................................................27
    3.18       Intellectual Property.....................................................................28
    3.19       Tax Matters ..................................................................................31
    3.20       Insurance ......................................................................................33
    3.21       Compliance with Environmental Matters .....................................33
    3.22       Inventory ......................................................................................34
    3.23       Prohibited Payments.....................................................................34
    3.24       Sanctions; Trade Controls.............................................................35
    3.25       Transactions with Certain Persons................................................35
    3.26       Bankruptcy and Insolvency...........................................................36
    3.27       No Other Agreements ...................................................................36
    3.28       Customers and Vendors ................................................................36
    3.29       Bank Accounts; Powers of Attorney..............................................37
    3.30       No Brokers....................................................................................37
    3.31       Accuracy of Information................................................................37

ARTICLE IV    REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLERS...........................................................................................38

4.1    No Conflict..................................................................................38
4.2    Consents and Approvals ...........................................................38
4.3    Bankruptcy and Insolvency......................................................38
4.4    Ownership of Ordinary Shares..................................................38

ARTICLE V    REPRESENTATIONS AND WARRANTIES OF THE BUYER .....................39

5.1    Organization...............................................................................39
5.2    Authorization .............................................................................39
5.3    No Conflict.................................................................................39
5.4    Consents and Approvals ............................................................40
5.5    No Brokers .................................................................................40

ARTICLE VI    COVENANTS ...........................................................................40

6.1    Reasonable Best Efforts and Consents .....................................40
6.2    Publicity .....................................................................................40
6.3    Termination of Certain Agreements; Release............................41
6.4    Transition ...................................................................................41
6.5    Confidentiality ...........................................................................42
6.6    Use of Intellectual Property ......................................................42
6.7    Non-Competition; Non-Solicitation ........................................42

ARTICLE VII    INDEMNIFICATION..................................................................43

7.1    Survival......................................................................................43
7.2    Indemnification Obligations of Sellers .....................................44
7.3    Indemnification Obligations of Buyer ......................................45
7.4    Indemnification Procedures, Limitations and Other Matters.....46
7.5    Tax Indemnification and Other Tax Matters .............................48
7.6    Buyer's Right of Offset..............................................................49

ARTICLE VIII    MISCELLANEOUS ...................................................................49

8.1    Assignment ................................................................................49
8.2    Notices .......................................................................................49
8.3    Governing Law; Venue; Waiver of Jury Trial...........................50
8.4    Entire Agreement; Amendments and Waivers ..........................51
8.5    Counterparts...............................................................................51
8.6    Severability ................................................................................51
8.7    Fees and Expenses .....................................................................51
8.8    Specific Performance .................................................................52
8.9    No Third Party Beneficiaries .....................................................52

**EXHIBITS**

Exhibit A ..............................................FORM OF KEY MAN EMPLOYMENT AGREEMENT
Exhibit B ..............................................FORM OF REVOLVING CREDIT LINE AGREEMENT

## SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT (this "Agreement") is made this 9th day of April, 2018 (the "Closing Date"), by and among BRIGHTSTAR ASIA LTD., a Hong Kong private company limited by shares (the "Buyer"), HARVESTAR SOLUTIONS LIMITED, a Hong Kong private company limited by shares duly incorporated under the laws of Hong Kong with CR No. 2409859 (the "Company"), Tyler Miller of 515 Grand Oaks Drive, Brentwood, TN 37027, with Passport No. 488806742, and Omar Elmi of 8260 Mitchell Road, Eden Prairie, MN 55347, with Passport No. 458794341 (each, a "Seller" and, collectively, the "Sellers").

## RECITALS

WHEREAS, the Sellers own all of the issued and outstanding Ordinary Shares; and

WHEREAS, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, fifty-one percent (51%) of the Ordinary Shares (the "Subject Securities") upon the terms and subject to the conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Defined Terms.  As used herein, the defined terms below shall have the following meanings:

"Action" means any action, claim, complaint, suit, litigation, proceeding, dispute, arbitration, mediation, inquiry, audit, assessment, reassessment or investigation, objection, appeal, examination, hearing, regulatory or administration law proceeding, or any similar event, occurrence or proceeding, of any nature (whether civil, criminal, quasi-criminal, regulatory, administrative or investigative), at Law, in equity or otherwise.

"Affiliate" means a Person that directly, or indirectly, controls, or is controlled by, or is under common control with, a specified Person.  A Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Ancillary Agreements" means, collectively, the Key Man Employment Agreements, the Commercial Agreement, the Shareholders Agreement, the Revolver, any Release Documents, any Transfer Documents and an agreement terminating the Confidentiality Agreement.

"Assets" means all properties, assets, claims, Contracts and businesses of every kind, character and description, whether real, personal or mixed, tangible or intangible, and wherever located (including in the possession of vendors or other third parties or elsewhere), in each case whether or not recorded or reflected on the books and records or financial statements of any

3

Person, including the following: (a) all cash, cash equivalents, notes and accounts receivable (whether current or non-current and whether billed or unbilled); (b) all certificates of deposit, banker's acceptances and other investment securities of any other form and maturity; (c) the fee interest in all owned real properties (including all Improvements located thereon or contained therein and appurtenances thereto); (d) the leasehold interest in all leased real properties and all leasehold Improvements; (e) all Equipment and Inventory; (f) all Capital Shares of any Person other than the Company; (g) all Intellectual Property; (h) all rights existing under all Contracts; (i) all prepayments, deposits, performance bonds, guarantees, receivables from tax or other Government Entities, advances for insurance premiums and deferred tax accounts; (j) all claims, causes of action, choses in action, rights to indemnification, rights of recovery and rights of set-off of any kind; (k) all books, ledgers, files and legal and business records of every kind; (l) all advertising materials and all other printed, electronic or written materials, including purchase orders, forms, labels, shipping materials, catalogues, sales brochures, operating manuals, and instructional documents; (m) all goodwill; (n) all telephone and facsimile numbers; and (o) all Permits.

"Balance Sheet" means the reviewed consolidated balance sheet of the Company and its Subsidiaries as at the Balance Sheet Date, together with the notes thereto.

"Balance Sheet Date" means December 31, 2017.

"Benefit Plans" means plans, arrangements, agreements, programs, policies, practices or undertakings, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, registered or unregistered to which the Company or any of its Subsidiaries is a party or bound or in which the Employees participate or under which the Company or any of its Subsidiaries will have any liability or contingent liability, or pursuant to which payments are made, or benefits are provided to, or an entitlement to payments or benefits may arise with respect to any of its Employees or former Employees, directors or officers, individuals working on contract with the Company or any of its Subsidiaries or other individuals providing services to any of them of a kind normally provided by employees (or any spouses, dependents, survivors or beneficiaries of any such persons).

"Books and Records" means all books, records, lists, ledgers, financial data, files, reports, correspondence, plans, drawings, technical manuals and operating records of every kind pertaining to the Company or any of its Subsidiaries or their respective Assets or the actual or potential customers, suppliers, distributors, contractors, service providers or Employees of the Company or any of its Subsidiaries, in whatever form, including all (a) corporate books and records of the Company, (b) disk or tape files, printouts, runs or other computer-based information, in all computer programs required to access, and the equipment containing, all such computer-based information, (c) product, business and marketing plans, (d) sales, customer maintenance, distributor, supplier and production records, including sales and promotional literature, and (e) Employee records and information.

"Business" means the business of the Company and its Subsidiaries as conducted by the Company and its Subsidiaries prior to and up until the Closing.

4

"Business Day" means any day other than a Saturday, a Sunday or a day on which banking institutions in Hong Kong are authorized by Law or executive order to remain closed.

"Capital Shares" means, with respect to any Person, (a) capital shares of such Person, (b) partnership (whether general or limited) or membership interests or units in such Person, (c) any other equity interest in such Person, including any phantom share or units or any interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distribution of assets of, such Person, (d) subscriptions, calls, warrants, options or commitments of any kind or character relating to, or entitling any Person to purchase or otherwise acquire, any of the foregoing and (e) securities convertible into or exercisable or exchangeable for any of the foregoing.

"Closing" has the meaning ascribed to such term in Section 2.3(a).

"Closing Date" means the date hereof.

"Commercial Agreement" means the Amended and Restated Master Services Agreement and Statement of Work #1 between Brightstar Corp. and Harvestar Technologies Inc. dated as of April 9, 2018.

"Company Contract" means any Contract to which the Company or any of its Subsidiaries is party or by which it or any of its Assets is bound.

"Confidential Information" means, as to any Person, all proprietary and confidential, financial, marketing, operational, organizational, know-how, Employee, customer, vendor, technical and other information relating to the business of such Person, including all correspondence, memoranda, notes, summaries, analyses, compilations, forecasts, studies, models, extracts of and documents and records reflecting, based upon or derived from Confidential Information and Personal Information, regardless of who prepares it, as well as all copies and other reproductions thereof, whether in writing or stored or maintained in or by electronic, magnetic or other means, media or devices.

"Confidentiality Agreement" means the Mutual Non-Disclosure Agreement, dated July 12, 2017, between the Company and Brightstar US Inc., an affiliate of the Buyer.

"Contract" means any contract, agreement, lease, sublease, license, sublicense, sales order, purchase order, statement of work, instrument, undertaking or other commitment or arrangement, whether written or oral, express or implied, including any amendments thereto.

"Copyrights" means all copyrights and copyrightable subject matter, mask works, and other rights of authorship and any moral rights related thereto, and all applications and registrations therefor.

"Customer Deliverables" means the products, processes and services that the Company or any of its Subsidiaries (i) currently provides, markets, sells or licenses, or (ii) has provided, marketed, sold or licensed, or (iii) currently plans to provide, market, sell or license in the future.

"Employment Agreements" means agreements, other than benefit arrangements, whether oral or written relating to any Employee, including any communication or practice relating to an Employee which imposes any obligation on the Sellers.

"Employees" means individuals employed, retained, or contracted for by the Company or any of its Subsidiaries, on a full-time, independent, part-time or temporary basis, relating to the Business, including those employees of the Business on disability leave, parental leave or other absence.

"Encumbrance" means any encumbrance, lien, security interest, pledge, hypothec, escrow, option, charge, easement, restrictive covenant, assignment, security interest, deed of trust, statutory trust or deemed trust, deed to secure debt, right of first refusal, restriction on transfer of title or voting, conditional sales agreement, license, mortgage, right-of-way, title retention agreement or arrangement, lease, right to occupy of any kind, encroachment, building or use restriction, or any adverse claim of any nature whatsoever, whether voluntarily incurred, arising by operation of Law or otherwise, and including any Contract to give any of the foregoing in the future or any other encumbrance of any nature whatsoever, which in substance secures payment.

"Environmental Laws" means any federal, provincial or municipal law, statute, by-law, order, ordinance, code, regulation, rule, order or permit and all standards, guidelines, directives, policies, protocols, bulletins, Environmental Permits, now in effect in each jurisdiction in which the Business is carried on and other lawful requirements of any Governmental Entity, principles of common law and equity and all judicial and administrative decisions, orders and decrees that relate to pollution or protection of the environment, human health and safety, or relating to waste disposal or to emissions, discharges, Releases or threatened Releases of Hazardous Materials or other environmental matters, and to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling and the like of Hazardous Materials.

"Environmental Permits" means all permits, licenses, approvals, consents, authorizations, registrations, privileges, exemptions, waivers, variations, clearances, orders, certificates, and other concessions under any Environmental Laws.

"Equipment" means all equipment, fixtures, physical facilities, machinery, spare parts, supplies, tools and other tangible personal property.

"Financial Statements" means (a) the Reviewed Financial Statements and (b) the Interim Financial Statements.

"GAAP" means the United States generally accepted accounting principles from time to time approved by the Financial Accounting Standards Board, or any successor entity thereto, applicable as at the date on which such principles are to be applied or on which any calculation or determination is required to be made in accordance with generally accepted accounting principles.

"Governmental Entity" means any federal, provincial, tribal, territorial, county, municipal, local or foreign government (or any political subdivision thereof), and any legislature, agency, authority, bureau, branch, department, division, commission, court, regulator, tribunal,

magistrate, justice, multi-national organization, ministry, agency, quasi-governmental body or other organization, body or instrumentality exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, decision, ruling, directive, assessment or reassessment, verdict or award entered, issued, made or rendered by or with any Governmental Entity.

"Hazardous Materials" means any hazardous, dangerous or toxic substance, material or waste that is prohibited, controlled or regulated under any applicable Environmental Law including pollutants, contaminants, dangerous goods or substances, toxic or hazardous substances or materials, wastes, petroleum hydrocarbons, volatile organic compounds, polyaromatic hydrocarbons, PCBs, UFFI, lead-based materials, asbestos containing materials, and specifically includes underground storage tanks.

"Hong Kong" means the Hong Kong Special Administrative Region of the People's Republic of China.

"Improvements" means all buildings, improvements, fixtures and facilities located on or attached to any real property and used in, on or at such real property (but in any event excluding any Equipment or personal property).

"Indebtedness" means (a) all obligations for borrowed money or in respect of loans, deposits or advances of any kind, (b) all obligations evidenced by bonds, debentures, notes or other similar instruments or debt securities, (c) all obligations upon which interest charges are customarily paid, (d) all reimbursement obligations in respect of letters of credit, surety bonds, bankers' acceptances or similar instruments, (e) all obligations arising from cash/book overdrafts, (f) all obligations arising from deferred compensation arrangements, (g) all obligations secured by an Encumbrance, (h) all capital lease obligations, (i) all deferred rent or royalty obligations, (j) all obligations (contingent or otherwise) for the deferred purchase price of property or services, (k) any guaranties in connection with any of the foregoing and (l) all accrued interest, prepayment premiums or penalties related to any of the foregoing.

"Intellectual Property" means with respect to any Person, all technology, inventions by date of closing, know-how, trade secrets, customer information, product designs under development, intellectual property, applications and other proprietary rights of such Person, whether registered or unregistered, including: (a) Patents; (b) Trademarks; (c) Copyrights; (d) rights in Software, application programming interfaces, algorithms, databases, compilations and data, technology and documentation supporting the foregoing; (f) all Proprietary Rights, (g) all rights of publicity or similar rights; (h) rights in multimedia and social media content, websites, IP addresses, designs and domain name and social media registrations; (i) proprietary services and processes, tooling, and (j) all applications and registrations for the foregoing, as each of the foregoing may exist anywhere in the world.

"Interim Balance Sheet" means the unaudited consolidated balance sheet of the Company and its Subsidiaries as at the Interim Balance Sheet Date.

"Interim Balance Sheet Date" means January 31, 2018.

"Interim Financial Statements" means the Interim Balance Sheet and the related unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for the one-month period ended on the Interim Balance Sheet Date.

"Inventory" means (a) all inventory, merchandise, products and other personal property held or stored for the purposes of, or used in connection with, the Business, including finished goods, parts and equipment, raw materials, packaging supplies and work-in-process, (b) any prepaid deposits for such inventory, merchandise, products or other personal property, and (c) any and all rights to the warranties received from suppliers with respect to such inventory, merchandise, products or other personal property (to the extent assignable) and related claims, credits, rights of recovery and set off with respect thereto, in each case, prepared in accordance with GAAP.

"Key Employees" means, collectively, the Sellers.

"Key Man Employment Agreements" means the employment agreements, dated as of the Closing Date, by and between the Company or a Subsidiary and each of the Key Employees, substantially in the form attached hereto as Exhibit A.

"Knowledge of the Sellers" (or any similar phrase) means the actual knowledge of any of the Sellers or the knowledge such Persons should have after reviewing the applicable provisions of this Agreement and undertaking a reasonable investigation to confirm the truth and accuracy of the relevant statement.

"Law" means any law (statutory, common, or otherwise), constitution, treaty, convention, statute, ordinance, code, regulation, rule, by-law or other similar authority enacted, adopted, promulgated, or applied by any Governmental Entity, including all privacy, employment, anti-money laundering, anti-corruption, Trade Compliance and Trade Control Laws, Tax Laws and Environmental Laws.

"Leased Real Property" means the leased office space situated at the following locations: (a) Unit 3, 4/F, Block 4, 51A Ting Kok Road, Tai Ping Industrial Centre, Tai Po, New Territories, Hong Kong and (b) Block 1 Lot 5, Millennium Drive, Light Industry & Science Park (LISP) 3, Brgy. San Rafael, Sto. Tomas, Batangas, Philippines.

"Liabilities" means any liability, Indebtedness or obligation of any nature (whether direct or indirect, known or unknown, fixed or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured, determinable or undeterminable, and whether or not required to be included in financial statements in accordance with GAAP), including those arising under any Action, Law or Contract.

"Mandatory Provident Fund Schemes Ordinance" means the Mandatory Provident Fund Schemes Ordinance (Cap 485) of Hong Kong imposing a compulsory saving scheme for the retirement of employees in Hong Kong.

"Material Adverse Effect" means any change, event, occurrence, effect or circumstance which, individually or in the aggregate, has resulted or could reasonably be expected to result in a material adverse effect on (a) the Business, Assets, Liabilities, results of operations, condition

8

(financial or otherwise) or prospects of the Company or any Subsidiary or (b) the right or ability of the Sellers or the Company to consummate any of the transactions contemplated hereby or by the Ancillary Agreements.

"Ordinary Course of Business" means, with respect to a Person, any action taken by, or the conduct of, such Person that is: (a) consistent with the past practices of such Person in timing, frequency and amount and otherwise taken in the ordinary course of the normal day-to-day operations of such Person; (b) similar in nature and magnitude to actions customarily taken by, or the conduct of, such Person, in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person; and (c) consistent and in accordance with applicable Law.

"Ordinary Shares" means the Ordinary Shares of the Company, as described in the Organizational Documents of the Company, and as detailed (with the holders thereof) in Schedule 2.1, in each case, together with all rights attached, ancillary or related thereto.

"Organizational Documents" means the certificate of incorporation, articles of incorporation, articles of association, by-laws, articles of organization, limited liability company agreement, partnership agreement, formation agreement, operating agreement, joint venture agreement or other similar organizational document of any Person other than any individual (in each case, as amended to date), and including any certificates of designation or other similar instruments.

"Patents" means all U.S. and foreign patents, patent applications, patent disclosures, provisional patents, petty patents, utility models, invention disclosures and other rights of invention worldwide, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, extensions and renewals thereof, and any counterparts claiming priority therefrom.

"Permits" means all licenses, permits, grants, easements, variances, exceptions, franchises, certificates, approvals, findings of suitability, authorizations, consents or orders of, or filings with, or notifications to, any Governmental Entity or any other Person, including Environmental Permits.

"Permitted Encumbrances" means (a) liens for Taxes (i) not yet due and payable or (ii) being contested in good faith, if a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been reflected or reserved against on the Financial Statements, (b) statutory liens of landlords, liens of carriers, warehouse persons, mechanics and material persons and other liens imposed by Law incurred in the Ordinary Course of Business for sums (i) not yet due and payable or (ii) being contested in good faith, if a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been reflected or reserved against on the Financial Statements, (c) liens incurred or deposits made in connection with workers' compensation, employment insurance and other types of social security programs, in each case in the Ordinary Course of Business, and (d) easements, rights-of-way, restrictions and other similar charges or encumbrances imposed on real property, in each case, which (i) do not interfere with the conduct of business of the Company, (ii) were not incurred in connection with any Indebtedness and (iii) do not materially detract from the value of the property upon which such

9

encumbrance exists, in each case, if a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been reflected or reserved against on the Financial Statements.

"Person" means any individual, corporation, partnership, joint venture, association, joint share or stock company, trust, unincorporated organization, limited liability company or any other entity or organization of any kind, including a Governmental Entity.

"Personal Information" means information relating to an identifiable individual as defined by applicable Privacy Law and collected, used, disclosed, stored, maintained, or retained or transmitted by the Company or any of its Subsidiaries including information regarding the Company's or any Subsidiary's customers, suppliers, employees and agents, including, but not limited to, an individual's name, address, age, gender, identification number, income, family status, citizenship, employment, assets, liabilities, source of funds, payment records, credit card or debit card information with or without access codes, security codes or passwords to permit access to such accounts, financial information, personal references, health records and medical insurance numbers., telephone number (including mobile telephone number), e-mail address, Social Security number, state issued identification card number, driver's license number, passport number, trial identification number, personnel records, credit checks or background checks. Personal Information shall not include publicly available information, lawfully made available to the general public in federal, state or local government records.

"Privacy Law" means all federal, state, local or foreign laws or regulations, promulgated or amended from time to time during the term of this Agreement, applicable to Personal Information, as defined herein, collected, used, disclosed, stored, maintained, retained or transmitted by Company or any of its Subsidiaries.

"Privacy Rights" means, collectively, rights respecting (a) privacy generally, (b) the obtaining, storing, using or transmitting of Personal Information of any type, whether via electronic means or otherwise, and (c) spyware and adware.

"Proprietary Rights" means (a) trade secrets and rights in confidential or proprietary information, (b) know-how, discoveries, improvements, processes and procedures, formulae, specifications, and ideas and concepts for products, equipment, processes and services, (c) financial, marketing and business data, pricing and cost information, business and marketing plans and technology roadmaps, (d) lists of actual or potential licensors, licensees, suppliers, vendors, customers, distributors and business partners and related information and profiles, (e) all rights to use all of the foregoing and all other rights in, to, and under any of the foregoing; and (f) all drawings, records, books, tangible or electronic embodiments or other indicia, however evidenced, of any of the foregoing.

"Purchase Price" means $4,000,000.

"Release" means to release, spill, leak, pump, discharge, inject, escape, leech, migrate, dispose, discharge, spray, inoculate, abandon, deposit, seep, pour, emit, empty, throw, dump, place and exhaust and when used as a noun has a similar meaning.

"Release Documents" means all written termination and release agreements reasonably requested by the Buyer to effectuate the provisions set forth in Section 6.3.

"Representative" means, with respect to any Person, any Affiliate of such Person and any officer, director, manager, employee, agent, consultant, accountant, attorney, advisor or other representative of such Person or any such Affiliate.

"Returns" means any and all returns, notices, filings, reports, declarations, designations, documents, elections and information returns or statements (whether intangible, electronic or other form) with respect to Taxes required to be filed with any Governmental Entity or Tax authority or agency or provided to any Person in respect of Taxes, whether domestic or foreign, including consolidated, combined and unitary returns and all amendments thereto or thereof and any documents with respect to or accompanying requests for the extension of time in which to file any such returns, reports, declarations, documents and information statements or other information or filing (including any election, form, disclosure, schedule or estimate), including any schedule or attachment thereto, and any amendment thereof.

"Reviewed Financial Statements" means (a) the reviewed consolidated balance sheet of the Company and its Subsidiaries as at December 31, 2017, and (b) the related reviewed consolidated statements of income, changes in shareholders' equity and cash flows of the Company and its Subsidiaries for each of the fiscal years then ended, together with related footnotes and the reports thereon of the Company's certified public accountants.

"Shareholder Loan" means the revolving credit line made available at Closing by Buyer to the Company in the maximum amount of $1,000,000, pursuant to the terms of the revolving credit line agreement attached hereto as Exhibit B (the "Revolver").

"Shareholders Agreement" means the Shareholders Agreement, dated as of the date hereof, by and among the Company, the Buyer and the Sellers.

"Software" means computer code, programs, software, firmware, applications, programming tools, subroutines, libraries, emulators, objects, databases, modules, algorithms, development tools, diagnostics, and utilities, in each case, in all forms whether in source code, interpreted code or object code form (including system and terminal software programs), and any documentation or manuals related to the same as each of the foregoing may exist anywhere in the world.

"Subsidiary" means any corporation, partnership or limited liability company with respect to which a specified Person (or a subsidiary thereof) owns at least a majority of the common or ordinary shares or has the power to vote or direct the voting of sufficient securities to elect at least a majority of the directors.

"Tax" or "Taxes" means all taxes and governmental charges, however denominated, including without limitation, all income, sales, use, goods and services, harmonized sales, value added, excise, transfer, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, levies, imposts and other assessments or similar charges in the nature of a tax pension plan contributions, employment insurance and unemployment insurance payments and workers' compensation premiums, together with any instalments, assessments or reassessments with respect thereto, and any interest, fines and penalties, in all cases imposed by

any Governmental Entity in respect thereof and whether disputed or not and which the Company or any of its Subsidiaries may be obliged to pay, remit, withhold or collect.

"Trade Compliance and Trade Control Laws" means the U.S. Customs and Border Protection U.S. Department of Commerce (the Export Administration Regulations at 15 C.F.R. Pts. 730 to 774), U.S. Department of State (the International Traffic in Arms Regulations at 22 C.F.R. Pts. 120-130), the U.S. Department of the Treasury (the trade sanctions regulations (Office of Foreign Assets Control) at 31 C.F.R. Pts. 500 to 598), and The Import and Export (Strategic Commodities) Regulations, under the Import and Export Ordinance, Chapter 60, Laws of Hong Kong.

"Trademarks" means all trademarks, service marks, certification marks, trade dress, Internet domain names, trade names, identifying symbols, designs, product names, company names, slogans, logos or insignia, whether registered or unregistered, and all common law rights, applications and registrations therefor, and all goodwill associated therewith.

"Transfer Documents" means all written assignments, agreements, written instruments of transfer, share transfer forms, share powers, notarial deed or endorsement as required under applicable Laws (which include the instrument of transfer, bought note and sold note required by the Hong Kong stamp duty office) or reasonably requested by the Buyer to validly transfer to, and to vest in, the Buyer good and marketable right, title and interest in and to the relevant Subject Securities free of any and all Encumbrances.

     1.2    Construction.

     (a)    Any definition of or reference in this Agreement to any agreement, contract, document, instrument or other record herein shall be construed as referring to such agreement, contract, document, instrument or other record as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein).

     (b)    When a reference is made in this Agreement to any Person such reference shall be construed to include such Person's successors and permitted assigns.

     (c)    The word "will" in this Agreement shall be construed to have the same meaning and effect as the word "shall".

     (d)    When a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference shall be to an Article, Section, Exhibit or Schedule of or to this Agreement unless otherwise indicated.

     (e)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".

     (f)    When a reference in this Agreement is made to a "party" or "parties," such reference shall be to a party or parties to this Agreement unless otherwise indicated.

(g)     Unless the context requires otherwise, the terms "hereof," "herein," "hereby," "hereto", "hereunder" and derivative or similar words in this Agreement refer to this entire Agreement.

(h)     Unless the context requires otherwise, words in this Agreement using the singular or plural number also include the plural or singular number, respectively, and the use of any gender herein shall be deemed to include the other genders.

(i)     Unless otherwise stated, references in this Agreement to "dollars" or "$" are to U.S. dollars. In the event that any Hong Kong or Philippines currency figures are required to be used for purposes of making any calculations under this Agreement or any document or agreement delivered pursuant to this Agreement, or if conversion from United States currency to Hong Kong currency or Philippines is required or necessary to compare or compute figures in either United States currency or Hong Kong currency or Philippines currency, as applicable, all such conversions shall be completed, effected and calculated at the noon nominal closing exchange rate on the date on which such calculation is made, as indicated by the reference rates set forth in The Wall Street Journal

(j)     This Agreement was prepared jointly by the parties and no rule that it be construed against the drafter will have any application in its construction or interpretation.

(k)     References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(l)     Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified and shall be counted from the day immediately following the date from which such number of days are to be counted.

(m)    All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP or shall be interpreted in accordance with GAAP.

## ARTICLE II
## PURCHASE AND SALE OF SHARES

2.1     Purchase and Sale of Subject Securities.

(a)     At the Closing, each of the Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and accept from each of the Sellers, the Subject Securities set forth opposite such Seller's name on Schedule 2.1, free and clear of any and all Encumbrances.

(b)     In consideration for the sale of the Subject Securities pursuant to Section 2.1(a) and the covenants contained in Section 6.7, the Sellers shall receive from the Buyer at Closing, the Purchase Price, with each Seller receiving the portion of the Purchase Price multiplied by the percentage set forth opposite such Seller's name on Schedule 2.1.

2.2     Shareholder Loan. At the Closing the Buyer shall make available the Shareholder Loan. All drawdowns on the Shareholder Loan will be based upon a mutually agreeable business plan prepared by the Sellers and the Buyer. Approval of the business plan by the Buyer shall be a condition to the funding of the Shareholder Loan. The Shareholder Loan will be used by the Company for liquidity and general operational and corporate purposes.

2.3     Closing.

(a)     The closing of the purchase and sale of the Subject Securities contemplated by this Agreement (the "Closing") shall be held at the offices of Robinson & Cole LLP, 1055 Washington Boulevard, Stamford, Connecticut 06901 on the Closing Date. The parties agree that the closing may be consummated by the electronic exchange of signatures.

(b)     At the Closing:

(i)     each Seller shall deliver (or cause to be delivered) to the Buyer:

(A)     all original share certificates evidencing the Subject Securities held by such Seller, duly endorsed for transfer, and all Transfer Documents (including the instrument of transfer and the sold note in respect of the Subject Securities), duly executed by such Seller in favor of the Buyer;

(B)     each of the Ancillary Agreements to which such Seller is party, duly executed by such Seller;

(C)     a certificate of continuing registration issued by the Hong Kong Companies Registry dated a date no earlier than five (5) Business Days prior to Closing, confirming the Company continues to be registered in the Hong Kong Companies Registry;

(D)     evidence, to the satisfaction of the Buyer, of full payment and discharge of any Company Indebtedness in excess of $50,000 and any Company Indebtedness consisting of related party debt regardless of amount, including Company Indebtedness owed to any Seller or Affiliate of any Seller, and the full release of all Encumbrances in connection therewith;

(E)     a certified true copy of the duly passed resolution of the Company authorizing the transfer of the Subject Securities from each of the Seller to the Buyer, authorizing the updating of the register of members and issuance of new share certificate(s) to the Buyer;

(F)     a certified true copy of the duly passed resolution of the shareholders of the Company noting the appointment of directors nominated by the Buyer;

(G)     A copy of the articles of association of the Company, a certified true copy of this Agreement, a letter duly executed by a director of the

Company confirming the Company has not acquired nor has any right to acquire any real property, a copy of the Reviewed Financial Statements;

(H)     a certificate, in form and substance reasonably satisfactory to the Buyer, on behalf of the Company evidencing the resolutions of the directors of the Company authorizing the performance by the Company of its obligations under this Agreement and any Ancillary Agreement;

(I)     all Organizational Documents of the Company and its Subsidiaries, any corporate seal, share register or ledger and share certificate book (with any unissued share certificates) and all minute books and other statutory books as are kept by the Company, and all other Books and Records; and

(ii)     the Buyer shall:

(A)     pay to the Sellers the Purchase Price payable to them pursuant to Section 2.1(b); and

(B)     deliver (or cause to be delivered) to the Sellers: (1) each of the Ancillary Agreements to which the Buyer is party, duly executed by the Buyer; and (2) a certificate, in form and substance reasonably satisfactory to the Sellers, on behalf of the Buyer evidencing (x) the due authority of each Person who has executed this Agreement and any Ancillary Agreement on behalf of the Buyer and (y) a certified true copy of the duly passed resolution of the Buyer authorizing the performance by the Buyer of its obligations under this Agreement and the Ancillary Agreements to which it is a party.

2.4     Transfer Taxes. The Company shall be responsible for payment of any transfer taxes, sales use, registration, documentation or other Taxes imposed upon the transactions contemplated hereby or by the Ancillary Agreements.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY AND ITS SUBSIDIARIES

Except as set forth in a written disclosure schedule (the "Disclosure Schedule") delivered by the Sellers to the Buyer on or prior to the date hereof, a copy of which is attached hereto, the Sellers hereby, jointly and severally, represent and warrant to the Buyer as of the date hereof and as of the Closing Date, as follows:

3.1     Organization.  The Company is organized, subsisting and in good standing as a private company limited by shares under the Laws of Hong Kong and has full corporate power and authority to own, lease and operate its Assets and to conduct its business as it is now conducted and presently proposed to be conducted.  The Company is qualified to do business and is in good standing in each jurisdiction in which the ownership, operation or leasing of its Assets and the conduct of its business requires it to be so qualified.  Each jurisdiction in which the Company is qualified to do business is listed in Section 3.1 of the Disclosure Schedule.  Section 3.1 of the Disclosure Schedule also lists the name and position(s) of each of the Company's

directors and officers. The Company has delivered to the Buyer true, correct and complete copies of the Organizational Documents of the Company. Neither the Company nor any of its Subsidiaries is in in default under or in violation of any provision of its Organizational Documents, and such Organizational Documents will continue in effect without further amendment through the Closing Date.

3.2    Authorization. The Company has the requisite power and authority to execute and deliver this Agreement and each other Ancillary Agreement to which it is (or will be) a party, to consummate the transactions contemplated hereby and thereby and to perform all of its obligations contained herein and therein. The execution and delivery of this Agreement and each such Ancillary Agreement by the Company and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the directors of the Company and no other corporate proceedings are necessary to authorize this Agreement or each such Ancillary Agreement or to consummate the transactions contemplated hereby or thereby. This Agreement has been duly executed and delivered by the Company and (assuming due authorization, execution and delivery by the other parties thereto) constitutes a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors rights generally or (b) general principles of equity, whether considered in a proceeding at Law or in equity. Each Ancillary Agreement to which the Company is (or will be) a party has been (or will be as of the Closing) duly executed and delivered by the Company, and (assuming due authorization, execution and delivery by the other part(ies) thereto) constitutes (or will constitute as of the Closing) a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws in effect which affect the enforcement of creditors rights generally or (b) general principles of equity, whether considered in a proceeding at law or in equity.

3.3    No Conflict. None of the execution, delivery and performance of this Agreement or any Ancillary Agreement, compliance with any of the provisions hereof or thereof or the consummation of the transactions contemplated hereby and thereby, by any of the Sellers or the Company will (a) contravene, conflict with, or result in any violation or breach of any provision of, the Organizational Documents of the Company, (b) except as set forth in under Section 3.3 of the Disclosure Schedule, conflict with, result in a violation or breach of, or constitute a default under (including any such conflict, violation, breach or default resulting from the failure to make or obtain any required notification, consent, waiver or approval under), or result in the acceleration of, or create in any party the right to accelerate, terminate or cancel, or give rise to a right of payment, prepayment or reimbursement, or termination, cancellation, modification or acceleration under, or to additional accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any of Assets of the Company under any provision of, any Company Contract or any Permit held by the Company, in each case whether with or without notice, lapse of time or both, (c) result in a contravention, violation or breach of any Law or Governmental Order applicable to the Company or to any of its business or Assets, or (d) result in an imposition of any Encumbrance, restriction or charge on any of the Assets or the businesses of the Company (other than a Permitted Encumbrance) or on any of the Ordinary Shares.

3.4     Consents and Approvals.  No consent, waiver, agreement, approval, Permit or authorization of, or declaration, filing, notice or registration to or with, or assignment by, any Governmental Entity or other Person is required to be made or obtained by the Company in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement or the consummation of the transactions contemplated hereby and thereby.

3.5     Capitalization.

(a)     The authorized Capital Shares of the Company consists of 1,000 Ordinary Shares, of which 1,000 Ordinary Shares are issued and outstanding. The Company has never issued any Capital Shares other than the outstanding Ordinary Shares.  The Ordinary Shares constitute all of the outstanding Capital Shares of the Company.

(b)     All outstanding Ordinary Shares of the Company have been duly authorized and validly issued, are fully paid and non-assessable, were issued and sold in accordance with applicable Laws and were not issued in violation of any preemptive or other similar rights.  There are no (i) subscriptions, warrants, options, calls, rights of first offer, rights of first refusal, tag-along rights, drag-along rights, subscription rights, conversion rights, exchange rights or other commitments or rights of any character (contingent or otherwise) relating to, or entitling any Person to purchase or otherwise acquire, any Capital Shares of the Company or requiring the Company or any other Person to issue, deliver or sell, or cause to be issued, delivered or sold, or otherwise transfer, or cause to be transferred, Capital Shares of the Company, (ii) obligations of the Company or any other Person to repurchase, redeem, otherwise acquire or retire shares of Capital Shares of the Company, or to pay any dividend or make any distribution in respect of shares of Capital Shares of the Company, (iii) obligations or securities having the right to vote on any matters on which the Sellers may vote or convertible into or exchangeable for any Capital Shares of the Company or any commitments of any character relating to, or entitling any Person to purchase or otherwise acquire, any such obligations or securities, (iv) statutory preemptive rights or preemptive rights granted under the Organizational Documents of the Company, or (v) share appreciation rights, phantom share, profit participation, share-based performance units, or other similar rights with respect to the Company.  Except as set forth in Section 3.5(b) of the Disclosure Schedule, there are no shareholder agreements, voting trusts, proxies or other Contracts governing the affairs of the Company or the relationship, rights and duties of holders of its Capital Shares or relating to the purchase, sale, transfer or voting of its Capital Shares.  Except as set forth in Section 3.5(b) of the Disclosure Schedule, no Capital Shares of the Company is reserved for issuance.  The Sellers own of record and beneficially all of the Ordinary Shares as set forth opposite their names in Section 3.5(b) of the Disclosure Schedule, free and clear of any and all Encumbrances.  At the Closing, Sellers will transfer and convey to the Buyer, and the Buyer will receive from Sellers, good and valid title to the Subject Securities, free and clear of any and all Encumbrances.

(c)     Other than Harvestar Technologies Inc., the Company has no direct or indirect Subsidiaries, either wholly or partially owned, and Company holds no direct or indirect economic, voting or management interest in any Person or owns any securities issued by any Person.  The authorized share capital of Harvestar Technologies Inc. consists of 75,000,000 shares, of which 50,000,000 shares are issued and outstanding, and as to which the Company is the record holder of 49,999,995 shares, with the remaining five shares held by nominee directors.

Neither the Company nor any of its Subsidiaries has any obligation to make any investment in any Capital Shares or debt securities of any Person or to extend any loan to any Person (which, for the avoidance of doubt, shall not include any extension of credit in the Ordinary Course of Business).

(d)     Each Subsidiary of the Company is organized, subsisting and in good standing under the Laws of its jurisdiction of formation or incorporation and has full corporate power and authority to own, lease and operate its assets and to conduct its business as it is now conducted and presently proposed to be conducted. Each Subsidiary of the Company is qualified to do business and is in good standing in each jurisdiction in which the ownership, operation or leasing of its assets and the conduct of its business requires it to be so qualified.

3.6     Absence of Certain Changes. Since the Balance Sheet Date, (A) the business of the Company and its Subsidiaries has been operated in the Ordinary Course of Business and (B) there has been no Material Adverse Effect. Without limiting the generality of the foregoing, except as set forth in Section 3.6 of the Disclosure Schedule, since the Balance Sheet Date, neither the Company nor any of its Subsidiaries has:

(a)     amended or otherwise modified or permitted any waiver of or granted any consents under its Organizational Documents;

(b)     adopted a plan or agreement of liquidation, dissolution, restructuring, merger, consolidation or recapitalization;

(c)     (i) (A) issued, delivered, sold, transferred, pledged, granted, disposed of, or created, permitted, allowed or suffered to exist any Encumbrance on, any of its Capital Shares; or (B) issued, delivered, sold, transferred, pledged, granted, transferred or disposed of, or created, permitted, allowed or suffered to exist any Encumbrance on, any options, warrants, securities convertible into or exercisable for shares of its Capital Shares (including convertible debt) or other rights to purchase or obtain any shares of its Capital Shares; (ii) effected or approved any split, combination, subdivision or reclassification of any shares of its Capital Shares; (iii) declared, set aside or paid any dividend or other distribution; or (iv) redeemed, repurchased, otherwise acquired or retired any shares of its Capital Shares;

(d)     created, incurred, assumed, suffered to exist or guaranteed or otherwise become liable for any Indebtedness or Liability or issued rights to acquire any debt security;

(e)     paid, discharged or satisfied any Liability in the aggregate in excess of $10,000;

(f)     agreed to make any capital expenditures with respect to which payment is to be made after Closing;

(g)     (i) granted, agreed to or announced any increase in or accelerated the compensation, bonus, benefits or commissions, or otherwise increased the compensation, bonus, benefits or commissions payable or to become payable, to any Employee; (ii) granted any rights to retention, severance or termination pay or other pay in lieu of notice to, or entered into any new (or amend any existing) employment, retention, severance or other Contract with, any

Employee; (iii) granted, agreed to or announced any loan, bonus, fee, incentive compensation, service award or other like benefit to or for the benefit of any Employee; (iv) adopted, established, amended or terminated any Benefit Plan, or taken any action to accelerate the vesting, payment or funding of compensation or benefits under any Benefit Plan, to the extent not already provided in any such Benefit Plan; (v) entered into any Contract with any Employee; (vi) caused or suffered any written or oral termination, cancellation or amendment of any Contract with any Employee; or (vii) entered into any collective bargaining agreement;

(h)     entered into or consummated any transaction involving the acquisition of all or substantially all of the business, shares, assets or other properties of any other Person;

(i)     purchased, leased, licensed or otherwise acquired any amount of Assets for consideration in excess of $10,000 individually or $20,000 in the aggregate;

(j)     (i) sold, assigned, transferred, leased, licensed or otherwise disposed of, or waived or canceled any claims or rights to, any amount of Assets other than in the Ordinary Course of Business, to Persons who are not Sellers or Affiliates of the Company or any of its Subsidiaries for fair consideration or (ii) mortgaged, pledged or suffered any other Encumbrance of any Asset, except Permitted Encumbrances;

(k)     suffered any damage, destruction or loss, whether or not covered by insurance, with respect to its business or Assets;

(l)     made any Tax election, changed any annual Tax accounting period, amended any Return, settled or compromised any income Tax Liability, entered into any closing agreement, settled any Tax claim or assessment, surrendered any right to claim a Tax refund or failed to make the payments or consented to any extension or waiver of the limitations period applicable to any Tax claim or assessment;

(m)     entered into or terminated any Material Company Contract or amended or modified, had accelerated or received a notice of default or termination under, any Company Contract;

(n)     made any payment or transferred any Assets of the Company or any of its Subsidiaries to, or entered into, amended or terminated any Contract with, any of the Sellers or their respective Affiliates (other than employment compensation in the Ordinary Course of Business);

(o)     granted, extended, amended (except as required in the diligent prosecution of the Intellectual Property owned by the Company or any of its Subsidiaries), waived or modified any rights in or to, or sold, assigned, leased, transferred, licensed, cancelled or otherwise disposed of, any Intellectual Property owned or licensed by the Company or any of its Subsidiaries, or failed to exercise a right of renewal or extension under any Contract for any such Intellectual Property;

(p)     adopted or changed any of its accounting policies, principles, methods, practices, periods or procedures, including any change in the application or interpretation of GAAP;

(q)     canceled, waived, released, settled or compromised any Action; or

(r)     entered into or approved any Contract to do engage in or cause any of the foregoing.

3.7     Title to Assets; Condition and Sufficiency of Assets.   The Company and its Subsidiaries own, license or lease and have good and marketable title to, or a valid license or leasehold interest in, all Assets necessary for the conduct of the Business as currently conducted and currently contemplated to be conducted and such Assets in the aggregate are in such operating condition and repair (subject to normal wear and tear) as is necessary for the conduct of its businesses as currently conducted and currently contemplated to be conducted.   Such Assets are sufficient to permit the conduct of the Business after the Closing in substantially the same manner as currently conducted and currently contemplated to be conducted.

3.8     Real and Personal Property.

(a)     Neither the Company nor any of its Subsidiaries owns any real property.

(b)     Section 3.8(b) of the Disclosure Schedule sets forth all Contracts pursuant to which the Company or any of its Subsidiaries leases, subleases or otherwise has a right to occupy or use the Leased Real Property, true and correct copies of which have been delivered to the Buyer prior to the date of this Agreement (the "Real Property Leases").   The Company and its Subsidiaries, have a good and valid leasehold interest in and to, and enjoy peaceful and undisturbed possession of the Leased Real Property free and clear of any and all Encumbrances other than any Permitted Encumbrances which would not permit the termination of any Real Property Lease by the lessor thereof.   With respect to each such parcel of Leased Real Property, (i) there are no pending or, to the Knowledge of the Sellers, threatened Actions (including condemnation proceedings) or any other matter that could adversely affect the current or currently contemplated use, occupancy or value relating to such Leased Real Property or any portion thereof, and (ii) neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Sellers, any other Person has entered into any sublease, license, option, right, concession or other Contract granting to any Person the right to use or occupy such Leased Real Property or any portion thereof or interest therein.

(c)     Section 3.8(c)(i) of the Disclosure Schedule identifies all Improvements and Equipment with a net book value of at least $25,000 owned by the Company or any of its Subsidiaries.   The Company and its Subsidiaries have good and marketable title to all Improvements and Equipment purported to be owned by them, free and clear of any and all Encumbrances other than Permitted Encumbrances.  With respect to each such Improvement and item of Equipment, (i) there are no leases, licenses, options, rights, concessions or other Contracts granting to any Person the right of use to any portion of such Improvement or Equipment, (ii) there are no outstanding options or rights of first refusal in favor of any Person to purchase any such Improvement or Equipment or any portion thereof or interest therein, and (iii) there are no parties who are in possession of or who are using any such Improvement or Equipment.   Section 3.8(c)(ii) of the Disclosure Schedule sets forth all Contracts pursuant to which the Company or any of its Subsidiaries leases, subleases or otherwise has a right to use any Improvements or Equipment involving annual payments in excess of $10,000 (the "Other

Leases"), true and correct copies of which have been delivered to the Buyer prior to the date of this Agreement. The Company and its Subsidiaries have good and valid leasehold interests in and to, and enjoy peaceful and undisturbed possession of, all Improvements and Equipment described in the Other Leases, free and clear of any and all Encumbrances other than any Permitted Encumbrances which would not permit the termination of any Other Lease by the lessor thereof.

3.9    Material Company Contracts.

(a)    Section 3.9(a) of the Disclosure Schedule identifies Company Contracts which are in the categories listed below (collectively, the "Material Company Contracts") as of the date hereof.

(i)    any Contract (A) relating to any Ordinary Shares or other Capital Shares or securities of the Company or any of its Subsidiaries or rights in connection therewith or (B) limiting or restricting the ability of the Company or any of its Subsidiaries to make distributions or declare or pay dividends in respect of its Capital Shares;

(ii)    any employment, independent contractor, consulting or other Contract pursuant to which any individual would be contractually entitled to payment by the Company or any of its Subsidiaries of base compensation, fees, or target bonus in excess of $50,000 per annum in the aggregate;

(iii)    any Contract pursuant to which the Company or any of its Subsidiaries (A) has created, incurred, assumed or guaranteed any Indebtedness in excess of $10,000, (B) has created, incurred, assumed or suffered an Encumbrance (other than a Permitted Encumbrance) on any Assets of the Company or any of its Subsidiaries; or (C) the Company or any of its Subsidiaries has made (or promised to make) any loan or advance to, or other investment in, any Person;

(iv)    any Contract pursuant to which the Company or any of its Subsidiaries (A) has committed to ensuring the current or future compatibility of their products and technology with the products or technology of other Persons or (B) has offered or committed to any rebates, discounts, incentives or volume purchase credits to any of its customers or potential customers;

(v)    any Contract pursuant to which the Company or any of its Subsidiaries is subject to a revenue-sharing arrangement or is obligated to pay royalties, commissions or other compensation to any other Person in connection with the Customer Deliverables;

(vi)    any Contract pursuant to which the Company or any of its Subsidiaries licenses, has licensed, granted rights (including by covenant-not-to-sue or non-assert) or has otherwise obtained a right to use any Intellectual Property or technology that is material to the operation of its business as currently conducted or currently contemplated to be conducted, including any Contracts relating to any patent pool or similar arrangement in which the Company or any of its Subsidiaries participates;

(vii)    any master services Contract (together with any related software license, maintenance and other Contracts);

(viii)    any Contract concerning any strategic alliance, partnership or joint venture, and any Contract relating to the joint development, manufacturing or research;

(ix)    any Contract with any vendor, supplier or service provider (other than Employees);

(x)    the Real Property Leases and Other Leases;

(xi)    any other Contract that is reasonably expected to require payments by the Company or any of its Subsidiaries in excess of $25,000 in any year;

(xii)    any Contract that (A) restricts or purports to restrict the business activities of the Company or any of its Subsidiaries the method of conducting, scope (whether geographic or otherwise) or nature of its business, including any covenant not to compete or any restraint or limitation on the right of the Company or any of its Subsidiaries to solicit customers or to solicit or hire employees, (B) grants to the other party to such Contract or any third Person "most favored nation" or similar preferred status or (C) imposes exclusivity obligations on the Company or any of its Subsidiaries;

(xiii)    any Contract to (A) sell, license or otherwise dispose of any Assets of the Company or any of its Subsidiaries other than in the Ordinary Course of Business or (B) issue or sell any Capital Shares;

(xiv)    any confidentiality or non-disclosure Contract;

(xv)    any Contract other than as set forth above to which the Company or any of its Subsidiaries is a party or by which it or any of its Assets or businesses is bound or subject that if breached by the Company or any of its Subsidiaries, or terminated in advance of its scheduled expiration or not renewed, would reasonably be expected to have a Material Adverse Effect;

(xvi)    any written commitment to enter into any agreement of the type described in Sections 3.9(a)(i) through ((xv)).

(b)    Each of the Contracts listed in Section 3.9(a) of the Disclosure Schedule sets forth the entire arrangement and understanding between the Company or any of its Subsidiaries and the other parties thereto with respect to the subject matter thereof and, except as indicated in Section 3.9(b) of the Disclosure Schedule, there have been no amendments or side or supplemental arrangements to or in respect of any such Contract. True, complete and correct copies of all of the Contracts listed in Section 3.9(a) of the Disclosure Schedule (including any amendments or supplements thereto) have been delivered to the Buyer.

(c)    Except as set forth in Section 3.9(c) of the Disclosure Schedule, (i) each Material Company Contract (A) constitutes a valid and binding obligation of the Company and its Subsidiaries; (B) is in full force and effect, and enforceable against the Company and its

Subsidiaries, and, to the Knowledge of Sellers, each other party thereto, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws in effect which affect the enforcement of creditors rights generally or general principles of equity, whether considered in a proceeding at Law or in equity; and (C) was not entered into as a result of non-compliance with any applicable Laws; (ii) neither the Company nor any of its Subsidiaries nor, to the Knowledge of Sellers, any other party thereto is in breach or default under any Material Company Contract, with or without notice or lapse of time or both, and the Company and its Subsidiaries have not given or received notice (whether written or oral) of any dispute, breach or default thereunder; (iii) no action has been taken (or omitted to be taken) by the Company or any of its Subsidiaries and no event or circumstance has occurred or exists that, with notice or lapse of time or both, would constitute a material breach of or default, or permit termination, modification or acceleration by a party thereto (other than the Company and its Subsidiaries) under any such Material Company Contract; and (iv) neither the Company and its Subsidiaries have received any notice (whether written or oral) of any pending or threatened cancellation, revocation, termination or material modification or amendment of any Material Company Contract, and no party has repudiated or disputed any term thereof. Neither the Company nor any of its Subsidiaries has assigned, delegated or otherwise transferred any of its rights or obligations with respect to any such Material Company Contract.

3.10    Compliance with Laws; Permits.

(a)     The Company and its Subsidiaries have at all times been, and are currently in, compliance in all material respects with all Laws. Neither the Company nor any of its Subsidiaries has received any notice to the effect that, and the Sellers do not have any knowledge that, (i) the Company or any of its Subsidiaries is not currently in compliance with, or is in violation of, any applicable Laws, (ii) any Governmental Entity is conducting, or has any intention to conduct, any investigation or review, or any investigation or review by any Governmental Entity is pending or threatened, or (iii) facts or circumstances existing which could reasonably be expected to result in a failure of the Company or any of its Subsidiaries to comply with, or a violation of, any Laws.

(b)     The Company and its Subsidiaries have obtained all Permits necessary for the conduct of the Business as it is currently being conducted or currently contemplated to be conducted, or necessary for the ownership, lease and/or use and operations of their Assets, and hold such Permits free and clear of any Encumbrances. All such Permits are valid, subsisting and in full force and effect and a true, correct and complete list of such Permits is set forth in Section 3.10(b) of the Disclosure Schedule. Neither the Company nor any of its Subsidiaries has violated any such Permit in any material respect, and the Company and its Subsidiaries are in compliance in all material respects with all such Permits. Neither the Company or any of its Subsidiaries has received any notice from any Governmental Entity or other Person threatening to suspend, revoke, withdraw, modify or limit any Permit. No action has been taken (or omitted to be taken) by the Company or any of its Subsidiaries and no event or circumstance has occurred or exists that, with notice or lapse of time or both, would constitute a material breach of or default under, or permit or provide grounds for termination, suspension, revocation, withdrawal or modification of, any such Permit.

23

3.11   Financial Statements.   True and complete copies of the Financial Statements are set forth in Section 3.11 of the Disclosure Schedule.  The Financial Statements (a) have been prepared from, and in accordance with, the Books and Records, (b) have been prepared in accordance with GAAP and all applicable Laws, consistently applied throughout the periods covered thereby, and (c) present fairly, in all material respects, the financial position, results of operations, cash flows and shareholders' equity of the Company as of the dates thereof and for the periods covered thereby (as applicable).  The reserves set forth in the Financial Statements have been determined in accordance with GAAP and adequately provide for the Liabilities and contingencies reserved against.  Neither the Company nor any of its Subsidiaries has engaged in any transaction, maintained any bank account or used any corporate funds except for transactions, bank accounts or corporate funds which have been and are reflected in the Books and Records.  Since the Balance Sheet Date, there has been no change in any of the significant accounting policies, practices or procedures of the Company or any of its Subsidiaries, except as disclosed in the notes to the Financial Statements.  No financial statements of any Person other than the Company and its Subsidiaries are required by GAAP to be included in the Financial Statements.

3.12   Absence of Undisclosed Liabilities.   Except as set forth in Section 3.12 of the Disclosure Schedule, neither the Company nor any of its Subsidiaries has any material Liabilities other than (a) any Liabilities that are reflected and properly reserved against on the Balance Sheet and on any Interim Balance Sheet, (b) Liabilities incurred since the Interim Balance Sheet Date in the Ordinary Course of Business (none of which Liabilities relates to any breach of Contract, tort or violation of Law or Governmental Order or arose out of any Action).  None of the Liabilities of the Company or any of its Subsidiaries has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries has any Liability unrelated to its business and operations as currently conducted.

3.13   Books and Records.   The Company and its Subsidiaries have made and kept, and previously made available to the Buyer true and complete copies of, all Books and Records, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Assets and the other activities of the Company and its Subsidiaries in all material respects.  The books of account and other financial records of the Company and its Subsidiaries (a) reflect all items of income and expense and all Assets and Liabilities required to be reflected therein in accordance with GAAP applied on a basis consistent with the past practices of the Company and its Subsidiaries, (b) are in all material respects complete and correct, and do not contain or reflect any material inaccuracies or discrepancies, (c) have been maintained in accordance with good business and accounting practices, and (d) were prepared in accordance with all applicable Laws.  The minute books of the Company and its Subsidiaries previously delivered or made available to the Buyer are true, correct and complete and accurately and adequately reflect all minutes of meetings, resolutions and other actions previously taken by the shareholders, members, board of directors and committees of the board of directors (by written consent, at a meeting, or otherwise), as the case may be, of the Company and its Subsidiaries in all material respects and contain true, correct and complete copies of its Organizational Documents and all amendments thereto.  The copies of the shareholders ledger and the share certificate books of the Company and its Subsidiaries previously delivered to the Buyer are true, correct and complete and

accurately and adequately reflect all transactions in connection with the Company's and its Subsidiaries' Capital Shares.

3.14    Litigation; Government Orders.  There is no Action pending or, to the Sellers' knowledge, threatened against, by, relating to, or affecting the Company or any of its Subsidiaries or any of its Assets or businesses.  To the Knowledge of Sellers, there are no facts or circumstances existing which could reasonably be expected to result in any such Actions. Section 3.14 of the Disclosure Schedule sets forth a complete and accurate description of all Actions to which the Company or any of its Subsidiaries has been a party, including any such Actions that were settled prior to the institution of formal proceedings.  There is no pending or threatened Action for the dissolution, liquidation, insolvency or rehabilitation of the Company or any of its Subsidiaries and there is no basis for any such Action.  Neither the Company nor any of its Subsidiaries nor, to the Knowledge of Sellers, its Employee is subject to any Governmental Order relating to or affecting the Business of the Company or any of its Subsidiaries and, to the Knowledge of Sellers, there are no facts or circumstances existing which could reasonably be expected to result in any such Governmental Order.

Furthermore, neither the Company nor any of its Subsidiaries, nor any of its directors or executives, nor to the Sellers' knowledge, any persons for whom such Person is vicariously liable is or was the subject of any investigation, inquiry or enforcement proceedings by any authority for any potential violation of any anti-corruption law (including pursuant to the U.S. Foreign Corrupt Practices Act ("FCPA") and any applicable Laws) in relation to the Company or any of its Subsidiaries, and to the Sellers' knowledge no such proceedings, investigations or inquiries have been threatened or are pending and there are no circumstances likely to give rise to any such proceedings, investigations or inquiries.

3.15    Employee Matters.

(a)    Section 3.15(a) of the Disclosure Schedule sets forth a complete and accurate list of the Employees, together with their place of employment, service dates, the current annual salary rates, bonuses (whether monetary or otherwise), deferred or contingent compensation, commission, pension, accrued vacation, "golden parachute" and other like benefits or other material compensation paid or payable (in cash or otherwise) since January 1, 2017 and a description of the position and job function.  Section 3.15(a) of the Disclosure Schedule also lists Employees on inactive status, including lay-off, short-term disability leave, long-term disability leave, pregnancy and parental leave or other extended absences, or receiving benefits pursuant to workers' compensation legislation, and specifies the last date of active employment, the reason for the absence, and the expected date of return of each such Employee.

(b)    Current and complete copies of all Employment Agreements or, where oral, written summaries of the terms thereof, have been delivered or made available to the Buyer. Except for those Employment Agreements listed in Section 3.15(b) of the Disclosure Schedule, there are no Employment Agreements which are not terminable on the giving of reasonable notice in accordance with applicable Law, nor are there any Employment Agreements providing for cash, other compensation, benefits or contingent rights on Closing.

(c)     The Company and its Subsidiaries are in compliance in all material respects with all applicable Laws respecting Employees and employment, including employment practices, employment standards, pay equity, labor relations, employee documentation, workers compensation, occupational safety, plant closings, terms and conditions of employment, equal employment opportunity, human rights, the payment of social security and other Taxes and wages and hours.  Neither the Company nor any of its Subsidiaries is liable for any claims for past due wages or any penalties for failure to comply with any of the foregoing.  The Company and its Subsidiaries have properly classified all Employees and independent contractors in accordance with applicable Laws.  There are no material controversies pending or, to the Knowledge of Sellers, threatened between the Company or any of its Subsidiaries and any of its Employee or former employee and, to the Knowledge of Sellers, there are no facts or circumstances existing which could reasonably be expected to result in any such controversies.  To the Knowledge of Sellers, no Employees have any plans to terminate employment with the Company or any of its Subsidiaries.

(d)     The Company and each of its Subsidiaries have paid to all employees all wages, overtime pay, allowances and any other compensations due and payable to the employees in accordance with applicable Laws, and has paid all insurance contributions or obtained insurance coverage required under applicable Laws.  The Company and each of its Subsidiaries are in compliance with the Mandatory Provident Fund Schemes Ordinance.

(e)     There are no claims, pending claims nor, to the Knowledge of the Sellers, threatened claims pursuant to any Laws relating to the Employees or former employees, including employment standards, human rights, child labor, equal employment opportunity, labor relations, occupational health and safety, workers' compensation, or pay equity.   To the Knowledge of the Sellers, nothing has occurred which might lead to a claim under any such Laws.  There are no outstanding decisions, orders or settlements or pending settlements which place any obligation upon the Sellers to do or refrain from doing any act.

(f)     Section 3.15(f) of the Disclosure Schedule lists all Benefit Plans which the Company or any of its Subsidiaries sponsors, maintains, contributes or is obligated to contribute, or under which the Company or any of its Subsidiaries has or may have any liability.  Each Benefit Plan conforms to and has been operated and administered in compliance with the requirements of such plans and applicable Laws.   Neither the Company nor any of its Subsidiaries is delinquent as to contributions or payments to, or in respect of, any of its Benefit Plans and all amounts payable with respect to the portion of the plan year ending on the Closing will be paid on or before the Closing.

(g)     Except for the Benefit Plans or as disclosed in Section 3.15(g) of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to, or bound by, nor does the Company or any of its Subsidiaries have any liability or contingent liability with respect to any employment policies or plans, whether written or unwritten, funded or unfunded, or formal or informal.

(h)     Except as set forth on Section 3.15(h) of the Disclosure Schedule, neither the Company nor any of its Subsidiaries has used the services of or workers provided by third

party contract labor suppliers, temporary employees, "leased employees" or individuals who have provided services as independent contractors.

(i)     Neither the Company nor any of its Subsidiaries is delinquent in any payments to any of its Employees or leased employees, nor is it aware of any claims for any wages, salaries, commissions, bonuses or other direct compensation for any services performed by them or any amounts required to be reimbursed to such Employees or leased employees, and the Company and its Subsidiaries have made all remittances to Governmental Entities (including without limitation, for income tax, employment insurance, pension benefits and workers compensation) that are required to be made on behalf of such Employees, leased employees or by the Company or any of its Subsidiaries on account of same.

(j)     Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby, or any termination of employment or service or other event or occurrence in connection therewith will or may (i) entitle any current or former employee, director or consultant of the Company or any of its Subsidiaries to any payment or benefit (or result in the funding of any such payment or benefit) or result in any forgiveness of indebtedness with respect to any such persons, (ii) increase the amount of any compensation, equity award or other benefits otherwise payable by the Company or any of its Subsidiaries or (iii) result in the acceleration of the time of payment, funding or vesting of any compensation, equity award or other benefits.

(k)     All current assessments under workers' compensation legislation in relation to the Business of the Company and its Subsidiaries and their contractors and subcontractors have been paid or accrued. The Company and its Subsidiaries have not been and are not subject to any additional or penalty assessment under such legislation which has not been paid and has not been given notice of any audit. The accident cost experience of the Company and its Subsidiaries is such that there are not pending nor, to the Knowledge of the Sellers, potential assessments, experience rating charges or claims which could adversely affect the premium payments or accident cost experience of the Company and its Subsidiaries or result in any additional payments in connection with the Business.

    3.16    Employment and Labor Matters.

(a)     Neither the Company nor any of its Subsidiaries is a party to, or subject to, or a participant in any negotiation of, any labor Contract or any collective bargaining Contract with any labor organization, union, work council, group or association, and there are no employee unions (nor any other similar labor or employee organizations) under Law, custom or practice in respect of any Employees or any Persons providing on site services in respect of the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries has experienced, and is not currently the subject of, any threatened or apparent union organizing activities. Neither the Company nor any of its Subsidiaries is subject to any outstanding Liabilities in respect of former Employees.

(b)     There are no outstanding or, to the Knowledge of the Sellers, threatened unfair labor practices, complaints or applications relating to any labor organization, union, work council, group or association, including any proceedings which could result in certification of

any such Person as the bargaining agent for any Employees or any Persons providing on site services in respect of the Company or any of its Subsidiaries, and there have not been any such proceedings within the last three years.

3.17    Personal Information.

(a)    No misuse or misappropriation of Personal Information has occurred in respect of the Company or any of its Subsidiaries. All consents, approvals, permits, waivers, rulings, exemptions or acknowledgments required to be obtained under applicable Law for the purpose of disclosing Personal Information to the Buyer and the Buyer's advisors in connection with their evaluation of the transactions contemplated by this Agreement have been obtained to the extent that such Personal Information is to be disclosed to the Buyer.

(b)    The collection, use and retention of the Personal Information by the Company and its Subsidiaries, the disclosure or transfer of the Personal Information by the Company and its Subsidiaries to any third parties and transfer of the Personal Information by the Company and its Subsidiaries to the Buyer as part of the Buyer's due diligence and as contemplated by this Agreement or any Ancillary Agreement complies with all Privacy Laws.

(c)    There are no restrictions on the Company or any of its Subsidiaries' collection, use, disclosure and retention of the Personal Information except as provided by Privacy Laws.

(d)    There are no investigations, inquiries, actions, suits, claims, demands or proceedings, whether statutory or otherwise, pending, ongoing, or to the best of the Knowledge of the Sellers, threatened with respect to the Company or any of its Subsidiaries' collection, use, disclosure or retention of the Personal Information.

(e)    No decision, judgment or order, whether statutory or otherwise, is pending or has been made, and no notice has been given pursuant to any Privacy Laws, requiring the Company or any of its Subsidiaries to take (or to refrain from taking) any action with respect to the Personal Information.

(f)    Company has complied and is in compliance with all applicable Privacy Laws.

3.18    Intellectual Property.

(a)    Section 3.18(a) of the Disclosure Schedule sets forth (i) a list of all Intellectual Property owned or purported to be owned or controlled by the Company or any of its Subsidiaries that is patented, registered or for which there are applications for such patents or registration, (ii) a true summary of all material unregistered Intellectual Property owned by the Company or any of its Subsidiaries, including material Proprietary Rights ((i) and (ii) collectively, the "Owned Intellectual Property"), and (iii) a list of all Intellectual Property that is licensed by the Company or any of its Subsidiaries from a third party or which is otherwise presently being used, has been used, or is being held for use, in connection with the business, services, products, or processes of the Company or any of its Subsidiaries as presently conducted and as contemplated to be conducted (the "Licensed Intellectual Property" and, together with the

Owned Intellectual Property, the "Company IP"). In addition, Section 3.18(a) of the Disclosure Schedule sets forth the following information with respect to the Company IP: (A) for each Patent, the number, normal expiration date, title and priority information for each country in which such Patent has been issued, or, the application number, date of filing, title and priority information for each country, (B) for each Trademark, the date first used, the application serial number or registration number, the class of goods covered, the nature of the goods or services, the countries in which the names or mark is used and the expiration date for each country in which a Trademark has been registered, and (C) for each Copyright for which registration has been sought, whether or not registered, the date of creation and first publication of the work, or in the case of mask works the date of first commercial exploitation, the number and date of registration for each country in which a Copyright application has been registered. True, correct and complete copies of each registration, application, license and other Contracts or material documents relating to the Company IP have been delivered to the Buyer.

(b)     Except as set forth on Section 3.18(b) of the Disclosure Schedule, the Company and its Subsidiaries own and have the exclusive right to use all of the Owned Intellectual Property and has valid and enforceable rights to use all of the Licensed Intellectual Property, in each case, free and clear of any and all Encumbrances. The Company IP gives the Company and its Subsidiaries sufficient rights to use, and constitute all of the Intellectual Property used in or necessary for the conduct of the Company's and its Subsidiaries' Business as it is presently being conducted and as currently contemplated to be conducted, including the design, manufacture, lease, promotion and sale of all Customer Deliverables. To the Knowledge of the Sellers, the Owned Intellectual Property is valid, subsisting and enforceable. None of the Company IP includes any Intellectual Property of any former employer of any Employees. All of the pending applications for Owned Intellectual Property have been duly filed, diligently prosecuted and all other actions to protect such Owned Intellectual Property have been taken.

(c)     Neither the Company IP, nor the operation of the Company's business as currently conducted or currently contemplated to be conducted nor the use, development, sale or license of the Customer Deliverables, infringes, dilutes, misappropriates or otherwise violates the Intellectual Property of any third Person. There is no Action pending or, to the Knowledge of the Sellers, threatened against the Company or any of its Subsidiaries related to its infringement or violation or misuse of any Person's Intellectual Property in any manner. Except as set forth in Section 3.18(c) of the Disclosure Schedule, neither the Company nor any of its Subsidiaries (i) has received any notice alleging, nor to the Knowledge of the Sellers, are there facts or circumstances that might give rise to, invalidity with respect to any of the Company IP and (ii) has not (whether orally or in writing) been charged, received notice of, nor to the Sellers' knowledge is it threatened to be charged, with infringement of Intellectual Property rights of others and, to the Sellers' knowledge, there are no facts or circumstances that might give rise to such charge. No Person has notified the Company or any of its Subsidiaries (whether orally or in writing) that it is claiming any ownership of or right to use any of the Company IP.

(d)     Except as set forth in Section 3.18(d) of the Disclosure Schedule, to the Knowledge of the Sellers, no Person is infringing or otherwise violating any Company IP or, in the case of Licensed Intellectual Property that is material to the Business of the Company or any of its Subsidiaries or with respect to which the Company or any of its Subsidiaries has

29

enforcement rights, such Licensed Intellectual Property, and no such infringement claims are pending or threatened against any Person by the Company or any of its Subsidiaries.

(e)     The ownership of the Owned Intellectual Property of the Company or any of its Subsidiaries and rights to use the Licensed Intellectual Property will not be lost, altered, impaired or rendered subject to termination by any third Person, by virtue of the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby.

(f)     All Employees are under written obligation to the Company and its Subsidiaries to maintain in confidence all confidential or proprietary information acquired by them in the course of their engagement and to assign to the Company and its Subsidiaries all inventions made by them within the scope of their employment or engagement with the Company and its Subsidiaries and for a reasonable period thereafter. All Employees who have contributed to or materially participated in the conception, reduction to practice or development of any Intellectual Property, have so contributed or participated either: (i) in a "work-for-hire" Contract with the Company and its Subsidiaries in accordance with applicable Law, that by its terms accords the Company and its Subsidiaries full and exclusive ownership of all right, title and interest in and to, all such Intellectual Property; or (ii) under appropriate instruments of assignment in favor of the Company and its Subsidiaries as assignee that by their terms convey to the Company and its Subsidiaries full and exclusive ownership of all right, title and interest in and to all such Intellectual Property.

(g)     The Company and its Subsidiaries have taken reasonable steps necessary or appropriate (including entering into appropriate confidentiality and nondisclosure agreements with Employees, licensees and customers) to safeguard and maintain the secrecy and confidentiality of their trade secrets and other Proprietary Rights. To the Knowledge of the Sellers, there has not been any breach of such confidentiality or nondisclosure agreement by any party thereto.

(h)     Except as set forth in <u>Section 3.18(h) of the Disclosure Schedule</u>, neither the Company nor any of its Subsidiaries has disclosed or delivered to any escrow agent or other Person any of the source code relating to Software owned or purported to be owned or controlled by the Company or any of its Subsidiaries ("<u>Company Software</u>") or the Customer Deliverables, and no Person has the right, contingent or otherwise, to obtain access to or use of any such source code. Neither the Company Software nor the Customer Deliverables contain any "back door," "time bomb," "Trojan horse," "worm," "drop dead" device, "virus" or other software routines, code or devices designed to permit unauthorized access to or to disable, erase or otherwise adversely affect the operation or functionality of any software, hardware or data without the consent of the user (collectively, "<u>Viruses</u>").

(i)     Except as set forth in <u>Section 3.18(i) of the Disclosure Schedule</u>, no Company Software or component thereof contains any code that is, in whole or in part, subject to the provisions of any license to Software that is made generally available to the public without requiring payment of fees or royalties (including any obligation or condition under any "open source" license) ("<u>Open Source Software</u>"). No Open Source Software used by the Company or any of its Subsidiaries has been used, modified, distributed or conveyed in any way such that the

license obligations or conditions thereof may subject the Company Software to any disclosure or other obligation or restriction. For the purposes of this Section 3.18(i), "modified" or a "modification" means: any addition to or deletion from any part of the Open Source Software; or any integration or incorporation of any part of the Open Source Software with or into the Company Software at any time, including, before, during or after compilation, linking (statically or dynamically) or execution. The Company and its Subsidiaries are in full compliance with the terms and conditions of all licenses governing the use of the Open Source Software and the Company Software and all components thereof. No Company Software is subject to any license terms that (i) require, or condition the use or distribution of any Company IP on, the disclosure, licensing or distribution of any source code for any portion of such Company IP or (ii) otherwise impose any limitation, restriction or condition on the right or ability of the Company or any of its Subsidiaries to use or distribute any Company IP.

(j)    Neither the Company nor any of its Subsidiaries (i) is in violation of any Laws relating to the rights of any Person with respect to Personal Information and/or Privacy Rights, including the Laws relating to the collection, storage, use, security and transfer of Personal Information and (ii) is in compliance with all applicable industry standards relating to Personal Information and/or Privacy Rights.

(k)    All third party servicing, outsourcing, hosting or similar arrangements relating to the management of information relating to the Company are set forth in Section 3.18(k) of the Disclosure Schedule.

3.19    Tax Matters.

(a)    The Company and its Subsidiaries have duly and timely filed with the appropriate Governmental Entities all Returns (including information reporting and related documents) in respect of Taxes required to be filed through the date hereof in all jurisdictions applicable to the Company and its Subsidiaries and will timely file any such Returns required to be filed on or prior to the Closing Date. Each such Return and other information filed by the Company and its Subsidiaries is true, complete and accurate in all material respects and properly reflects and does not in any material respect understate the taxable income or the liability of the Company and its Subsidiaries for such Taxes for the period to which such Return relates. The adjusted cost base or cost amount of the assets of the Company and its Subsidiaries and the undepreciated capital cost or cumulative eligible capital of such assets, for determining future capital cost allowance, amortization and income tax deductions and the various Tax accounts are accurately reflected in the Returns and books and records of the Company and its Subsidiaries. Neither the Company nor any of its Subsidiaries has requested any extension of time within which to file any Return (including information Returns) in respect of any Taxes which has not since been filed. The Sellers have delivered to the Buyer complete and accurate copies of all Returns of the Company and its Subsidiaries for the 2016 tax year, to the extent a Return has been filed or is due. No claim has ever been made by a Governmental Entity in a jurisdiction where the Company or any of its Subsidiaries does not file a Return that it is or may be subject to taxation by that jurisdiction.

(b)    All Taxes for which the Company and its Subsidiaries are or may be liable, whether to taxing Governmental Entities or to third parties, (i) if due and payable, have

been timely paid prior to the Closing Date, or (ii) if not yet due and payable, an adequate reserve (in conformity with GAAP) has been established therefor. Neither the Company nor any of its Subsidiaries has any Liability for Taxes in excess of the amounts so paid or reserves so established. There are no Taxes for which the Company or any of its Subsidiaries is or may become liable that will apply in a period or a portion thereof beginning on or after the Closing Date and that are attributable to income earned or activities occurring before the Closing Date.

(c)     The Company and its Subsidiaries have, within the time and in the manner prescribed by applicable Law, withheld and remitted to the proper Governmental Entities all Taxes required to be withheld or remitted by the Company and its Subsidiaries including without limitation in respect of each payment made to any of its present or former officers, directors, shareholders, employees, any Person who is a non-resident and any other Person.

(d)     Without limiting the generality of the foregoing, the Company and its Subsidiaries are in material compliance with all registration, collection, remittance, timely reporting and record keeping obligations in respect of all sales tax legislation. The Company and its Subsidiaries have properly requested, received and retained all relevant exemption certificates and/or other documentation supporting any claimed exemption or waiver of Taxes on sales or other transactions to which the Company or any of its Subsidiaries otherwise would have been obligated to collect or withhold Taxes.

(e)     No examination, audit or other Action relating to Taxes of the Company or any of its Subsidiaries is currently in progress and no Governmental Entity is asserting or has threatened to assert against the Company or any of its Subsidiaries any deficiency, proposed deficiency or claim for additional Taxes or any adjustment thereof with respect to any period for which a Tax Return has been filed, for which Tax Returns have not yet been filed or for which Taxes are not yet due and payable. Neither the Company nor any of its Subsidiaries has granted any waiver of any limitation period applicable to any claim for Taxes or agreed to any extension of time with respect to any Tax assessment or deficiency. No objections or appeals to any assessment or reassessment have been filed. There is no basis for any adverse reassessment by any Governmental Entity for any year remaining open for reassessment. No power of attorney or authorization has been executed by the Company or any of its Subsidiaries with respect to any open matter relating to Taxes that is currently in force.

(f)     There are no Encumbrances for Taxes (other than for current Taxes not yet due and payable) on the Assets of the Company or any of its Subsidiaries.

(g)     All elections with respect to Taxes affecting the Company or any of its Subsidiaries or their respective Assets as of the date hereof are set forth in Section 3.19(g) of the Disclosure Schedule.

(h)     There are no Tax sharing Contracts or similar Contracts (including indemnity Contracts) currently in effect with respect to or involving the Company or any of its Subsidiaries and, after the Closing Date, neither the Company nor any of its Subsidiaries shall be bound by any such Tax sharing Contracts or similar Contracts or have any Liability under any such Contracts entered into prior to the Closing.

(i)     There is no deductible outlay or expense owing by the Company or any of its Subsidiaries to an Affiliate, except as disclosed in the Balance Sheet, which is unpaid and which will be included in the of the income of the Company or any of its Subsidiaries for any taxation year ending on or after the Closing Date.

(j)     All of the interest which has been paid or is payable by the Company or any of its Subsidiaries or in respect of its debt is deductible in calculating their income for tax purposes.

(k)     Neither the Company nor any of its Subsidiaries is a party to or bound by any Tax indemnity obligation or similar contract or practice with respect to Taxes (including any advance pricing agreement, closing agreement or other contract relating to Taxes with any Governmental Entity).

(l)     Neither the Company nor any of its Subsidiaries has any Liability for Taxes of any other Person, as a transferee or successor, by Contract or otherwise.

3.20    Insurance.  Section 3.20 of the Disclosure Schedule sets forth all policies of, or binders for business interruption, fire, property, casualty, crime, directors and officers, liability, title, worker's compensation, product liability, errors and omissions and other forms of insurance (including bond and surety arrangements) to which the Company or any of its Subsidiaries is a party, a named insured or otherwise the beneficiary of coverage or which are maintained by the Company or any of its Subsidiaries. All such policies and binders are in full force and effect on the date hereof, shall be kept in full force and effect by the Company and its Subsidiaries through the Closing Date and will continue in full force and effect on identical terms following the Closing. Such insurance provides, and during its term has provided, coverage to the extent and in the manner (a) customary, adequate and reasonable for the Company and its Subsidiaries and their respective Assets, businesses and operations and the risks insured against in connection therewith, including replacement cost insurance coverage for all of the Assets and (b) as may be or may have been required by Law and by any and all Contracts to which the Company or any of its Subsidiaries is or has been a party or by which it or any Assets is or has been bound. Neither the Company nor any of its Subsidiaries is in any breach of or default under any of such policies or binders (including with respect to the payment of premiums or the giving of notices), no event has occurred which, with notice or the lapse of time, would constitute a breach or default and neither the Company nor or any of its Subsidiaries has failed to present or give any notice with respect to any material claim under any such policy or binder in a due and timely fashion. No insurer has refused, denied or disputed coverage with respect to the Company or any of its Subsidiaries and there are no unpaid claims under any such policies or binders. No insurer has advised the Company or any of its Subsidiaries that it intends to reduce coverage, materially increase any premium or fail to renew any existing policy or binder and, to the Knowledge of the Sellers, there are no facts or circumstances under which any insurer might be justified in doing any of the foregoing.

3.21    Compliance with Environmental Matters.  Except as set forth in Section 3.21 of the Disclosure Schedule:

(a)     The Company and its Subsidiaries and their operations on the Leased Real Property have complied with and are in compliance, in all material respects, with all applicable Environmental Laws and all Environmental Permits necessary for the conduct of the Business and all such Environmental Permits are in full force and effect.  No Hazardous Materials are or have been treated, stored, handled, Released, discharged or disposed of at, on or under or migrated onto or from the Leased Real Property by or, on behalf of the Company or any of its Subsidiaries in violation of Environmental Laws.

(b)     Neither the Company nor any of its Subsidiaries has received any notice, request for information, complaint, demand, order or similar communication from any Governmental Entity alleging any violation of or liability under any Environmental Laws or any Governmental Order which are necessary or required under any Environmental Laws with respect to the Business or properties of the Company or any of its Subsidiaries or the operation or ownership thereof.

(c)     Neither the Company nor or any of its Subsidiaries has entered into any agreement pursuant to which it has assumed or will assume any liability or obligation under Environmental Law, including any obligation for costs of investigation, monitoring, removal or remediation of Hazardous Materials.

3.22    Inventory.  The Inventory of the Company and its Subsidiaries consists of (a) raw materials and supplies, (b) goods in process, and (c) finished goods, all of which are free from material defects in materials and workmanship and are merchantable and fit for the purpose for which they were procured or manufactured and contain genuine, branded parts obtained from the direct suppliers to (the applicable) original equipment manufacturer.  None of the Inventory is slow-moving, obsolete, damaged, or defective, subject only to the reserve for inventory writedown set forth on the face of the Balance Sheet (rather than in any notes thereto) as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company and its Subsidiaries.

3.23    Prohibited Payments.  Neither the Company nor any of its Subsidiaries, nor any of its agents, directors or executives, nor to the Sellers' knowledge, any persons for whom such Person is vicariously liable is nor has it at any time engaged in any conduct, activity or practice which would violate any money-laundering laws or anti-corruption law, including but not limited to the FCPA or any applicable Laws, nor has it, directly or indirectly, (a) offered, paid, promised to pay, or authorized the payment of any money, or offered, given, promised to give, or authorized the giving of anything of value (including but not limited to tangible and intangible gifts, favors, services, and those entertainment and travel expenses that go beyond what is reasonable and customary and of modest value), directly or indirectly, to or from any Person or any Representative thereof, to obtain favorable treatment in securing business or otherwise to obtain special concessions for the Company or any of its Subsidiaries, (b) offered, paid, promised to pay, or authorized the payment of any money, or offered, given, promised to give, or authorized the giving of anything of value (including but not limited to tangible and intangible gifts, favors, services, and those entertainment and travel expenses that go beyond what is reasonable and customary and of modest value), directly or indirectly, to or for the benefit of any Governmental Entity or political party or any official, employee or agent thereof, for the purpose of affecting his or her action or the action of the Governmental Entity or political party that he or

she represents to obtain favorable treatment in securing business or to obtain special concessions for the Company or any of its Subsidiaries, (c) made or agreed to make any contribution, or reimbursed any political gift or contribution made by any other Person, to any candidate for federal, state, local, municipal, territorial or foreign public office, (d) established or maintained any unrecorded fund or asset for any purpose or made any false entries on the Books and Records of the Company or any of its Subsidiaries for any reason, (e) paid or delivered any fee, commission or any other sum of money or item of property, however characterized, to any finder, agent, government official or other party, in the United States, Hong Kong, the Republic of the Philippines or any other country, which in any manner relates to the Assets, businesses or operations of the Company or any of its Subsidiaries that the Company or such Subsidiary knows or has reason to believe to have been illegal under any Laws (or any rules or regulations thereunder) of any country having jurisdiction, or (f) otherwise used funds of the Company or any of its Subsidiaries for any illegal purpose, including any violation of the FCPA or the equivalent legislation in jurisdictions to which the Company or any of its Subsidiaries is subject. No Seller has, directly or indirectly, in connection with the Company or any of its Subsidiaries or their respective Assets or business, made or agreed to make any payment to any Person connected with or related to any Governmental Entity, except payments or contributions required or allowed by applicable Law.

3.24    Sanctions; Trade Controls.

(a)    Neither the Company nor any of its Subsidiaries nor, to the Knowledge of the Sellers, any director, officer, agent, employee, Seller or Person acting on behalf of such other Person or on behalf of the Company or any of its Subsidiaries is currently the target of any sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department (including the designation as a "specially designated national or blocked person" thereunder), the U.S. State Department, U.S. Commerce Department, the United Nations Security Council or other relevant sanctions authorities (collectively, "Sanctions") nor (i) is the Company or any of its Subsidiaries located, organized or resident in a country sanctioned by any relevant sanctions authority ("Sanctioned Country") nor (ii) has the Company or any of its Subsidiaries, Sellers or any director, officer, agent, employee, or any other Person acting on behalf of the Company or any of its Subsidiaries or Sellers, knowingly shipped goods of the Company or any of its Subsidiaries to, or transacted business with, any Sanctioned Country nor dealt with any customer, supplier or person located or ordinarily residing in a Sanctioned Country.

(b)    The Sellers will not, directly or indirectly, use the proceeds of the transaction, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, to fund any activities of or business with any individual or entity, or in any country or territory, that, at the time of such funding, is the target of Sanctions, or in any other manner that will result in a violation by any Person of Sanctions.

(c)    The Company has been in compliance with all applicable Trade Compliance and Trade Control Laws. Without limiting the foregoing, the Company has not imported, exported or transferred any product, exchanged, supplied, disclosed or provided access to any technical data, or otherwise provided any service contrary to the applicable Trade Compliance and Trade Control Laws.

3.25    <u>Transactions with Certain Persons</u>.  Except as set forth in <u>Section 3.25 of the Disclosure Schedule</u>, no holder of the Ordinary Shares, Seller, Employee or Affiliate of any of the foregoing, and no member of any such Person's immediate family, is currently, or within the last three (3) years has been, a party to any business relationship, transaction or Contract with the Company or any of its Subsidiaries, or owned any asset that is used in the Business of the Company or any of its Subsidiaries, including any Contract (a) providing for the furnishing of services by, (b) providing for the lease or rental of real or personal property from, (c) providing for the borrowing or loaning of money or other property to, or (d) otherwise requiring payments to (other than for dividends or distributions to any holder of Ordinary Shares in his or her capacity as such or for services as Employee in his or her capacity as such), any such Person or any Person in which any such Person has an interest as a holder of Capital Shares or as an officer, director, trustee or partner.  In addition, no such Person has an interest in any Person that engages in competition with the Company or any of its Subsidiaries with respect to any line of products or services of the Company or any of its Subsidiaries in any market presently served by the Company or any of its Subsidiaries (except for ownership of less than one (1%) percent of the outstanding Capital Shares of any corporation that is publicly traded on any recognized exchange or in the over-the-counter market).

3.26    <u>Bankruptcy and Insolvency</u>.  Neither the Company nor any of its Subsidiaries is insolvent and neither the Company nor any of its Subsidiaries is otherwise subject to any Action under any other bankruptcy, insolvency, reorganization, moratorium or other similar Laws and equitable principles relating to or limiting creditors' rights, nor has the Company or any of its Subsidiaries made an assignment in favor of its creditors or a proposal in bankruptcy to its creditors or any class thereof, nor had any petition for a receiving order presented in respect of it. Neither the Company nor any of its Subsidiaries has initiated Action with respect to a compromise or arrangement with its creditors or for its winding up, liquidation or dissolution. No receiver has been appointed in respect of the Company or any of its Subsidiaries or any of their respective properties or assets and no execution or distress has been levied upon any of the properties or assets of the Company or any of its Subsidiaries.  No Action has been taken or authorized by or against the Company or any of its Subsidiaries with respect to any amalgamation, merger, consolidation, arrangement or reorganization of, or relating to, the Company or any of its Subsidiaries nor have any such Action been authorized by any other Person.

3.27    <u>No Other Agreements</u>.  Except as set forth in <u>Section 3.27 of the Disclosure Schedule</u>, other than sales of products and services in the Ordinary Course of Business, none of the Sellers or the Company or any of its Subsidiaries has an obligation of any kind or nature, absolute or contingent, to any other Person to (a) sell or effect a sale of all or any of the Assets of the Company or any of its Subsidiaries, (b) sell or effect a sale of any Capital Shares of the Company, (c) effect any merger, consolidation or other reorganization of, or other business combination involving, the Company or any of its Subsidiaries, or (d) enter into any Contract or cause the entering into a Contract with respect to any of the foregoing.

3.28    <u>Customers and Vendors</u>.

(a)    <u>Section 3.28 of the Disclosure Schedule</u> lists, for the Company and its Subsidiaries, the (i) five (5) largest customers in terms of sales during the twelve (12) month

period ended as of the Balance Sheet Date and states the approximate total aggregate sales by the Company and its Subsidiaries to each such customer during such periods and (ii) five (5) largest vendors during the twelve (12) month period ended as of the date of the Balance Sheet Date and states the approximate total aggregate purchases by the Company and its Subsidiaries from each such vendor during such periods.

(b)     Neither the Sellers nor the Company nor any of its Subsidiaries has received notice of termination or an intention to terminate any relationship with the Company or any of its Subsidiaries from any customer or vendor and to the Sellers knowledge no customer or vendor has grounds for terminating any relationship with the Company or any of its Subsidiaries. Neither the Sellers nor the Company nor any of its Subsidiaries has received any notice or has any reason to believe that any customer of the Company or any of its Subsidiaries has ceased, or will cease, to use the services of the Company or any of its Subsidiaries, including as a result of discontinuing any trial, or has substantially reduced, or will substantially reduce, the use of such services at any time, including as a result of modifying the terms of any trial. Neither the Sellers nor the Company nor any of its Subsidiaries has received any notice or has any reason to believe that any vendor will not sell supplies, services, technology and other goods to the Company or any of its Subsidiaries at any time after the Closing on terms and conditions substantially similar to those used in its current sales to the Company or any of its Subsidiaries, subject only to general and customary price increases.

3.29     Bank Accounts; Powers of Attorney.  Section 3.29 of the Disclosure Schedule contains a complete and correct list of (a) the names and locations of all banks, trust companies, securities brokers and other financial institutions at which the Company or any of its Subsidiaries has an account, lockbox or safe deposit box or maintain a banking, custodial, trading or other similar relationship; (b) the bank, trust company, securities broker and other financial institution in which each such account, lockbox or safe deposit box is held; and (c) the name of every Person authorized to draw thereon or who has access thereto.  There are no outstanding powers of attorney granted by or on behalf of the Company or any of its Subsidiaries.

3.30     No Brokers.  None of the Sellers or the Company or any of its Subsidiaries, nor any of the Employee, holders of Ordinary Shares or any of their respective Affiliates, has employed or made, or will enter into or make, any Contract or understanding with any broker, finder or similar agent or any Person that will result in any Liability of the Company or any of its Subsidiaries or the Buyer or any of their respective Affiliates for any finder's fee, brokerage fee or commission or similar payment in connection with the transactions contemplated hereby and by the Ancillary Agreements, nor is there any claim by any Person, or any basis for a claim by any Person for any such finder's fee, brokerage fee or commission or similar payment.

3.31     Accuracy of Information.  None of the information supplied or to be supplied by or on behalf of the Sellers or the Company or any of its Subsidiaries (a) to any Person for inclusion in any document or application filed with any Governmental Entity having jurisdiction over, or in connection with, the transactions contemplated by this Agreement and the Ancillary Agreements or (b) to Buyer or its Representatives in connection with, pursuant to, or contained in, this Agreement, the negotiations leading up to this Agreement, any Ancillary Agreement, the Disclosure Schedule or the exhibits, Schedules, certificates, documents, written information or lists attached hereto or specifically referred to herein or otherwise in connection with the

transactions contemplated by this Agreement or by such Ancillary Agreements, contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact required to be stated herein or therein or that is necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading. All documents required to be filed, if any, by the Sellers or the Company or any of its Subsidiaries with any Governmental Entity in connection with this Agreement or the transactions contemplated by this Agreement comply in all material respects with the provisions of applicable Law. To the Knowledge of the Sellers, there are no facts, circumstances or developments pertaining to the Company or any of its Subsidiaries or their respective business which would reasonably be expected to have a Material Adverse Effect and which have not been disclosed in this Agreement, the Disclosure Schedule or the Financial Statements, or otherwise disclosed to the Buyer in writing.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLERS

Each of the Sellers hereby, severally and not jointly, represents and warrants to the Buyer as of the date hereof and as of the Closing Date, as follows:

4.1     No Conflict. None of the execution, delivery and performance of this Agreement or any Ancillary Agreement, compliance with any of the provisions hereof or thereof or the consummation of the transactions contemplated hereby and thereby, by any of the Sellers or the Company or any of its Subsidiaries will (a) conflict with, result in a violation or breach of, or constitute a default under (including any such conflict, violation, breach or default resulting from the failure to make or obtain any required notification, consent, waiver or approval under), or result in the acceleration of, or create in any party the right to accelerate, terminate or cancel, or give rise to a right of payment, prepayment or reimbursement, or termination, cancellation, modification or acceleration under, or to additional accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any assets of such Seller under any provision of, any Contract to which such Seller is a party or by which it or any of its assets is bound or any Permit held by such Seller, in each case whether with or without notice, lapse of time or both, (b) result in a contravention, violation or breach of any Law or Governmental Order applicable to such Seller or to any of its business or assets, or (c) result in an imposition of any Encumbrance, restriction or charge on any of the assets or the businesses of such Seller (other than a Permitted Encumbrance) or on any of the Ordinary Shares held by such Seller.

4.2     Consents and Approvals. No consent, waiver, agreement, approval, Permit or authorization of, or declaration, filing, notice or registration to or with, or assignment by, any Governmental Entity or other Person is required to be made or obtained by such Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which such Seller is (or will be) a party or the consummation of the transactions contemplated hereby and thereby.

4.3     Bankruptcy and Insolvency. Each of the Sellers is not an insolvent Person or subject to any bankruptcy, insolvency or other similar Law.

4.4     Ownership of Ordinary Shares.  Such Seller has good and marketable title to, and owns of record and beneficially, the outstanding Ordinary Shares set forth opposite such Seller's name on Schedule 2.1, free and clear of any and all Encumbrances, and has full right and power and authority to deliver such Ordinary Shares to the Buyer as contemplated hereby.  No Seller is a party to any Contract with respect to any Ordinary Shares or Capital Shares of the Company or any of its Subsidiaries, including any Contract that could require such Seller to sell, transfer, or otherwise dispose of any Ordinary Shares other than this Agreement and the Ancillary Agreements.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers:

5.1     Organization.  The Buyer is organized, subsisting and in good standing as a private company limited by shares under the Laws of Hong Kong and has full corporate power and authority to own, lease and operate its assets and to conduct its business as it is now conducted and presently proposed to be conducted.  The Company is qualified to do business and is in good standing in each jurisdiction in which the ownership, operation or leasing of its Assets and the conduct of its business requires it to be so qualified.

5.2     Authorization.  The Buyer has the requisite power and authority to execute and deliver this Agreement and each other Ancillary Agreement to which it is (or will be) a party, to consummate the transactions contemplated hereby and thereby and to perform all of its obligations contained herein and therein.  The execution and delivery of this Agreement and each such Ancillary Agreement by the Buyer and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the directors of the Buyer and no other corporate proceedings are necessary to authorize this Agreement or each such Ancillary Agreement or to consummate the transactions contemplated hereby or thereby.  This Agreement has been duly executed and delivered by the Buyer and (assuming due authorization, execution and delivery by the other parties thereto) constitutes a valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors rights generally or (b) general principles of equity, whether considered in a proceeding at Law or in equity.  Each Ancillary Agreement to which the Buyer is (or will be) a party has been (or will be as of the Closing) duly executed and delivered by the Buyer, and (assuming due authorization, execution and delivery by the other part(ies) thereto) constitutes (or will constitute as of the Closing) a valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as the enforceability thereof may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization or similar Laws in effect which affect the enforcement of creditors rights generally or (b) general principles of equity, whether considered in a proceeding at law or in equity.

5.3     No Conflict.  None of the execution, delivery and performance of this Agreement or any Ancillary Agreement, compliance with any of the provisions hereof or thereof or the consummation of the transactions contemplated hereby and thereby, by the Buyer will (a)

contravene, conflict with, or result in any violation or breach of any provision of, the Organizational Documents of the Buyer, (b) conflict with, result in a violation or breach of, or constitute a default under (including any such conflict, violation, breach or default resulting from the failure to make or obtain any required notification, consent, waiver or approval under), or result in the acceleration of, or create in any party the right to accelerate, terminate or cancel, or give rise to a right of payment, prepayment or reimbursement, or termination, cancellation, modification or acceleration under, or to additional accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance (other than a Permitted Encumbrance) upon any assets of the Buyer under any provision of, any Contract to which the Buyer is a party or by which it or any of its assets is bound or any Permit held by the Buyer, in each case whether with or without notice, lapse of time or both, (c) result in a contravention, violation or breach of any Law or Governmental Order applicable to the Buyer or to any of its business or assets, or (d) result in an imposition of any Encumbrance, restriction or charge on any of the assets or the businesses of the Buyer (other than a Permitted Encumbrance).

     5.4    Consents and Approvals. No consent, waiver, agreement, approval, Permit or authorization of, or declaration, filing, notice or registration to or with, or assignment by, any Governmental Entity or other Person is required to be made or obtained by the Buyer in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which it is (or will be) a party or the consummation of the transactions contemplated hereby and thereby.

     5.5    No Brokers. The Buyer has not employed or made, nor will it enter into or make, any Contract or understanding with any broker, finder or similar agent or any Person that will result in any Liability of the Sellers or any of their respective Affiliates for any finder's fee, brokerage fee or commission or similar payment in connection with the transactions contemplated hereby and by the Ancillary Agreements, nor is there any claim by any Person, or any basis for a claim by any Person for any such finder's fee, brokerage fee or commission or similar payment.

## ARTICLE VI
## COVENANTS

     6.1    Reasonable Best Efforts and Consents. The Company and the Sellers shall take such actions as may be necessary or advisable to make effective the transactions contemplated by this Agreement and the Ancillary Agreements. The Sellers and the Buyer shall (a) cooperate with the other parties hereto and pursue diligently and in good faith and use all reasonable best efforts to, or cause to be taken, all actions necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements and to put the Buyer in possession of the Subject Securities and in final control of the Company and its Assets and (b) execute any documents, instruments or conveyances of any kind that may be necessary or advisable to carry out any of the transactions contemplated by this Agreement and the Ancillary Agreements. Notwithstanding of the foregoing, nothing contained in this Agreement shall require (i) any party or any of its Affiliates to defend or settle any Action should it determine, in its sole discretion, that it is not in its interest to do so or (ii) the Buyer to sell, transfer, divest or otherwise dispose of any of its business or assets (or those of the Company) in

connection with this Agreement or the transactions contemplated by this Agreement and the Ancillary Agreements.

6.2    Publicity.    The parties agree that no public release, statement, issuance or announcement concerning the terms of the transactions contemplated hereby shall be issued by any party without the prior written consent of the Buyer (in the case of any such release, statement, issuance or announcement by Sellers or the Company) or the Sellers (in the case of any such release, statement, issuance or announcement by the Buyer); provided, however, that nothing herein shall restrict any party from disclosing the existence of this Agreement (or the basic terms hereof) or any transaction contemplated hereby (or the basic terms thereof) to the extent that such party deems it necessary or advisable in connection with its reporting obligations to its debt holders or under applicable securities Laws or rules of a securities exchange.

6.3    Termination of Certain Agreements; Release.

(a)    Effective immediately prior to the Closing, all shareholders, investor rights and other Contracts between the Company, on the one hand, and any of the Sellers or their Affiliates, on the other hand, will be automatically canceled, discharged and settled, without any Liability or continuing obligation to the Company, and the Sellers will deliver to the Buyer such additional documentation evidencing such terminations as Buyer may request.

(b)    Each of the parties agrees that all rights of the Sellers or any other Person (other than the Buyer) relating to the Subject Securities shall automatically terminate and be extinguished as of the Closing.  Effective as of the Closing, each Seller hereby knowingly, voluntarily and irrevocably releases, waives and forever discharges, to the fullest extent permitted by Law, on such Seller's own behalf and on behalf of Seller's Affiliates, agents, assignees, attorneys, heirs, executors, administrators and anyone else claiming by or through such Seller (collectively referred to as the "Releasors"), the Company and each of its past, present and future Affiliates (including the Buyer and its Affiliates), holders of Capital Shares, successors and assigns (individually, a "Releasee" and collectively, "Releasees") of and from any and all charges, Encumbrances, demands, Actions, Contracts, obligations, damages (including consequential, punitive or exemplary damages), Liabilities or the like of whatever nature (including attorneys' fees and costs), whether at Law, in equity or otherwise, whether known or unknown, asserted and unasserted, which such Seller or any other such Releasor now have, have ever had or may hereafter have against any of the Releasees on account of, arising out of or relating to any investment in the Company or any other matter, event, cause or circumstances arising at or prior to the Closing (giving effect to the Closing); provided, however, such Seller is not hereby releasing, waiving or discharging any rights to enforce this Agreement or any Ancillary Agreement to which it is party or any rights to indemnification from the Company pursuant to the Organizational Documents of the Company.  Each Seller hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any Action of any kind against any Releasee based upon any matter purported to be released hereby.  If any provision of this Section 6.3(b) is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Section 6.3(b) will remain in full force and effect.  Any provision of this Section 6.3(b) held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

41

6.4     Transition. No Seller will take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier or other business associate of the Company, or any Governmental Authority from maintaining at least as favorable relationships with the Company after the Closing as it maintained with the Company prior to the Closing. Each Seller will, and will cause its Affiliates to, refer all customer inquiries relating to the businesses of the Company to the Buyer, or an Affiliate thereof, from and after the Closing.

6.5     Confidentiality. Following the Closing, each Seller shall treat and hold as such all of the Confidential Information of the Company, refrain from using any of the Confidential Information, except directly in connection with his or her continued employment with the Company or ownership in the Company. If any Seller is ever requested or required (by oral question or request for information or documents in any Action) to disclose any such Confidential Information, then such Seller will notify the Buyer promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with this Section 6.5. If, in the absence of a protective order or the receipt of a waiver hereunder, any Seller that is, on the written advice of counsel, required under applicable Law to disclose any such Confidential Information, then such Seller may disclose such Confidential Information to the extent so required; provided, however, that the disclosing Seller will use its reasonable best efforts to obtain, at the reasonable request of the Buyer, a protective order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed.

6.6     Use of Intellectual Property. The Sellers acknowledge that from and after the Closing Date, the name "Harvestar" and all similar or related names, marks and logos (all of such names, marks and logos being the "Company Marks") shall be owned by the Company, that neither the Sellers nor any of their Affiliates shall have any rights in the Company Marks and that neither the Sellers nor any of their Affiliates will contest the ownership or validity of any rights of the Buyer, the Company in or to the Company Marks.

6.7     Non-Competition; Non-Solicitation.

(a)     Subject to paragraph (b) below, from and after the Closing through the later of (i) the fourth anniversary of the Closing Date or (ii) the second anniversary of the date on which the Sellers cease to own any Ordinary Shares or other securities of the Company (the "Restricted Period"), each Seller shall, and shall cause its respective Affiliates to, not, directly or indirectly, own, manage, operate, engage in or carry on (including in the capacity as an employee or independent contractor) any business substantially similar to or competitive with the Business of the Company, Brightstar Corp. or any of their respective Subsidiaries on the Closing Date, anywhere in the world other than for services on behalf of the Company or any of its Subsidiaries.

(b)     Notwithstanding the foregoing, if the Executive Call Right, as defined in the Shareholders Agreement, is exercised and consummated, then for twelve (12) months immediately following the closing of the Executive Call Right, each Seller shall, and shall cause its respective Affiliates to, not, directly or indirectly, own, manage, operate, engage in or carry on (including in the capacity as an employee or independent contractor) any business substantially similar to or competitive with the business of Brightstar Corp. or any of its

Subsidiaries on the Closing Date anywhere in the world other than for the business conducted by the Company or any of its Subsidiaries on the date of the closing of the Executive Call Right.

(c)     During the Restricted Period, each Seller shall, and shall cause its respective Affiliates to, not, directly or indirectly, hire or engage any employee or consultant of the Company, Brightstar Corp., or any of their Subsidiaries, including any employees or consultants of the Company, Brightstar Corp., or any Subsidiary thereof or induce or attempt to induce any such employee or consultant to leave his or her employment or engagement with the Company, Brightstar Corp., or any of their Subsidiaries; provided, however, that the foregoing will not prohibit the Sellers from soliciting or hiring or engaging any such employee or consultant pursuant to or as a result of a general solicitation that is not directed to the Company's, Brightstar Corp.'s or any of their Subsidiaries' employees or consultants.

(d)     During the Restricted Period, each Seller shall, and shall cause its respective Affiliates to, not, directly or indirectly, solicit, divert, take away or attempt to take away any customer or supplier of the Company, Brightstar Corp., or any of their Subsidiaries who was a customer or supplier on the Closing or during the three (3) year period preceding the Closing or the business or patronage of any such customers or suppliers or in any way knowingly interfere with, disrupt or attempt to disrupt any then-existing relationships between the Company, Brightstar Corp., or any of their Subsidiaries, on the one hand, and any of its or their customers or suppliers at any time, on the other.

(e)     Each Seller agrees and acknowledges that the restrictions in this Section 6.7 are reasonable in scope and duration and are necessary to protect Buyer after the Closing. The parties agree and acknowledge that the breach of this Section 6.7 will cause irreparable damage to Buyer and the Company and upon breach of any provision of this Section 6.7, Buyer and/or the Company will be entitled to injunctive relief (temporary and permanent), specific performance, or other equitable relief without the necessity or proving actual damages; provided, however, that the foregoing remedies will in no way limit any other remedies which Buyer and/or the Company may have.

## ARTICLE VII
## INDEMNIFICATION

7.1     Survival.

(a)     Subject to Section 7.1(c), (i) the representations and warranties contained in Article III (other than the Fundamental Representations and the representation and warranties set forth in Sections 3.15 (Employee Matters), 3.16 (Employee and Labor Matters), 3.17 (Personal Information), 3.18 (Intellectual Property), 3.19 (Tax Matters) and 3.21 (Compliance with Environmental Matters)), the indemnification in Section 7.2(a)(iv), and Buyer's representations and warranties (and any claim arising from, relating to or otherwise in respect of a breach thereof) shall survive the Closing until the date that is eighteen (18) months after the Closing Date, after which time such representations and warranties shall terminate and have no further force or effect (and no claim arising from, relating to or otherwise in respect of a breach thereof may be made), (ii) the representations and warranties (and any claim arising from, relating to or otherwise in respect of a breach thereof) contained in Sections 3.1 (Organization),

3.2 (Authorization), 3.3 (No Conflict), 3.4 (Consents and Approvals), 3.5 (Capitalization), 3.7 (Title to Assets; Condition and Sufficiency of Assets), and 3.29 (No Brokers) and the representations and warranties (and any claim arising from, relating to or otherwise in respect of a breach thereof) contained in Article IV (collectively, the "Fundamental Representations"), shall survive and continue in full force and effect indefinitely, and (iii) the representations and warranties contained in Sections 3.15 (Employee Matters), 3.16 (Employee and Labor Matters), 3.17 (Personal Information) and 3.21 (Compliance with Environmental Matters) shall survive the Closing until the date that is ninety (90) days following the expiration of the applicable statute of limitations (including any extension thereof), after which time such representations and warranties shall terminate and have no further force or effect (and no claim arising from, relating to or otherwise in respect of a breach thereof may be made), and (iv) the representations and warranties contained in Section 3.19 (Tax Matters) and any other representations and warranties with respect to Tax or Taxes will expire ninety (90) days after the date after which the relevant Governmental Entity shall no longer be entitled, taking into account any valid waivers filed or granted in respect of Taxes, to assess or reassess liability for Taxes in respect thereof, provided, for greater certainty, that if a Seller, the Company or any other Person has made any misrepresentation that is attributable to neglect, carelessness or willful default or has committed any fraud in filing a Return or in supplying any information under applicable Laws, the representations and warranties of such Seller in respect of, or related to, Taxes, shall continue in full force and effect without limitation of time to the extent that the assessment or reassessment period can be extended because of such circumstances or as a result of any such waivers filed under applicable Law.

(b)      Subject to Section 7.1(c), unless a specified period is set forth in this Agreement limiting the time in which claims may be made in respect of a breach of such covenant or agreement contained herein (in which event such specified period shall control and any claim arising from, relating to or otherwise in respect of a breach of such covenant shall survive only for such period), all covenants and agreements contained herein shall survive the Closing until the date they otherwise expire (a) by their terms, or (b) if no term is set forth therein, as a matter of applicable Law.

(c)      The period of time a representation or warranty or covenant or agreement survives the Closing pursuant to this Section 7.1 shall be the "Survival Period" with respect to such representation or warranty or covenant or agreement.  In the event notice of any claim for indemnification under this Article VII shall have been given within the applicable Survival Period (and with reasonable specificity in light of the circumstances) and such claim has not been finally resolved by the expiration of such Survival Period, the representations or warranties or covenants or agreements that are the subject of such claim shall survive until such claim is finally resolved.

7.2      Indemnification Obligations of Sellers.

(a)      Subject to the terms of this Article VII, the Sellers shall be liable for and indemnify and hold harmless, on a joint and several basis, the Buyer, its Affiliates (including the Company) and their respective Representatives (each a "Buyer Indemnified Party" and collectively, the "Buyer Indemnified Parties") from and against any and all losses (including diminutions in value), charges, Liabilities, obligations, present or future damages (whether

actual, punitive or consequential), lawsuits, judgments, deficiencies, Taxes, demands, claims, costs, fees and expenses (including interest, penalties, costs of mitigation, attorney or legal fees (on a solicitor and client basis without reduction for tariff rates) and expenses, amounts paid in the investigation, defense or settlement of any of the foregoing, and the costs of enforcing this indemnity) (collectively, "Losses") suffered or incurred by any Buyer Indemnified Party in connection with, arising out of or relating to (i) any breach or inaccuracy of any of the representations or warranties contained in Article III (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or words of similar import or effect) other than the Fundamental Representations and representations contained in Section 3.15 (Employee Matters); (ii) any breach or inaccuracy of any of the Fundamental Representations set forth in Article III or representations contained in Section 3.15 (Employee Matters) (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or words of similar import or effect); (iii) any breach of any of the covenants or agreements of the Sellers or the Company contained in this Agreement; and (iv) the use, development, sale or license of the Company IP or Customer Deliverables alleging that such use, development, sale or license infringes, dilutes, misappropriates or otherwise violates the Intellectual Property of any third Person. Nothing contained in the Disclosure Schedules shall qualify, limit or exclude the obligations pursuant to Section 7.2(a)(iii).

(b)    Subject to the terms of this Article VII, each Seller shall be liable for and indemnify and hold harmless, on a several and not joint basis (based on the Sellers' respective percentages set forth opposite their names in Schedule 2.1), the Buyer Indemnified Parties from and against any and all Losses suffered or incurred by any Buyer Indemnified Party in connection with, arising out of or relating to any breach or inaccuracy of any of the representations or warranties of such Seller contained in Article IV (disregarding all qualifications and exceptions contained therein relating to materiality or words of similar import or effect).

(c)    Other than arising out of or in connection with fraud, willful breach or intentional misrepresentation for which the limitations under this Section 7.2(c) shall not apply, the obligations of the Sellers to indemnify any Buyer Indemnified Party for Losses shall be subject to the following limitations: (i) the Sellers shall not be required to provide indemnification to any Buyer Indemnified Party pursuant to Section 7.2(a)(i) unless the aggregate amount of Losses incurred by all Buyer Indemnified Parties in respect of all claims for indemnification pursuant to Section 7.2(a)(i) exceeds $50,000 (the "Basket"), and then the Buyer Indemnified Parties shall be entitled to indemnification for only the amount Losses exceed the Basket; and (ii) in no event shall the aggregate amount of Losses for which the Sellers are obligated to indemnify the Buyer Indemnified Parties pursuant to Section 7.2(a)(i) exceed $4,000,000 (the "Cap").

(d)    For the avoidance of doubt, neither the Basket nor the Cap shall apply to claims for indemnification pursuant to Sections 7.2(a) (ii), 7.2(a) (iii) or 7.2(b).

(e)    The indemnification provided for in this Section 7.2 is not limited to Third-Party Claims.

7.3    Indemnification Obligations of Buyer.

(a)    Subject to the terms of this Article VII, the Buyer shall be liable for and indemnify and hold harmless the Sellers, their Affiliates and their respective Representatives (each a "Seller Indemnified Party" and collectively, the "Seller Indemnified Parties") from and against any and all Losses suffered or incurred by any Seller Indemnified Party in connection with, arising out of or relating to (i) any breach or inaccuracy of any of the representations or warranties contained in Article V (disregarding all qualifications and exceptions contained therein relating to materiality or words of similar import or effect); and (ii) any breach of any of the covenants or agreements of the Buyer contained in this Agreement.

(b)    The indemnification provided for in this Section 7.3 is not limited to Third-Party Claims.

7.4    Indemnification Procedures, Limitations and Other Matters.

(a)    In the event that any Action is commenced by a third party involving a claim for which a party required to provide indemnification hereunder (an "Indemnifying Party") may be liable to a party entitled to indemnification (an "Indemnified Party") hereunder (a "Third Party Claim"), the Indemnified Party shall promptly notify the Indemnifying Party in writing of such Third Party Claim (the "Claim Notice"); provided that no delay on the part of the Indemnified Party in giving any such Claim Notice shall relieve the Indemnifying Party of any indemnification obligation hereunder except to the extent that the Indemnifying Party is materially prejudiced by such delay.   Any Claim Notice shall set forth, with reasonable specificity in light of the circumstances, the basis of the claim for the Losses.   Subject to the Indemnifying Party (i) acknowledging and agreeing in writing (in form and substance reasonably satisfactory to the Buyer) that the Buyer Indemnified Parties will be indemnified by the Indemnifying Party in respect of any Losses they may incur or suffer in connection with any Third Party Claim, (ii) providing reasonable written assurance to the Buyer of the financial capacity of the Indemnifying Party to meet such indemnification obligations, and (iii) as to any Third Party Claim relating to Taxes, in Buyer's sole discretion, the result of such claim does not have the potential of impacting post-close Tax periods, then  the Indemnifying Party, upon giving notice to such Indemnified Party, shall be entitled to assume the defense of such Third Party Claim with counsel of its own choosing (reasonably satisfactory to the Indemnified Party) and, in such an event (A) the Indemnifying Party will be entitled to prosecute, appeal, negotiate, resolve, settle, compromise, arbitrate or otherwise pursue such Third Party Claim, in whole or in part; and (B) the Indemnifying Party shall have no obligation to indemnify or pay for or reimburse any Indemnified Party for any attorneys' fees, investigation costs or litigation or other defense expenses incurred by the Indemnified Party after the assumption of the defense of such Third Party Claim; provided, however, that the Indemnifying Party shall not, without the prior written consent of the Indemnified Party, settle, compromise or consent to the entry of any judgment in respect of any Third Party Claim if (1) any Indemnified Party is a party to the applicable claim or has been actually threatened to be made a party thereto, unless such settlement, compromise or consent includes a complete and unconditional release of each Indemnified Party from all liability arising out of such claim; or (2) such settlement, compromise or consent would lead to any Liability or create any financial or other obligation on the part of the Indemnified Party for which the Indemnified Party is not entitled to indemnification

hereunder; provided further, however, that the Indemnifying Party shall not be entitled to assume the defense or settle, compromise or consent to the entry of any judgment in respect of any Third Party Claim if the Third Party Claim could (x) impose injunctive or other equitable relief against the Indemnified Party or (y) require the admission of criminal or civil wrongdoing by any Indemnified Party. Notwithstanding the foregoing, the Indemnified Party shall have the right to control, pay or settle any Third Party Claim which the Indemnifying Party shall have undertaken to defend so long as the Indemnified Party shall also waive any right to indemnification therefor by the Indemnifying Party. If the Indemnifying Party fails to assume the defense of any Third Party Claim in accordance with this Section 7.4(a) (including providing the written acknowledgement and assurance contemplated above) within ten (10) days after receipt of the Claim Notice or is not entitled hereunder to assume the defense of any Third Party Claim, the Indemnified Party shall have the right to undertake, at the Indemnifying Party's cost, risk and expense, the defense, compromise and settlement of such Third Party Claim on behalf of and for the account of the Indemnifying Party in the Indemnified Party's reasonable discretion.

(b)     The Indemnified Party at its own expense shall be entitled to participate in (but not control) the defense of any Third Party Claim and to employ counsel of its choice for such purpose.

(c)     In calculating amounts payable to an Indemnified Party, the amount of any indemnified Losses shall be (i) determined without duplication of any other Loss which has been paid under any other representation, warranty, covenant, or agreement hereunder; and (ii) computed net of payments then already recovered by any Indemnified Party under any insurance policy with respect to such Losses (after deducting reasonable costs and expenses incurred in connection with recovery of such proceeds, including actual or reasonably anticipated premium increases).

(d)     To the extent that the Indemnifying Party makes any payment pursuant to this Article VII in respect of Losses for which the Indemnified Party has a right to recover against a third party (including an insurance company), the Indemnifying Party shall be subrogated to the rights of the Indemnified Party to seek and obtain recovery from such third party. The Indemnifying Party shall only be entitled to seek and obtain recovery from any third party pursuant to this Section 7.4(d) to the extent that pursuing such recovery would not reasonably be expected to materially adversely affect any material on-going business relationship between such third party and the Indemnified Party or its Affiliates.

(e)     Each Seller acknowledges and agrees that, from and after the Closing, the Company shall not have any Liability or obligation to indemnify or hold harmless or otherwise pay, reimburse or make any Buyer Indemnified Party or the Sellers whole, for or on account of any claim for indemnification under this Article VII.

(f)     The right to indemnification under this Agreement and any other remedies based upon breach of representations, warranties, covenants, agreements or obligations will not be affected by any investigation conducted with respect to, or knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, whether as a result of disclosure by a party hereto or otherwise, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant,

agreement or obligation. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant, agreement or obligation, will not affect the right to indemnification or other remedy based on such representations, warranties, covenants, agreements and obligations.

(g) Any indemnification payment made under this Agreement shall be treated as an adjustment to the Purchase Price for Tax purposes. If any Indemnified Party is required under applicable laws to pay Taxes in respect of an amount received in respect of any claim for indemnification submitted hereunder by way of indemnification as determined hereunder, the Indemnifying Party shall pay such additional amount as is necessary to place the Indemnified Party in the same after tax position as it would have been if no Taxes (except as provided in the previous sentence) had been payable by the Indemnified Party on the amount received by the Indemnified Party in respect of any such claim.

7.5     Tax Indemnification and Other Tax Matters.

(a) Notwithstanding anything to the contrary in this Agreement, the Sellers shall, jointly and severally, indemnify and hold harmless each Buyer Indemnified Party from and against any and all Losses incurred in connection with, arising out of, resulting from or relating to (i) any and all Taxes of the Company (A) with respect to all periods ending on or prior to the Closing Date (the "Pre-Closing Period") or (B) attributable, in the case of any period beginning before the Closing Date and ending after the Closing Date (the "Straddle Period"), to the portion of such period up to and including the Closing Date (such portion shall be referred to herein as the "Pre-Closing Partial Period" and the portion of such period after the Closing Date shall be referred to herein as the "Post-Closing Partial Period"), (ii) any Liability of the Company for Taxes (A) as a transferee, assignee or successor, where the Company's status as a transferee, assignee or successor arose prior to Closing, or (B) under any Contract entered into by the Company prior to Closing, (iii) any failure by the Company to comply with any requirements imposed on the Company prior to Closing relating to the preparation, filing or provision of any Returns, (iv) any Tax deductions asserted by the Company prior to Closing in respect of revenue to be realized by the Company after the Closing and (v) any failure by the Company to comply, prior to the Closing, with any requirements to withhold or to remit amounts required to be withheld.

(b) The determination of the Taxes attributable to the Pre-Closing Partial Period of a Straddle Period shall be based, in the case of real and personal property Taxes, on a per diem basis and, in the case of other Taxes, on the actual activities or income of the Company during such Pre-Closing Partial Period and Post-Closing Partial Period.

(c) In the case of Returns for such periods filed after Closing, the Buyer for Pre-Closing Periods shall cause the Company to prepare and file all Returns in respect of Taxes for Straddle Periods. Reasonably promptly after the Company or the Buyer acquires actual knowledge of an amount of Taxes due and unpaid with respect to any Pre-Closing Period or Straddle Period, the Company or the Buyer, as the case may be, shall notify the Sellers of the amount of Taxes allocable to the Pre-Closing Period or Pre-Closing Partial Period. The Sellers shall pay the amount of such Taxes to the Company or the Buyer, as the case may be, not later than the earlier of (i) the date on which such Taxes became due or (ii) 30 days after the receipt of

such notice. If the Sellers disputes such amount, then the Sellers shall provide a written notice of such dispute together with the applicable payment. The Buyer and the Sellers shall use their respective reasonable efforts to resolve any such dispute, and if no resolution is achieved within two (2) months, the Sellers and the Buyer shall refer the matter to an Independent Accounting Firm, whose determination of the issue for which there is disagreement shall be final and binding on the Sellers and the Buyer. Upon resolution or determination of any dispute, the Buyer and the Sellers shall make payments to settle such dispute in accordance with the results of such resolution or determination.

(d)    The Buyer shall control the conduct of all audits or other proceedings relating to Taxes of the Company for Pre-Closing Periods and Straddle Periods. Where such audits or other proceedings may give rise to a payment obligation (whether pending resolution of any dispute or as a result of the resolution of any dispute) on the part of Sellers under this Section 7.5, then the Buyer shall, to the extent permitted under applicable procedures, provide the Sellers with the right to participate in, but not control, such audit or other proceeding. In the event that the Sellers or the Buyer receive notice of a claim, audit or other proceeding against the Company with regard to a Pre-Closing Period or Straddle Period from any Tax authority, such party shall promptly notify the other parties of such claim.

(e)    Buyer may not settle or otherwise resolve any claim, audit or proceeding involving Taxes for a Pre-Closing Period or Straddle Period on a basis that would give rise to a payment obligation on the part of Sellers under this Section 7.5 without the consent of the Sellers, which consent shall not be unreasonably withheld, delayed or conditioned.

(f)    The Sellers and the Buyer shall furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance (including access to books and records) relating to the Company as is reasonably necessary for the preparation of any Return, claim for refund or audit, and the prosecution or defense of any claim, suit or proceeding relating to any proposed adjustment.

7.6    Buyer's Right of Offset. Notwithstanding anything contained in this Agreement to the contrary, the Buyer may withhold and set off against any and all amounts due to the Sellers under this Agreement, any and all amounts claimed against the Sellers hereunder, including pursuant to any provision of this Article VII.

## ARTICLE VIII
## MISCELLANEOUS

8.1    Assignment. This Agreement and the rights and obligations hereunder are not assignable or otherwise transferable unless such assignment or transfer is consented to in writing by both the Sellers and the Buyer; provided, however, that the Buyer may assign any rights (but not obligations) under this Agreement to any of its Affiliates or to any lender(s) as collateral security. Subject to the preceding sentence, this Agreement and all the provisions hereof shall be binding upon and shall inure to the benefit of the parties and their respective successors and permitted assigns. Any attempted assignment in violation of this Section 8.1 shall be null and void and of no effect.

8.2   <u>Notices</u>.   All notices, consents, waivers, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when received if delivered personally, (b) when sent by electronic mail or facsimile (which is confirmed by the intended recipient), and (c) when sent by overnight courier service or when mailed by certified or registered mail, return receipt requested, with postage prepaid to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Sellers:

> Tyler Miller
> 515 Grand Oaks Drive
> Brentwood, TN 37027
> Tel: +16154403664
> Fax: +85235946100
> Email: tmiller@harvestarsl.com

> Omar Elmi
> PO BOX 44716
> Eden Prairie, MN 55344
> Tel: 85293330241
> Fax: 85235946100
> Email: oelmi@harvestarsl.com

With a copy to:

> McKenzie Laird Ottinger Leach, PLLC
> 3835 Cleghorn Avenue, Suite 250
> Nashville, TN 37215
> Tel: (615) 916-3223
> Email: rlaird@mckenzielaird.com
> Attention:  Robert H. Laird, Jr.

If to the Buyer, addressed to:

> Brightstar Corp.
> 9725 NW 117th Avenue, Suite 300
> Miami, Florida 33178
> Tel: (305) 994-3324
> Fax: (305) _____
> Attention:  Catherine Smith, General Counsel

With a copy to:

> Robinson & Cole LLP
> 1055 Washington Boulevard, 10th Floor
> Stamford, Connecticut 06901

Tel: (203) 462-7500
Fax: (203) 203-462-7599
Attention: Eric M. Kogan

8.3     Governing Law; Venue; Waiver of Jury Trial.  This Agreement shall be governed, construed and interpreted and the rights of the parties determined in accordance with the internal Laws of the State of New York applicable therein without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of New York applicable therein.  Each of the Sellers and the Company irrevocably consent to the service of any and all process in any Action arising out of or relating to this Agreement by registered or certified mail, return receipt requested, to the Sellers at their address specified in Section 8.2.  All Actions brought against the parties arising out of or relating to this Agreement, or any obligations hereunder, shall be brought in a federal or state court situated in the State of New York.  By executing and delivering this Agreement, the parties irrevocably: (a) accept generally and unconditionally the non-exclusive jurisdiction and venue of any such court; (b) waive any objections which such party may now or hereafter have to the laying of venue of any of the aforesaid Actions arising out of or in connection with this Agreement brought in any such court and hereby further irrevocably waive and agree not to plead or claim in any such court that such Action brought in any such court has been brought in an inconvenient forum; (c) agree that service of all process in any such Action in any such court may be made by registered or certified mail, return receipt requested, to such party at their respective addresses provided in accordance with Section 8.2; and (d) agree that service as provided in Section 8.3(c) is sufficient to confer personal jurisdiction over such party in any such Action in any such court, and otherwise constitutes effective and binding service in every respect.  **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATED IN ANY WAY WHATSOEVER (WHETHER IN CONTRACT, TORT OR OTHERWISE) TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

8.4     Entire Agreement; Amendments and Waivers.  This Agreement and the Ancillary Agreements (including the Exhibits and Schedules, including the Disclosure Schedule) constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to such subject matter; provided, however, this Agreement shall not supersede the terms and provisions of the Confidentiality Agreement, which shall survive and remain in effect until expiration or termination thereof in accordance with its terms and this Agreement. This Agreement may be amended, modified or supplemented only by a written mutual agreement executed and delivered by the Sellers and the Buyer. Except as otherwise provided in this Agreement, any failure of any party to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefits thereof only by a written instrument signed by the party granting such waiver, but such waiver, or delay in or failure to insist upon strict compliance with such obligations, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure to so comply.

8.5     Counterparts.  This Agreement may be executed in any number of counterparts, each of which when executed, shall be deemed to be an original and all of which together shall

be deemed to be one and the same instrument binding upon all of the parties notwithstanding the fact that all of the parties are not signatory to the original or the same counterpart. For purposes of this Agreement, facsimile signatures shall be deemed originals.

8.6     Severability.  In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument; provided that in no event shall Buyer be required to acquire less than all of the Subject Securities.

8.7     Fees and Expenses.  Subject to the provisions of Article VII, each party shall be responsible for its own costs, fees and expenses incurred in connection with the preparation, negotiation, execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby, including all fees and expenses of financial advisors, accountants, lawyers and other Representatives of such party.

8.8     Specific Performance.  The parties agree that if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at Law would exist and damages would be difficult to determine, and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at Law or in equity.

8.9     No Third Party Beneficiaries.  Expect for the Seller Indemnified Parties and the Buyer Indemnified Parties, who shall be intended third party beneficiaries with respect to Article VII with the right to directly enforce the same against the parties as if signatories hereto, this Agreement is for the sole benefit of the parties and their successors and permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties and such successors and permitted assigns, any legal or equitable rights hereunder.

[*Signature page follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

**COMPANY:**

**HARVESTAR SOLUTIONS LIMITED**

By:
    Name: TYLER MILLER
    Title: DIRECTOR

**BUYER:**

**BRIGHTSTAR ASIA LTD.**

By:
    Name:
    Title:

**SELLERS:**

Tyler Miller

Omar Elmi

[Signature Page to Share Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

COMPANY:

HARVESTAR SOLUTIONS LIMITED

By:_____
    Name:
    Title:

BUYER:

BRIGHTSTAR ASIA LTD.

By:_____
    Name: Noel Marsden
    Title: Director

SELLERS:

_____
Tyler Miller

_____
Omar Elmi

[Signature Page to Share Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on their respective behalf, by their respective officers thereunto duly authorized, all as of the day and year first above written.

**COMPANY:**

**HARVESTAR SOLUTIONS LIMITED**


By:_____
    Name:
    Title:


**BUYER:**

**BRIGHTSTAR ASIA LTD.**


By:_____
    Name:
    Title:


**SELLERS:**


_____
Tyler Miller


_____
Omar Elmi

Schedule 2.1

Sellers

| Seller Name | Ordinary Shares Owned | Ordinary Shares to be Sold | Seller Percentage |
|---|---|---|---|
| Tyler Miller | 500 | 255 | 50% |
| Omar Elmi | 500 | 255 | 50% |

## EXHIBIT A

(Form of Key Man Employment Agreement)

## EXHIBIT B

(Form of Revolving Credit Line Agreement)