**EXECUTION VERSION**

SHAREHOLDERS AGREEMENT

by and among

HARVESTAR SOLUTIONS LIMITED.

and

THE SHAREHOLDERS NAMED HEREIN

dated as of April 9, 2018

**EXECUTION VERSION**

# SHAREHOLDERS AGREEMENT

THIS SHAREHOLDERS AGREEMENT (this "Agreement") is made as of April 9, 2018, by and among (i) HARVESTAR SOLUTIONS LIMITED, a Hong Kong private company limited by shares ("Company"), (ii) BRIGHTSTAR Asia Ltd., a Hong Kong private company limited by shares ("Brightstar" and any additional parties deemed an Investor pursuant to Sections 16 and 17, collectively the "Investors"), (iii) TYLER MILLER, an individual ("Miller"), and (iv) OMAR ELMI, an individual ("Elmi" and together with Miller, and any additional parties deemed an Executive pursuant to Sections 16 and 17 collectively the "Executives").  The Investors and the Executives are collectively referred to herein, along with other Shareholders who become parties to this Agreement pursuant to the provisions of Sections 16 and 17, as the "Shareholders" and each, individually, as a "Shareholder."  A schedule of Shareholders (the "Schedule of Shareholders") is attached hereto.  Certain capitalized terms used herein and not otherwise defined herein shall have the respective meanings given to such terms in Exhibit A.

## BACKGROUND

A.      Pursuant to the Share Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), by and among the Company, Brightstar, Miller and Elmi, Brightstar acquired 510 of the issued and outstanding Ordinary Shares constituting fifty-one percent (51%) of the Ordinary Shares of the Company from the Executives.

B.      The execution and delivery of this Agreement is a condition to the consummation of the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, incorporating the foregoing and in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties to this Agreement hereby agree as follows:

1.      Governing Bodies.

(a)      Voting Agreement.  Each Shareholder shall vote all of such Shareholder's Ordinary Shares and any other voting Securities of the Company over which such Shareholder has voting control from time to time and shall take all other actions reasonably necessary or desirable within such Shareholder's control (whether in such Shareholder's capacity as a Shareholder, member of any Governing Body or committee thereof or officer of the Company or its Subsidiaries or otherwise, and including attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company shall take all necessary and desirable actions within its control (including calling special board and Shareholder meetings), so that:

(i)      the authorized number of members on the Governing Bodies of the Company and its Subsidiaries shall comprise at least five members, or such greater number as may be determined by Brightstar;

(ii)     the following Persons shall be elected to the Governing Bodies of the Company and its Subsidiaries, it being understood that Brightstar shall at all times have the right, exercisable in its discretion, to select a number of members of the Governing Body of each of the Company and any of its Subsidiaries who have not less than a majority of the voting power of such Governing Bodies:

(A)     any representative designated by Brightstar pursuant to <u>Section 1(a)(ii)</u> (the "<u>Brightstar Directors</u>"), who shall initially be Joe Kalinoski, Andy Zeinfeld and Michael Singer and after the date of this Agreement, such other Persons who are designated by Brightstar from time to time pursuant to this clause (A) to appoint or replace any new, or to replace any or all of the initial, Brightstar Directors;

(B)     for as long as Miller and his Permitted Transferees hold, in the aggregate, not less than 5% of the Ordinary Shares (as adjusted for stock splits, stock dividends, recapitalizations and the like) Miller shall have the right to appoint one representative to the Governing Bodies of the Company and its Subsidiaries (the "<u>Miller Director</u>"); and

(C)     for as long as Elmi and his Permitted Transferees hold, in the aggregate, not less than 5% of the Ordinary Shares (as adjusted for stock splits, stock dividends, recapitalizations and the like) Elmi shall have the right to appoint one representative to the Governing Bodies of the Company and its Subsidiaries (the "<u>Elmi Director</u>" and together with the Miller Director, the "<u>Executive Directors</u>");

(iii)     the removal (with or without cause) of any Brightstar Director or any Executive Director, if applicable, shall be only upon the written request to the applicable Governing Body by the Person or Persons entitled to designate such director pursuant to <u>Section 1(a)(ii)</u>;

(iv)     in the event that any representative designated hereunder for any reason ceases to serve as a member of the Governing Body during his or her term of office, the resulting vacancy on such Governing Body shall be filled by a representative designated by the Person or Persons entitled to designate such director pursuant to <u>Section 1(a)(ii)</u>;

(v)     if any Person fails (but is otherwise entitled) to designate a representative to any Governing Body pursuant to the terms of this <u>Section 1</u>, the election of a Person to such Governing Body shall be accomplished in accordance with the Organizational Documents applicable to such Governing Body and applicable Law; *provided*, that the parties shall take all necessary actions to remove such individual if the Person or Persons which failed (and are otherwise entitled) to designate such a representative so directs.

(b)     <u>Required Meetings; Insurance</u>.  There shall be at least four meetings of the Governing Body of the Company during every fiscal year.  Meetings of the Governing Body and its Subsidiaries may be conducted by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in such a meeting constitute presence in person at the meeting.  Any action required or permitted to be taken at any meeting of the Governing Body of the Company or any of its Subsidiaries or of any committee thereof may be taken without a meeting if all directors of the Governing Body or committee, as the case may be, consent thereto in writing, or by electronic

transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Governing Body or committee, as the case may be. The Company shall maintain customary directors' and officers' insurance covering members of the Company's and its Subsidiaries' Governing Bodies in amounts determined by the Governing Body of the Company.

(c)     Compensation Committee.  The Brightstar Directors shall have the right to be members of, and shall have the majority of the votes on, any committee established by the Governing Body of the Company or any of its Subsidiaries.  The Company shall cause to be established, as soon as practicable, and will maintain, a compensation committee to establish and approve compensation for management and other highly compensated employees, all at the discretion of and pursuant to any powers and authority established from time to time by, the Governing Body of the Company.

(d)     Quorum.  At all meetings of any Governing Body of the Company or any of its Subsidiaries, members entitled to cast a majority of the votes of the entire Governing Body shall constitute a quorum for the transaction of business and the act of members entitled to cast a majority of the votes present at any meeting at which there is a quorum shall be the act of such Governing Body, except as may be otherwise specifically provided by the Companies Ordinance of Hong Kong or by the Organizational Documents of the Company or its Subsidiaries. Notwithstanding the foregoing, a quorum shall not be present for the transaction of business of any Governing Body of the Company or its Subsidiaries unless the Brightstar Directors (or with respect to any Subsidiaries, members of the Governing Body designated by Brightstar, if applicable) shall be present at a meeting of such Governing Body.  If a quorum shall not be present at any meeting of the Governing Body of the Company or its Subsidiaries, then the members of the Governing Body present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(e)     Expenses.  Each member of the Governing Bodies of the Company and its Subsidiaries shall be reimbursed by the Company (or its Subsidiaries) for his or her reasonable travel and out-of-pocket expenses incurred in the performance of his or her duties as a member of such Governing Body, including attendance in person at meetings of the Governing Body or the Governing Body of any of its Subsidiaries (or any committees thereof), in accordance with Brightstar Corp. expense reimbursement policies. Nothing contained in this Section 1(e) shall be construed to preclude any member of the Governing Body of the Company from serving the Company or any of its Subsidiaries in any other capacity and receiving compensation for such services as may be approved by the Governing Body from time to time.  This Agreement does not, and is not intended to, confer upon any member of the Governing Body of the Company any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any member of the Governing Body of the Company.

(f)     Voting.  Each director shall have one vote on all matters submitted to the Governing Body of the Company, any of its Subsidiaries, or any committees thereof, whether the consideration of such matter is taken at a meeting, by written consent or otherwise. The affirmative vote (whether by proxy or otherwise) of the Persons holding at least a majority of the votes then serving on any such Governing Body (or any committee thereof) shall be the act of

such Governing Body (or committee thereof) unless this Agreement requires otherwise or the Companies Ordinance of Hong Kong or the Company's or any of its Subsidiaries' Organizational Documents, as applicable, require a vote of a greater number.

(g)     Excess cash (subject to reserves, limitations on Indebtedness and cash flow requirements) shall be distributed to Shareholders according to their respective Ownership Percentages and in accordance with the Articles of Association of the Company; provided that no dividends or distributions shall be paid as long as there is any Indebtedness owing by the Company or any of its Subsidiaries to any Shareholder or an Affiliate thereof.

(h)     This Section 1, and the covenants contained herein, shall terminate upon the consummation of a Qualified Public Offering, provided that following any Qualified Public Offering, the Company will nominate and use its best efforts (including soliciting proxies) to have at least one member of the Governing Body of the Company designated by Brightstar.

2.     Irrevocable Proxy; Conflicting Agreements.

(a)     Grant of Proxy.  In order to secure each Shareholder's obligation to vote his, her or its Ordinary Shares and other voting Securities of the Company in accordance with the provisions of Section 1 and Section 6 hereof, and for other good and valuable consideration, each Shareholder hereby appoints Brightstar as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution, to vote all of his, her or its Ordinary Shares and other voting Securities of the Company on all matters that may be submitted to such Shareholder pursuant to Section 1 and Section 6 of this Agreement, and to execute any required documents and instruments on behalf of such Shareholder in order to consummate any transactions contemplated by Section 6 hereof (subject to the limitations contained in Section 6(c) hereof), but only in the event that such Shareholder (i) fails to vote his, her or its Ordinary Shares and other voting Securities of the Company in connection with such vote, (ii) attempts to vote his, her or its Ordinary Shares and other voting Securities of the Company in contradiction with the terms of this Agreement, (iii) unreasonably withholds or delays execution of any documents and instruments required in connection with any transactions contemplated by Section 6, provided that such documents and instruments meet the conditions of Section 6(c) and do not contain any material undertakings, restrictions or obligations except as permitted by Section 6(c), or (iv) otherwise breaches any provision of Section 1 or Section 6 of this Agreement. Each Shareholder agrees to appoint Brightstar as its proxy in accordance with the Articles of Association of the Company. The proxies and powers granted by each Shareholder pursuant to this Section 2 are coupled with an interest and are given to secure the performance of each Shareholder's obligations under this Agreement.  Unless otherwise provided under the Articles of Association of the Company, such proxies and powers are irrevocable for the term of this Agreement and will survive the death, incompetency and disability of each Shareholder and the respective holders of their Securities.

(b)     No Conflict.  Each Shareholder represents that he, she or it has not granted and is not a party to any proxy, voting trust or other agreement which is inconsistent with or conflicts with the provisions of this Agreement, and no Shareholder shall grant any proxy or become party to any voting trust or other agreement which is inconsistent with or conflicts with the provisions of this Agreement.

4

3.  Legend.  Each certificate evidencing Securities and each certificate issued in exchange for or upon the Transfer (as defined below) of any Securities (if such shares remain Securities as defined herein after such Transfer) shall (in addition to any other legends required by the terms of such Securities or the agreements under which such Securities were issued) be stamped or otherwise imprinted with legends in substantially the following form:

> "THE TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN THE SHAREHOLDERS AGREEMENT, DATED AS OF APRIL 9, 2018, AMONG HARVESTAR SOLUTIONS LIMITED AND CERTAIN SHAREHOLDERS, AND THE COMPANY RESERVES THE RIGHT TO REFUSE THE TRANSFER OF SUCH SECURITIES UNTIL SUCH CONDITIONS HAVE BEEN FULFILLED WITH RESPECT TO SUCH TRANSFER. A COPY OF SUCH CONDITIONS SHALL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES OR BLUE SKY LAWS. THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SAID ACT OR LAWS."

The Company shall imprint such legend on certificates evidencing Securities outstanding prior to the date hereof.  The legend set forth above shall be removed from the certificates evidencing any securities that cease to be Securities.

4.  Disposition of Securities.

(a)  No Shareholder may transfer, sell, convey, exchange, pledge, hypothecate, encumber or otherwise dispose of (collectively, "Transfer") any Securities, except in compliance with this Agreement.  Any attempted Transfer other than in accordance with this Agreement shall be null and void.  Subject to compliance with Sections 7 and 16, any Investor shall be entitled to freely Transfer any Securities owned by such Investor to any Person at any time and from time to time.  For the avoidance of doubt, any Transfer restrictions set forth in this Agreement are in addition to and shall not in any way limit any Transfer restrictions contained in any other agreements between the Company and any Shareholder or pursuant to any Incentive Plan or applicable Award Agreement.

(b)  Each Shareholder that is not an Investor shall not Transfer any Securities owned by him (or other securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such Securities): (i) without the prior written consent of the Governing Body of the Company, except (A) when required of a Shareholder pursuant to Sections 6 or 10, or when permitted pursuant to Sections 7, 8 or 11; or (B) as otherwise set forth in any Incentive Plan or applicable Award Agreement.  So long as the provisions of Sections 10

and 11 of this Agreement remain in effect, any transfer to a Permitted Transferee shall only be subject to the written consent of the Governing Body of the Company, such consent not to be unreasonably withheld.

     5.     Intentionally Omitted.

     6.     Drag Along Sale.

     (a)     Participation.  Subject to the other applicable terms of this Agreement, including Section 6(c) hereof, if the Investors (the "Dragging Shareholders") propose to consummate, or the Company's Governing Body approves (including by the vote or affirmative consent of all of the Brightstar Directors), a Sale of the Company to an Independent Third Party (a "Drag Along Sale"), the Dragging Shareholders shall have the right to require each other Shareholder (each, a "Drag Along Shareholder") to vote for, consent to and raise no objections against such Drag Along Sale and to otherwise comply with the provisions of this Section 6.  If the Drag Along Sale is structured as a (i) merger or consolidation, each Drag Along Shareholder shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation, or (ii) sale of stock, each Drag Along Shareholder shall agree to sell all of its, his or her Securities and rights to acquire Securities on the terms and conditions proposed by the Dragging Shareholders or approved by the Company's Governing Body, as applicable.  Each Drag Along Shareholder shall take all necessary or desirable actions in connection with the consummation of the Drag Along Sale as requested by the Company or the Investors, including the execution of such agreements and such instruments and other actions reasonably necessary to execute the transfer documents negotiated by the Company or the Investors, as the case may be.  Subject to the limitations contained in Sections 6(c) and (d) below, the Drag Along Shareholders acknowledge and agree that such transfer documents are expected to provide customary representations, warranties, indemnities, and escrow arrangements relating to such Drag Along Sale and further may provide for the appointment of a "Shareholder's representative" selected by Brightstar for purposes of  purchase price adjustments and proper allocation and distribution of the final aggregate consideration upon the Drag Along Sale, among other things.  The Drag Along Shareholders shall be permitted to sell their Securities in a Drag Along Sale pursuant to this Section 6 without complying with the provisions of Section 5 of this Agreement.

     (b)     Drag Along Notice.  To exercise their rights pursuant to this Section 6, the Dragging Shareholders shall deliver a written notice (the "Drag Along Notice") to the Company and each Drag Along Shareholder. The Drag Along Notice shall describe in reasonable detail: (i) the name (s) of the Independent Third Party; (ii) the proposed date, time and location of the closing of the Drag Along Sale; and (iii) the proposed amount of consideration in the Drag Along Sale, including, if applicable, the purchase price per share of each applicable class or series of Securities to be sold and the other material terms and conditions of the Drag Along Sale.

     (c)     Conditions to Participation.

     (i)     The obligations of the Drag Along Shareholders to participate in the Drag Along Sale of the Company are subject to the satisfaction of the following conditions: (A) upon the consummation of the Drag Along Sale, each Drag Along Shareholder shall receive the same form and amount of consideration (in proportion to the respective amounts of each class or series

of Security that such Drag Along Shareholder owns or has the right to acquire) as each other holder of such class or series of Security; (B) if any Drag Along Shareholders are given an option as to the form and amount of consideration to be received, each Drag Along Shareholder shall be given the same option (in proportion to the respective amount of each class or series of Security that such Drag Along Shareholder owns or has the right to acquire, but with identical rights and preferences, without giving effect to any minority or majority ownership interests or voting interests); (C) for a Drag Along Sale being consummated on or prior to the fourth anniversary of the date of this Agreement, if a Drag Along Shareholder is an Executive, the total consideration to be received by the Executive in the Drag Along Sale shall not be less than the amount the Executive would have received pursuant to <u>Section 10(f)</u> as of the date of the Drag Along Sale; and (D) if the Drag Along Sale is being consummated from the date of this Agreement through the term of the Executive Call Right, the Executives have waived or failed to exercise their right of first refusal set forth in Section 10(d); *provided*, *however*, that the fact that, in connection with a Drag Along Sale, (x) certain Shareholders may receive the right to make a debt or equity investment in a purchaser or one of its Affiliates (whether directly or through contribution of a security), or (y) certain Shareholders may enter into an employment agreement with purchaser or one of its Affiliates, shall not constitute a failure to satisfy any of the conditions set forth in this <u>Section 6(c)(i)</u>; and (E) each Drag Along Shareholder will bear, on a several but not joint basis, his or its pro rata share (based upon his, her or its share of Aggregate Net Proceeds in the Drag Along Sale) of any indemnities required of all of the Shareholders in connection with such Drag Along Sale, provided that each Drag Along Shareholder shall bear all indemnities with respect to representations and warranties required to be made by such Drag Along Shareholder with respect to such Drag Along Shareholder's ownership of the Securities to be transferred thereby, such Drag Along Shareholder's good title to such Securities, free and clear of any defects, encumbrances and adverse interests (other than as provided for in this Agreement), his authority to effect such transaction and the enforceability of such Drag Along Shareholder's obligations thereunder, in each case on a several but not joint basis. Except for the foregoing, no other representations or warranties shall be required from a Drag Along Shareholder with respect to his ownership of the Securities to be transferred, unless, and to the extent that, the same, or substantially similar, representations and warranties are made by the Dragging Shareholders. Under no circumstances shall the total indemnification required from a Drag Along Shareholder exceed the amount of the consideration (including any applicable transaction costs) received by such Drag Along Shareholder in connection with such sale, other than for indemnification arising out of, or in connection with, a Drag Along Shareholder's fraud, willful misconduct or intentional misrepresentation for which the indemnification obligations of a Drag Along Shareholder shall not be limited by this sentence.

(ii)    In the event that the consummation of a Drag Along Sale (the "<u>Drag Along Sale Closing</u>") has been conditioned on the receipt of non-competition or similar agreements from the Shareholders, each Drag Along Shareholder agrees if required pursuant to the terms of the Drag Along Sale to execute and deliver to Purchaser a reasonable confidentiality, non-competition, non-solicitation or similar agreement.

(d)    Upon receipt of the Drag Along Notice, (i) if the Executives have the option to exercise the Executive Call Right pursuant to <u>Section 11</u> or (ii) if the Executives do not have the option to exercise the Executive Call Right pursuant to <u>Section 11</u> solely for the reason that the Drag Along Notice was received prior to the second anniversary of the date of this Agreement

(with the Harvestar Volume for the initial 12 month period following the date of this Agreement determined on an annualized basis by extrapolating the actual Harvestar Volume for the time elapsed in such period), the Executives may, acting jointly only, elect to purchase all of the Securities subject to the Drag Along Notice or otherwise act as the purchaser in the Drag Along Sale, at the same price per share of each applicable class or series of Securities to be sold or enterprise value for the Company and all other terms and conditions as are set forth in the Drag Along Notice and otherwise payable by the Independent Third Party, by delivering a written notice of such election to the Dragging Shareholders within 10 Business Days after the Executives' receipt of the Drag Along Notice.  If the Executives have either (i) not elected to undertake the Drag Along Sale within 10 Business Days after the delivery of the Drag Along Notice, (ii) waived their rights to undertake the Drag Along Sale or (iii) elected to undertake the Drag Along Sale but have not consummated the Drag Along Sale within 60 days after the delivery of the Drag Along Notice ("Drag Along Notice Expiration"), the Investors may proceed with the Drag Along Sale with the Independent Third Party within 180 days of the Drag Along Notice Expiration at a price and on terms no more favorable to the Independent Third Party than those specified in the Drag Along Notice.

(e)     Purchaser Representative.  If the Company or the Investors enter into any negotiation or transaction for which Rule 506 (or any similar rule then in effect) under the Securities Act may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), then those Shareholders that do not qualify at the time as Accredited Investors shall, at the request of the Company, appoint a "purchaser representative" (as such term is defined in Rule 501 of the Securities Act) reasonably acceptable to the Company. If any such Shareholder appoints a purchaser representative designated by the Company, the Company shall pay the fees of such purchaser representative. However, if any such Shareholder declines to appoint the purchaser representative designated by the Company, such Shareholder shall appoint another purchaser representative (reasonably acceptable to the Company), and such Shareholder shall be responsible for the fees of the purchaser representative so appointed.

(f)     Costs.  All Shareholders will bear their respective pro rata share (based upon their pro rata share of the Aggregate Net Proceeds of the sale of all such Securities) of any reasonable costs related to the Drag Along Sale to the extent such costs are not otherwise paid by the Company or the applicable acquiring party.  Costs incurred by the Drag Along Shareholders on their own behalf shall not be considered costs of the Drag Along Sale.  Notwithstanding the above, the Company agrees that in the event of a Drag Along Sale it shall retain, and pay the costs of, one legal counsel on behalf of all of the Shareholders (which may, at the Company's discretion, be the same law firm that represents the Company) in connection with such Drag Along Sale.  Costs incurred by the Drag Along Shareholders on their own behalf shall not be considered costs of the Drag Along Sale, including legal counsel retained by any of the Drag Along Shareholders.  The obligation to pay any stamp duty or other transfer taxes in connection with a Drag Along Sale shall be set forth in the agreement governing such sale.

(g)     Retained Proceeds.  Any proceeds from a Drag Along Sale due or owing to the Company or the Drag Along Shareholder which are subject to claims or potential claims for indemnification or purchase price adjustment shall, unless the Dragging Shareholders elect otherwise (as determined by Brightstar as the "Shareholder's representative" pursuant to

Section 6(a)), be held in escrow or reserve accounts pending expiration of all such claims or potential claims.

(h)    Distribution of Aggregate Net Proceeds.  The Aggregate Net Proceeds shall be distributed to the Shareholders in accordance with, and subject to, any and all rights, preferences and privileges, including liquidation preferences, set forth in the Organizational Documents of the Company.

(i)    Termination of Provisions.  The provisions of this Section 6 shall cease to apply following completion of an Initial Public Offering.

7.    Tag-Along.

(a)    Notice of Sale.  Subject to this Section 7 and Section 8, if at any time or from time to time prior to completion of an Initial Public Offering, one or more of the Investors (the "Disposing Significant Shareholders") propose to sell Securities of the Company possessing the majority of the voting power of the Company (the "Tag-Along Securities") pursuant to a bona fide offer from an Independent Third Party (the "Tag-Along Purchaser"), and the Disposing Significant Shareholders cannot or have not elected to exercise their rights pursuant to Section 6 in connection with such Drag Along Sale, then such Disposing Significant Shareholders shall notify each of the other (i) Investors and (ii) Executives that are Shareholders and are employed by the Company or any of its Subsidiaries as of such time and their respective Permitted Transferees, in each case who hold any of the classes or series of Securities included in the Tag-Along Securities (each, a "Non-Disposing Shareholder") in writing of such offer and its terms and conditions (a "Tag-Along Sale Notice").  For any particular Tag-Along Sale Notice, the tag-along rights and the terms and conditions set forth in this Section 7 shall be applied separately on a class-by-class and series-by-series basis for each class or series of Tag-Along Securities, as applicable, including for purposes of calculating the respective Tag-Along Pro Rata Portions.

(b)    Right to Participate in Sale.  Upon receipt of a Tag-Along Sale Notice, each Non-Disposing Shareholder shall have the right to sell to the Tag-Along Purchaser (the "Tag-Along Sale"), at the same price and upon the same terms and conditions applicable to the Disposing Significant Shareholders, in lieu of the sale to the Tag-Along Purchaser by the Disposing Significant Shareholders, all or any portion of such Non-Disposing Shareholder's Tag-Along Pro Rata Portion of the Tag-Along Securities.  The Non-Disposing Shareholders' rights to sell pursuant to this Section 7 shall be exercised by delivery of a written notice (the "Non-Disposing Shareholder Exercise Notice") to the Disposing Significant Shareholder within 30 days following the delivery of the Tag-Along Sale Notice to the Non-Disposing Shareholders of the proposed sale to the Tag-Along Purchaser by the Disposing Significant Shareholders.  To the extent that any Non-Disposing Shareholder so delivers a Non-Disposing Shareholder Exercise Notice, such exercise shall be irrevocable and such Non-Disposing Shareholder shall be bound and obligated to sell to the Tag-Along Purchaser in the proposed Tag-Along Sale on the terms and conditions set forth in this Section 7.  Each Non-Disposing Shareholder who does not timely deliver a Non-Disposing Shareholder Exercise Notice in compliance with this Section 7(b) shall be deemed to have waived all of such Non-Disposing Shareholder's rights to participate in such Tag-Along Sale, and the Disposing Significant Shareholders shall (subject to the rights of any participating Non-Disposing Shareholder) thereafter be free to sell to the Tag-Along Purchaser

its Tag-Along Securities at a per share price that is no greater than the per share price set forth in the Tag-Along Sale Notice, without any further obligation to the Non-Disposing Shareholder.

(c)     <u>Terms and Conditions</u>.  The purchase of Securities from electing Non-Disposing Shareholders pursuant to this <u>Section 7</u> shall be on the same terms and conditions as are received by the Disposing Significant Shareholders, including any representations, warranties, covenants, restrictive covenants and indemnities, and the date of sale or other disposition.  Each Non-Disposing Shareholder shall take all actions as may be reasonably necessary to consummate the Tag-Along Sale, including entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Disposing Significant Shareholders.

8.     <u>Permitted Transfers</u>.  Subject to <u>Sections 4</u>, <u>16</u> and <u>17</u>, and notwithstanding anything to the contrary in this Agreement, any Shareholder may Transfer Securities (other than Securities held by a Stockholder that have not vested in accordance with any Incentive Plan or applicable Award Agreements) without complying with <u>Sections 5</u> or <u>7</u> to Permitted Transferees (as defined below) who consent in writing delivered to the Company to be bound by the same terms of this Agreement as the applicable Transferor in form and substance reasonably satisfactory to the Company and Brightstar.  With respect to any Shareholder that is a natural Person, a "<u>Permitted Transferee</u>" means (a) the spouse, parents, siblings or lineal descendants of such Shareholder, (b) any trust for the benefit of such Shareholder, or the benefit of the spouse, parents, siblings or lineal descendants of such Shareholder, (c) any corporation, partnership or limited liability company in which such Shareholder, the spouse, parents, siblings or the lineal descendants of such Shareholder are the direct and beneficial owners of all of the equity interests (provided such Shareholder, spouse, parents, siblings or lineal descendants agree in writing to remain the direct and beneficial owners of all such equity interests), (d) the personal representative of such Shareholder's estate or upon such Shareholder's incompetency for purposes of the protection and management of the assets of such Shareholder, and (e) the Company, as pledgee, pursuant to a pledge of Securities that creates a security interest in the pledged Securities.  With respect to a Shareholder that is not a natural Person (other than a trust), a "<u>Permitted Transferee</u>" means any Affiliate of such Shareholder (other than the Company and its Affiliates).  With respect to a Shareholder that is a trust, a "<u>Permitted Transferee</u>" means the beneficiaries of such trust. Notwithstanding the foregoing, no Shareholder shall intentionally avoid the provisions of this Agreement by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee (other than to another Permitted Transferee), and any Transfer or attempted Transfer in violation of this covenant shall be void.

9.     <u>Preemptive Rights</u>.  Subject to <u>Section 9(d)</u> and the limitations set forth in <u>Section 9(c)</u> below, each time the Company or any of its Subsidiaries proposes to issue any Securities of the Company or any of its Subsidiaries, whether or not currently authorized, as well as rights, options or warrants to purchase such equity securities, or other securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities (collectively, "<u>New Issue Securities</u>") to any Person, the Company shall first offer the New Issue Securities to (i) the Investors and (ii) the Executives that are Shareholders and are employed by the Company or any of its Subsidiaries as of such time and each of their

respective Permitted Transferees (each, a "Preemptive Shareholder"), in accordance with the following provisions:

(a)     The Company shall give a written notice to each Preemptive Shareholder hereunder (the "Preemptive Notice") stating: (i) the Company's intention to issue the New Issue Securities; (ii) the number and description of such shares or the amount of the New Issue Securities to be issued; (iii) the purchase price (calculated as of the proposed issuance date) and the other terms upon which the Company is offering the New Issue Securities; and (iv) the names of the Persons to whom the Company seeks to issue such New Issue Securities.

(b)     Transmittal of the Preemptive Notice to the Preemptive Shareholders by the Company shall constitute an offer by the Company to sell each Preemptive Shareholder his, her or its Preemptive Pro Rata Portion of the New Issue Securities for the price and upon the terms set forth in the Preemptive Notice (which price and terms shall be the same for all Preemptive Shareholders and all Persons to whom the Company seeks to issue such New Issue Securities). For a period of 10 Business Days after delivery of the Preemptive Notice to the Preemptive Shareholders, each Preemptive Shareholder shall have the option, exercisable by written notice to the Company, to accept the Company's offer as to all or any part of such Preemptive Shareholder's Preemptive Pro Rata Portion or any lesser number of the New Issue Securities. If two or more types of New Issue Securities are to be issued or New Issue Securities are to be issued together with other types of securities, including debt securities, in a single transaction or related transactions, the rights to purchase New Issue Securities granted to the Preemptive Shareholders under this Section 9 must be exercised to purchase all types of New Issue Securities and such other securities in the same proportion as such New Issue Securities and other securities are to be issued by the Company. If the Preemptive Shareholders (as a group) agree to purchase less than the total number of New Issue Securities proposed to be issued and sold, then the Company shall provide further notice to each Preemptive Shareholder electing to purchase its full Preemptive Pro Rata Portion, and shall allow each such Preemptive Shareholder to elect by written notice within five days following such notice by the Company to purchase all or a portion of its respective Preemptive Pro Rata Portion (calculated as if the only Preemptive Shareholders are the Preemptive Shareholders electing to purchase their entire Preemptive Pro Rata Portion pursuant to the prior Preemptive Notice) or, contingent upon and, to the extent that other such Preemptive Shareholders elect to purchase less than their entire Preemptive Pro Rata Portion (as so calculated), up to a specified maximum amount in excess of such Preemptive Pro Rata Portion of the unpurchased New Issue Securities at the same price and upon the same terms and conditions set forth in the Preemptive Notice. If, after such further offer to the Preemptive Shareholders, the Preemptive Shareholders (as a group) still agree to purchase less than the total number of New Issue Securities proposed to be issued and sold, then the Company shall have one 120 days thereafter to sell any or all of the remaining New Issue Securities (i.e., those not to be sold to any Preemptive Shareholder) to the Person or Persons set forth in the Preemptive Notice, upon terms and conditions no less favorable to the Company, and no more favorable to such Person or Persons, than those set forth in the Preemptive Notice. In the event that the Company has not sold such New Issue Securities within said 120 day period, the Company will not thereafter issue or sell any New Issue Securities without first offering such New Issue Securities to the Preemptive Shareholders in the manner provided in this Section 9.

(c)      The preemptive rights contained in this <u>Section 9</u> shall not apply to:

(i)      The issuance and sale of Securities by the Company, from time to time, to employees of the Company or its Subsidiaries, or pursuant to any Incentive Plan;

(ii)      The issuance of Securities, either directly or indirectly, in connection with the acquisition, strategic business combination or investment by the Company in any Person in connection with a Company Acquisition that, in each case, is not, prior to such transaction, an Affiliate of either the Company or any of the Preemptive Shareholders, in each case as approved by the Governing Body of the Company;

(iii)      The issuance of Securities in a Public Offering;

(iv)      The issuance of Securities to Independent Third Party credit financing sources as an "equity kicker" in connection with a debt financing or debt recapitalization of the Company or its Subsidiaries;

(v)      The issuance of Securities by any Subsidiary of the Company to the Company or any of its Subsidiaries;

(vi)      The issuance of Securities upon the exercise, conversion or exchange of other Securities which were issued in compliance with this <u>Section 9(c)</u> or Securities which were issued in an issuance which is exempt from this <u>Section 9(c)</u>; and

(vii)      The issuance of Securities in connection with any stock split, stock dividend or reverse split.

(d)      Notwithstanding anything to the contrary contained in this <u>Section 9</u>, the Company may, in order to expedite the issuance of New Issue Securities hereunder, issue all or a portion of the New Issue Securities to one or more Persons (each, an "<u>Initial Subscribing Shareholder</u>") without complying with the provisions of this <u>Section 9</u>; *provided*, that, prior to such issuance, either (i) each Initial Subscribing Shareholder agrees to offer to sell to each Preemptive Shareholder who is an Accredited Investor and who is not an Initial Subscribing Shareholder (each, an "<u>Other Accredited Shareholder</u>") his, her or its respective Preemptive Pro Rata Portion of such New Issue Securities on the same terms and conditions as issued to the Initial Subscribing Shareholders and in a manner which provides such Other Accredited Shareholder with rights substantially similar to the rights outlined in <u>Sections 9(a)</u> and <u>9(b)</u>, or (ii) the Company shall offer to sell an additional amount of New Issue Securities to each Preemptive Shareholder (other than Initial Subscribing Shareholders) only in an amount and manner which provides such Preemptive Shareholder with rights substantially similar to the rights outlined in <u>Sections 9(a)</u> and <u>9(b)</u>.  The Initial Subscribing Shareholders or the Company, as applicable, shall offer to sell such New Issue Securities to each Other Accredited Shareholder or Preemptive Shareholder (other than Initial Subscribing Shareholders), respectively and as applicable, within 90 days after the closing of the purchase of the New Issue Securities by the Initial Subscribing Shareholders.

10.     Put/Call Rights.

(a)     Commencing on the second anniversary of the date of this Agreement, the Executives and their Permitted Transferees shall have the right, but not the obligation, pursuant to the terms and conditions set forth in this Section 10, to sell to Brightstar (the "Put Right") on only one occasion per calendar year a portion of the Ordinary Shares specified in Section 10(e) held by such Persons (the "Put Shares").

(b)     The Executives may, acting jointly only, elect to sell the Put Shares by delivering written notice (the "Put Notice") to Brightstar and its Permitted Transferees by no later than 60 days after the applicable anniversary date of this Agreement as specified in Section 10(e).

(c)     If the Executives fail to deliver a Put Notice by such date, then Brightstar shall have the right, but not the obligation, pursuant to the terms and conditions set forth in this Section 10, to purchase from the Executives and their Permitted Transferees (the "Call Right") on only one occasion per calendar year a portion of the Ordinary Shares specified in Section 10(e) held by such Persons (the "Call Shares").

(d)     Brightstar may elect to purchase the Call Shares by delivering written notice (the "Call Notice") to the Executives and their Permitted Transferees by no later than 30 days after the expiration of the 60-day period specified in Section 10(b).  If Brightstar fails to deliver a Call Notice by such date, then it shall not be permitted to deliver another Call Notice until after the expiration of the next succeeding period for delivery of a Put Notice.

(e)     The number of Ordinary Shares subject to the Put Right or the Call Right, as applicable, shall be as follows:

(i)     upon the second anniversary of the date of this Agreement, the maximum number of Ordinary Shares subject to the Put Right or the Call Right, as applicable, shall represent 10% of the aggregate Ownership Percentages of all Shareholders;

(ii)     upon the third anniversary of the date of this Agreement, the maximum number of Ordinary Shares subject to the Put Right or the Call Right, as applicable, shall represent 15% of the aggregate Ownership Percentages of all Shareholders plus any Ordinary Shares not previously purchased pursuant to clause (i) above not to exceed a 10% aggregate Ownership Percentage of all Shareholders; and

(iii)     upon the fourth anniversary of the date of this Agreement, all remaining Ordinary Shares shall be subject to the Put Right or the Call Right, as applicable.

(f)     The sale price for the Put Shares subject to the Put Right shall be determined by the following formula: (i) 5.0 multiplied by (ii) the applicable Multiplier multiplied by (iii) the Harvestar Volume for the 12 full calendar months immediately preceding the date of the Put Notice multiplied by (iv) the Ownership Percentage represented by the Put Shares and then subtracting from the final product (v) the amount determined by multiplying all Indebtedness by the Ownership Percentage represented by the Put Shares, all subject to adjustment as provided in Section 11(e).

(g)     The purchase price for the Call Shares subject to the Call Right shall be determined by the following formula: (i) 6.0 <u>multiplied</u> by (ii) the applicable Multiplier <u>multiplied</u> by (iii) the Harvestar Volume for the 12 full calendar months immediately preceding the date of the Call Notice <u>multiplied</u> by (iv) the Ownership Percentage represented by the Call Shares and then <u>subtracting</u> from the final product (v) the amount determined by <u>multiplying</u> all Indebtedness by the Ownership Percentage represented by the Call Shares, all subject to adjustment as provided in <u>Section 11(e)</u>.

(h)     By way of example only, (i) if there have been no exercises of either the Put Right or the Call Right prior to the fourth anniversary of the date of this Agreement, (ii) EBIT for the immediately preceding 12 full calendar months is $26 million, (iii) Harvestar Volume for the immediately preceding 12 full calendar months is 2 million and (iv) total Indebtedness is $5 million, and the Executives exercise the Put Right for all of the Ordinary Shares held by the Executives and their Permitted Transferees, then the sale price for the Put Shares would equal (5) x ($10) x (2,000,000) x (49%), or $49.0 million, <u>less</u> ($5 million) x (49%), or $2.4 million, for a total sale price of $46.6 million.

(i)     If instead using the same example, Brightstar exercises the Call Right for all of the Ordinary Shares held by the Executives and their Permitted Transferees, then the purchase price for the Call Shares would equal (6) x ($10) x (2,000,000) x (49%), or $58.8 million, <u>less</u> ($5 million) x (49%), or $2.4 million, for a total purchase price of $56.4 million.

(j)     The closing of the sale of the Put Shares pursuant to the Put Right shall take place on the date designated by the Executives, which date shall not be more than 80 days nor less than five days after the delivery of the applicable Put Notice.  Payment for the Put Shares shall be made either (i) by wire transfer of immediately available funds to an account(s) designated by the Executives and their Permitted Transferees or (ii) if mutually agreed to by Brightstar and the Executives, in capital stock of Brightstar Corp., subject to the approval by the Governing Body and shareholders of Brightstar Corp.

(k)     The closing of the purchase of the Call Shares pursuant to the Call Right (the shall take place on the date designated by Brightstar, which date shall not be more than 80 days nor less than five days after the delivery of the applicable Call Notice.  Payment for the Call Shares shall be made either (i) by wire transfer of immediately available funds to an account(s) designated by the Executives and their Permitted Transferees or (ii) if mutually agreed to by Brightstar and the Executives, in capital stock of Brightstar Corp., subject to the approval by the Governing Body and shareholders of Brightstar Corp.

(l)     Notwithstanding anything to the contrary in this Agreement, Brightstar shall have the option to limit the amount paid to the Executives in connection with the exercise of either the Put Right or the Call Right to $25 million in any single fiscal year. Any amounts not paid to the Executives when otherwise due pursuant to <u>Sections 10(j)</u> or <u>10(k)</u> shall be paid in the succeeding fiscal year(s) (subject to the $25 million annual limitation) and the unpaid balance thereon shall bear interest at an annual rate equal to the then current cost of debt of Brightstar Corp.

(m)     The right to exercise the Put Right or the Call Right pursuant to this <u>Section 10</u> shall terminate upon the first to occur of (i) a Sale of the Company, and (ii) an Initial Public Offering.

11.     <u>Executive Call Right</u>.

(a)     Commencing on the second anniversary of the date of this Agreement (the "<u>Second Anniversary</u>") or, in the event Brightstar exercises the Executive Call Delay pursuant to the terms of this <u>Section 11</u>, the third anniversary of the date of this Agreement (the "<u>Third Anniversary</u>"), the Executives shall have the right but not the obligation, acting jointly only, pursuant to the terms and conditions set forth in this <u>Section 11</u>, to purchase from Brightstar and its Permitted Transferees (the "<u>Executive Call Right</u>") all of the Ordinary Shares held by such Persons (the "<u>Executive Call Shares</u>").

(b)     The Executives may exercise the Executive Call Right only if the Harvestar Volume for the 12 full calendar months immediately preceding the date of the Executive Call Notice (defined below) is less than 500,000. The Executives may elect to purchase the Executive Call Shares by delivering written notice (the "<u>Executive Call Notice</u>") to Brightstar and its Permitted Transferees within 60 days of the Second Anniversary and, if and only if Brightstar exercises the Executive Call Delay, then within 60 days of the Third Anniversary.

(c)     The purchase price for the Executive Call Shares subject to the Executive Call Right shall be the greater of (i) the Fair Market Value of the Company as of the date of delivery of the Executive Call Notice multiplied by the Ownership Percentage of Brightstar and its Permitted Transferees and (ii) the total amount of cash and other property invested by Brightstar and its Permitted Transferees in the Company less $2,000,000.

(d)     The closing of the purchase of the Executive Call Shares pursuant to the Executive Call Right shall take place on the date designated by Brightstar, which date shall not be more than 80 days nor less than 5 days after the delivery of the applicable Executive Call Notice.  Payment for the Executive Call Shares shall be made by wire transfer of immediately available funds to an account(s) designated by Brightstar and its Permitted Transferees.

(e)     Notwithstanding anything to the contrary contained in this Agreement, Brightstar shall have the right to postpone the exercise of the Executive Call Right on one occasion for a period not to exceed 12 months (the "<u>Executive Call Delay</u>") by delivering written notice to the Executives within 30 days of Brightstar's receipt of the Executive Call Notice.   Should Brightstar elect to exercise this right, then the amount payable to the Executives upon the next exercise of either the Put Right or the Call Right pursuant to <u>Section 10</u> or the Executive Call Right pursuant to this <u>Section 11</u> shall be increased by the sum of $2,000,000.

12.     <u>Representations and Warranties</u>.  Each of the Shareholders hereby represents and warrants to the following with respect to himself, herself or itself, as the case may be:

(a)     <u>Authorization</u>.  All corporate, partnership, member or other action on the part of the Shareholder, its directors, holders, members or partners necessary for the authorization, execution, delivery and performance by such Shareholder (if a corporation, partnership, limited liability company or other entity) of this Agreement has been taken.  This Agreement is a legal,

valid and binding obligation of such Shareholder, enforceable against such Shareholder strictly in accordance with its terms.

(b)    <u>No Violation</u>.  The execution and delivery of this Agreement will not (with or without notice or passage of time or both) (a) conflict with or result in a breach of any provision of the Organizational Documents or related documents of a Shareholder (if a corporation, partnership, limited liability company or other entity), (b) result in a default, give rise to any right of termination, cancellation or acceleration, or require any consent or approval, under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, loan, factoring arrangement, license, agreement, lease or other instrument or obligation to which such Shareholder is a party or by which it or any of its assets may be bound, other than any default which would not have a material adverse effect on the business, operations, financial condition, assets or properties of such Shareholder, or (c) violate any Law, judgment, Governmental Order, writ, injunction or decree of any Governmental Entity applicable to such Shareholder or any of its assets, other than any violation which would not have a material adverse effect on the business, operations, financial condition, assets or properties of such Shareholder.

13.    <u>Holdback Agreement</u>.  Each Shareholder of outstanding Securities shall not effect any public sale or distribution (including sales pursuant to Rule 144 of the Securities Act) of Securities of the Company, or any securities convertible into or exchangeable or exercisable for such Securities, during the seven days prior to and the 180-day period beginning on the effective date of a Qualified Public Offering, unless the underwriters managing such Qualified Public Offering otherwise agree.  This <u>Section 12</u> shall survive the termination of this Agreement.

14.    <u>Other Business Activities</u>.  The parties hereto, including the Company, expressly acknowledge and agree that, subject to the provisions of the Commercial Agreement: (i) the Investors and their Affiliates are permitted to have, and may presently or in the future have, investments or other business or strategic relationships, ventures, agreements or other arrangements with entities other than the Company or any Subsidiary thereof that are engaged in the business of the Company or any Subsidiary thereof, or that are or may be competitive with the Company or any Subsidiary thereof (any such other investment or relationship, an "<u>Other Business</u>"); (ii) none of the Investors or their Affiliates will be prohibited by virtue of the Investors' investment in the Company from pursuing and engaging in any Other Business; (iii) the Investors and their Affiliates will not be obligated to inform the Company or any other Shareholder of any opportunity, relationship or investment in any Other Business (a "<u>Company Opportunity</u>") or to present any Company Opportunity to the Company, and the Company hereby renounces any interest in any Company Opportunity and any expectancy that a Company Opportunity will be offered to it; (iv) nothing contained herein shall limit, prohibit or restrict any Brightstar Director (or any employee, officer, agent or representative of Brightstar) from serving on the Governing Body or committee of any Other Business; and (v) no other Shareholder will acquire, be provided with an option or opportunity to acquire, or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of the Investors or their Affiliates. The parties hereto expressly authorize and consent to the involvement of the Investors and their Affiliates in any Other Business; provided, that any transactions between the Company or the Subsidiaries thereof, on the one hand, and an Investor or an Other Business, on the other hand, will be on terms no less favorable to the Company or the Subsidiaries thereof than would be obtainable in a comparable arm's-length transaction. The parties hereto expressly

waive, to the fullest extent permitted by applicable Law, any rights to assert any claim that such involvement contemplated pursuant to this Section breaches any fiduciary or other duty or obligation owed to the Company or any Shareholder or to assert that such involvement constitutes a conflict of interest by such Persons with respect to the Company any Shareholder.

15.    Term.  Except with respect to the provisions herein that expressly provide for survival beyond the termination of this Agreement (which provisions shall survive the termination of this Agreement), this Agreement will terminate upon the consummation of a (i) Qualified Public Offering, (ii) Sale of the Company, or (iii) when all the Ordinary Shares are being held beneficially by one Shareholder only.

16.    Transfer; Transfers in Violation of Agreement.  Prior to Transferring any Securities to any Person, and as a condition precedent thereto, the Transferring Shareholder shall cause the prospective Transferee to execute and deliver to the Company and the other Shareholders a counterpart signature page to this Agreement in form and substance satisfactory to the Company and Brightstar, and such prospective Transferee shall agree to be bound by and acknowledge that such Securities are subject to all terms and conditions of this Agreement, including, the terms and conditions applicable to an "Investor" (if acquired from an Investor) or an "Executive" (if acquired from an Executive), with respect to the Securities so Transferred. Notwithstanding anything to the contrary in this Agreement, no Shareholder shall Transfer any Securities to a Competitor of the Company or to a Financial Investor without the prior written consent of Brightstar.  Any Transfer or attempted Transfer of any Securities in violation of any provision of this Agreement shall be void, and the Company shall not record such Transfer on its books or treat any purported transferee of such Securities as the owner of such Securities for any purpose.

17.    Additional Shareholders.  In connection with the issuance of any additional equity securities of the Company to any Person, the Company will require such Person to become a party to this Agreement as a "Shareholder" under this Agreement, and if approved by the Governing Body of the Company, as an "Investor" or an "Executive" by obtaining an executed counterpart signature page to this Agreement in form and substance satisfactory to the Company and Brightstar, and, upon such execution, such Person shall for all purposes be a "Shareholder" party to this Agreement (and if applicable an "Investor" or an "Executive") and the Schedule of Shareholders shall be accordingly updated.

18.    Descriptive Headings.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

19.    Amendment and Waiver.  Except as otherwise expressly provided herein, the provisions of this Agreement may be amended or waived at any time only by the written agreement of (a) the Company, (b) Brightstar and (c) by Shareholders (other than Brightstar) holding not less than a majority of the outstanding Ordinary Shares; *provided however*, that no amendment or waiver shall materially adversely affect the rights of any Shareholder in a manner that is disproportionate relative to other similarly situated Shareholders without the express written consent of the affected Shareholder. The Governing Body of the Company shall, from time to time, update or revise the Schedule of Shareholders to reflect the current Shareholders of the Company and their ownership of Securities, and any such update or revision shall not be

deemed to be an amendment to this Agreement and shall not require the approval (by vote, consent or otherwise) of any Shareholder.

20.     <u>Severability</u>.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  Notwithstanding the foregoing, if the duration of any term with respect to such provision could be reduced so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

21.     <u>Entire Agreement</u>.  Except as otherwise expressly set forth herein, this Agreement embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

22.     <u>Successors and Assigns</u>.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of, and be enforceable by, the Company and its successors and assigns and the Shareholders and the respective successors and permitted assigns of each of them, so long as they hold Securities.

23.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  A signed copy of this Agreement delivered by facsimile, electronic mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.     <u>Specific Performance</u>.  The Shareholders each acknowledge that the rights of each party hereunder are special, unique and of extraordinary character and that, in the event that any Shareholder violates or fails or refuses to perform any covenant or agreement made by it in this Agreement, the non-breaching parties may be without an adequate remedy at Law.   The Shareholders agree, therefore, that in the event that any Shareholder violates or fails or refuses to perform any covenant or agreement made by such Shareholder in this Agreement, the non-breaching parties may, subject to the terms of this Agreement and in addition to any remedies at Law for damages or other relief, institute and prosecute an action in any court of competent jurisdiction to enforce specific performance of such covenant or agreement or seek any other equitable relief.

25.     <u>Notices</u>.   All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made by delivery in person, by an internationally recognized overnight courier service, by facsimile or electronic mail or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto to his, her or its address set forth on the Company's records, which records will be made available upon request to each Shareholder as may be necessary to comply with the terms of, or exercise rights under, this Agreement.

26.     <u>Governing Law</u>.  THIS AGREEMENT IS MADE UNDER, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED SOLELY THEREIN, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

27.     <u>Venue</u>.  ANY LEGAL ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN A COURT SITUATED IN THE STATE OF NEW YORK, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY ACTION IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

28.     <u>Waiver of Jury Trial</u>.  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY ACTION OR PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

29.     <u>No Duties</u>.

(a)     To the maximum extent permitted by applicable law, no Shareholder (solely in its capacity as such), any of their respective Affiliates or officers or employees shall owe any duty (including any fiduciary duty) to the Company or to any other Shareholder other than a duty to act in accordance with the implied contractual covenant of good faith and fair dealing. The parties hereto acknowledge and agree that any Shareholder acting in accordance with this Agreement shall (a) be deemed to be acting in compliance with such implied contractual covenant, and (b) not be liable to the Company, to any other Shareholder or to any other Person that is a party to or is otherwise bound by (or is a beneficiary of) this Agreement for its reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Shareholder otherwise existing at law or in equity in respect of the Company, are agreed by all parties hereto to replace fully and completely such other duties and liabilities.

(b)     Subject to Section 29(a) above, but notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement a Shareholder is permitted or required to make a decision or take an action, in making such

decisions, the Shareholder shall be entitled to take into account only such interests and factors as it desires (including its own interests).

(c)     Notwithstanding the foregoing, nothing in this Section 29 shall limit any duty or other obligation of any Person who is an officer, employee or service provider of the Company or of any of its subsidiaries in its capacity as an employee or officer of or service provider to the Company or any of its subsidiaries.

30.     <u>References to Securities; Aggregation of Stock</u>.  Any references herein to any Shareholder's specific amount or number of Securities shall be deemed a reference to the corresponding number or amount of Securities which have been issued in respect of, in exchange for, or in substitution for such Securities, by recapitalization, reclassification, dividend or distribution.  All Securities held or acquired by a Shareholder and its Permitted Transferees shall be aggregated together for the purpose of determining the availability of any rights under this Agreement, and such Shareholder and its Permitted Transferees may apportion such rights as among themselves in any manner they deem appropriate.

31.     <u>No Third Party Beneficiaries</u>.  Except as explicitly provided herein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

32.     <u>Expenses</u>.  Each party shall pay its own expenses incurred in connection with the negotiation and execution of this Agreement and the consummation of the transactions contemplated by this Agreement.

33.     <u>Undefined Terms; Construction</u>.  Capitalized terms not defined in this Agreement (or in <u>Exhibit A</u>) have the meaning given to them in the Purchase Agreement.  In construing this Agreement, including the exhibits and schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Section or other subdivision in which any such terms may be employed; (b) except as otherwise set forth herein, references to Sections, schedules and exhibits refer to the Sections, schedules and exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's predecessors; (d) unless the context otherwise requires, all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP consistently applied; (e) no consideration shall be given to the headings of the Sections, schedules, exhibits, subdivisions, subsections or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid in its construction; (f) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions; (g) the term Agreement means this Agreement as amended or modified; (h) the word "discretion" and its syntactical variants is deemed to be preceded by the word "sole" (g) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any schedule or exhibit; (h) the plural

shall be deemed to include the singular and vice versa; and (i) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.

34.    <u>Currency</u>. Unless otherwise stated, references in this Agreement to "dollars" or "$" are to U.S. dollars. In the event that any Hong Kong or Philippines currency figures are required to be used for purposes of making any calculations under this Agreement or any document or agreement delivered pursuant to this Agreement, or if conversion from United States currency to Hong Kong currency or Philippines is required or necessary to compare or compute figures in either United States currency or Hong Kong currency or Philippines currency, as applicable, all such conversions shall be completed, effected and calculated at the noon nominal closing exchange rate on the date on which such calculation is made, as indicated by the reference rates set forth in The Wall Street Journal.

[*Signature page follows*]

**INTENDING TO BE LEGALLY BOUND**, the parties hereto have executed this Shareholders Agreement as of the day and year first above written.

**COMPANY:**

**HARVESTAR SOLUTIONS LIMITED**

By:

    Name:    TYLER MILLER

    Title:     DIRECTOR

**SHAREHOLDERS:**

**BRIGHTSTAR ASIA LTD.**

By: _____

    Name:

    Title:

Tyler Miller

_____

Omar Elmi

[Signature Page to Shareholders Agreement]

INTENDING TO BE LEGALLY BOUND, the parties hereto have executed this Shareholders Agreement as of the day and year first above written.

COMPANY:

**HARVESTAR SOLUTIONS LIMITED**

By:_____
    Name:
    Title:

SHAREHOLDERS:

**BRIGHTSTAR ASIA LTD.**

By:_____
    Name: Noel Marsden
    Title: Director

_____
Tyler Miller

_____
Omar Elmi

[Signature Page to Shareholders Agreement]

**INTENDING TO BE LEGALLY BOUND**, the parties hereto have executed this Shareholders Agreement as of the day and year first above written.

COMPANY:

**HARVESTAR SOLUTIONS LIMITED**

By:_____
    Name:
    Title:

**SHAREHOLDERS:**

**BRIGHTSTAR ASIA LTD.**

By:_____
    Name:
    Title:

_____
Tyler Miller

_____
Omar Elmi

[Signature Page to Shareholders Agreement]

## Schedule of Shareholders

**Updated as of April 9, 2018**

| Shareholder | Classification (If Investor or Executive) | Number of Ordinary Shares | Ownership Percentage |
|---|---|---|---|
| Brightstar Asia Ltd. | Investor | 510 | 51.0% |
| Tyler Miller | Executive | 245 | 24.5% |
| Omar Elmi | Executive | 245 | 24.5% |
| **Total** | | **1,000** | **100.0%** |

**Exhibit A**

Definitions

"Accredited Investor" has the meaning set forth in Rule 501 promulgated under the Securities Act.

"Affiliate" means a Person that directly, or indirectly, controls, or is controlled by, or is under common control with, a specified Person.  A Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Net Proceeds" means the aggregate proceeds received by Shareholders in connection with a Drag Along Sale after reduction for the applicable transaction expenses of the Company, its Subsidiaries and, to the extent such expenses are incurred on behalf of all Shareholders, the Dragging Shareholders.

"Award Agreements" means a written agreement, contract, certificate or other instrument or document evidencing the terms and conditions of any individual grant of Securities under any Incentive Plan.

"Business Day" means any day that is not a Saturday, Sunday or a day on which banking institutions in Hong Kong are authorized by Law or executive order to remain closed.

"Commission" means the Securities and Exchange Commission or any similar foreign Governmental Entity, including the Hong Kong Monetary Authority.

"Company Acquisition" means an acquisition by the Company of another Person that is not an Affiliate of the Company or its Subsidiaries, by merger, purchase of all or substantially all of such other Person's assets, or by other reorganization whereby the Company ends up owning, directly or indirectly, greater than 50% of the voting power of such other Person.

"Competitor" means any Person which is primarily engaged in substantially similar lines of business in which the Company or any of its Subsidiaries are then engaged, as determined in good faith by the Company's Governing Body.

"EBIT" means, for any period, the sum of consolidated net income of the Company and its Subsidiaries plus interest expense and income taxes, all determined in accordance with GAAP. Solely for purposes of this definition, corporate overhead charges or management fees relating to the operation of Brightstar and/or any of its Affiliates that are not directly related to the business of the Company and its Subsidiaries shall be limited to $500,000 in each fiscal year, subject to adjustment based on the United States Consumer Price Index.

"Fair Market Value" means the applicable fair market value of the Company, as applicable, determined in good faith by the Company's Governing Body; *provided however*, that a Shareholder shall be entitled to dispute such Governing Body's determination by delivering

written notice thereof, which notice shall include Shareholder's determination of fair market value, to the Governing Body within 30 days of receipt of the Governing Body's determination, in which case such dispute shall be resolved by an independent accounting firm of nationally or regionally recognized standing selected by the Company's Governing Body and reasonably acceptable to the Shareholder, the costs and expenses of which shall be borne by the Shareholder unless the determination of fair market value by the independent accounting firm is greater than the determination by the Company's Governing Body, in which case the Company shall reimburse the Shareholder for the costs and expenses of such independent accounting firm based on the proportional difference between the independent accounting firm's determination of fair market value and the Shareholder's and Company's respective determination.

"Financial Investor" means any institutional investor, private equity fund, venture capital fund, secondary fund, hedge fund, pension fund, family office or any other investment fund, investment bank or financial institution.

"GAAP" means the United States generally accepted accounting principles from time to time approved by the Financial Accounting Standards Board, or any successor entity thereto, applicable as at the date on which such principles are to be applied or on which any calculation or determination is required to be made in accordance with generally accepted accounting principles.

"Governing Body" means (i) in the case of the Company or a corporation, its directors, (ii) in the case of a limited liability company, its managers or board of members, if any, and (iii) in the case of any other legal entity, that entity's governing body or Person, as applicable.

"Governmental Entity" means any federal, provincial, tribal, territorial, county, municipal, local or foreign government (or any political subdivision thereof), and any legislature, agency, authority, bureau, branch, department, division, commission, court, regulator, tribunal, magistrate, justice, multi-national organization, ministry, agency, quasi-governmental body or other organization, body or instrumentality exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Harvestar Volume" means the number of handset units which are processed and billed at facilities operated by the Company and its Subsidiaries and includes all services from light refurbishment to full repair, but does not include handset units which are only tested, graded and/or repackaged.  The determination of Harvestar Volume shall be made in good faith by the Governing Body of the Company; *provided however*, that a Shareholder shall be entitled to dispute such Governing Body's determination by delivering written notice thereof, which notice shall include Shareholder's determination of Harvestar Volume, to the Governing Body within 30 days of receipt of the Governing Body's determination, in which case such dispute shall be resolved by an independent accounting firm of nationally or regionally recognized standing selected by the Company's Governing Body and reasonably acceptable to the Shareholder, the costs and expenses of which shall be borne by the Shareholder unless the determination of Harvestar Volume by the independent accounting firm is greater than the determination by the Company's Governing Body, in which case the Company shall reimburse the Shareholder for the costs and expenses of such independent accounting firm based on the proportional difference

between the independent accounting firm's determination of Harvestar Volume and the Shareholder's and Company's respective determination.

"Hong Kong" means the Hong Kong Special Administrative Region of the People's Republic of China.

"Incentive Plan" means any plans, programs or agreements approved by the Governing Body of the Company whereby Securities or options, rights, or warrants to acquire Securities, or securities convertible or exchangeable for Securities, are issuable as compensation for services to the Company or any of its Subsidiaries, including to employees, officers, members of the Governing Body of the Company, consultants or other service providers.

"Indebtedness" means, for the Company and its Subsidiaries on a consolidated basis, (i) all obligations for borrowed money or in respect of loans, deposits or advances of any kind, (ii) all obligations evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) all obligations upon which interest charges are customarily paid, (iv) all reimbursement obligations in respect of letters of credit, surety bonds, bankers' acceptances or similar instruments, (v) all obligations arising from cash/book overdrafts, (vi) all obligations arising from deferred compensation arrangements, (vii) all obligations secured by an Encumbrance, (viii) all capital lease obligations, (ix) all deferred rent or royalty obligations, (x) all obligations (contingent or otherwise) for the deferred purchase price of property or services, (xi) any guaranties in connection with any of the foregoing and (xii) all accrued interest, prepayment premiums or penalties related to any of the foregoing.

"Independent Third Party" means any Person who, immediately prior to the contemplated transaction, (i) does not own, directly or indirectly, in excess of 10% of the Ordinary Shares on a fully-diluted basis (a "10% Owner"), (ii) is not controlling, controlled by or under common control with any such 10% Owner, (iii) is not the spouse or descendant (by birth or adoption) of any such 10% Owner or a trust for the benefit of any such 10% Owner or such Persons, and (iv) with respect to Brightstar and its Affiliates, is neither an investment of any such 10% Owner nor a Subsidiary of any investment of any such 10% Owner.

"Initial Public Offering" means the initial Public Offering by the Company.

"Multiplier" means, at any time, the quotient determined by dividing (i) EBIT by (ii) the Harvestar Volume, in each case for the 12 full calendar months immediately preceding the date of the Put Notice or the Call Notice, as applicable; provided that under no circumstances shall such quotient exceed $10.00.

"Organizational Documents" means the certificate of incorporation, articles of incorporation, articles of association, by-laws, articles of organization, limited liability company agreement, partnership agreement, formation agreement, operating agreement, joint venture agreement or other similar organizational document of any Person other than any individual (in each case, as amended to date), and including any certificates of designation or other similar instruments.

"Ownership Percentage" means, for any Shareholder, such Person's Ownership Percentage as set forth from time to time on the Schedule of Shareholders.

"Person" means any individual, corporation, partnership, joint venture, association, joint share or stock company, trust, unincorporated organization, limited liability company or any other entity or organization of any kind, including a Governmental Entity.

"Preemptive Pro Rata Portion" means, with respect to each Preemptive Shareholder, the proportion that the total shares of outstanding capital stock (including Common Stock and Preferred Stock) owned by such Preemptive Shareholder bears to the total shares of outstanding capital stock (including Common Stock and Preferred Stock) owned by all Preemptive Shareholders.

"Public Offering" means any offering of shares of the Company's capital stock to the public pursuant to an effective registration statement under the Securities Act or any comparable registration statement under any similar foreign Law then in force.

"Qualified Public Offering" means any Public Offering by the Company in which the Company receives no less than $50 million of net proceeds from sales to Persons other than Affiliates of the Company pursuant to a Public Offering on an international, national or regional exchange or on the Nasdaq National Market System.

"Sale of the Company" means any transaction or series of transactions pursuant to which any Independent Third Party in the aggregate acquires (i) Securities of the Company possessing the majority of the voting power of the Company (whether by merger, consolidation, reorganization, combination, sale or Transfer of the Company's Securities), or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

"Securities" means Ordinary Shares, any other equity securities of the Company and any shares of capital stock or other securities directly or indirectly exercisable for, or convertible into, such securities; *provided*, *however*, that Securities shall not include any securities which have been sold to the public (i) pursuant to a registration statement declared effective by the Commission, or (ii) pursuant to Rule 144 promulgated under the Securities Act.

"Securities Act" means the Securities Act of 1933, and the rules and regulations promulgated thereunder, as amended from time to time.

"Subsidiary" means any corporation, partnership or limited liability company with respect to which a specified Person (or a subsidiary thereof) owns a majority of the common or ordinary shares or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors.

"Tag-Along Pro Rata Portion" means, with respect to each Non-Disposing Shareholder, the proportion that the total shares of the applicable class or series of Securities owned by such Non-Disposing Shareholder bears to the total of the applicable class or series of Securities owned by all Non-Disposing Shareholders and the Disposing Significant Shareholders.