UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TYLER MILLER,                          )
                                       )
         Plaintiff,                    )
                                       )
v.                                     )          Case No: 1:20-cv-4849-GBD-JLC
                                       )
BRIGHTSTAR ASIA, LTD,                  )
                                       )
         Defendant.                    )


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Kristina A. Reliford
Peter C. Sales (*Admitted Pro Hac Vice*)
Frankie N. Spero (*Admitted Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: (615) 252-3573
F: (615) 252-6380
kreliford@bradley.com
psales@bradley.com
fspero@bradley.com
*Attorneys for Brightstar Asia, Ltd.*

## TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ................................................................................. 1

II.    BACKGROUND .................................................................................. 1

       A.     Operations of Harvestar and Brightstar Corp. ...................................... 1

       B.     Brightstar Asia Acquires Majority Stake in Harvestar. ........................... 2

       C.     Brightstar Asia's Alleged Mismanagement of Harvestar. ....................... 2

III.   ARGUMENT ...................................................................................... 4

       A.     Plaintiff's Complaint Must be Dismissed under Fed. R. Civ. P. 12(b)(1)
              for Lack of Subject Matter Jurisdiction. ........................................... 4

              1.     Plaintiff Lacks Standing to Assert his Causes of Action in the
                     Complaint................................................................................. 4

                     a.     Plaintiff's Causes of Action are Derivative Claims, Not
                            Direct Claims, under Delaware Law.................................. 5

                            i.     Under *El Paso*, *NAF Holdings* is Inapposite, and the
                                   Court Must Apply *Tooley* to Determine whether
                                   Plaintiff's Claims are Derivative or Direct. ................ 7

                            ii.    Plaintiff's Contractual Claims in Counts I–III Sound
                                   in Breach of a Contractual Duty Allegedly Owed to
                                   Harvestar under the Shareholders Agreement. ............ 9

                            iii.   Plaintiff's Causes of Action in the Amended
                                   Complaint are Derivative under Both Prongs of
                                   *Tooley*.......................................................... 12

                                   A.     First *Tooley* Prong:  Plaintiff's Claims are
                                          Derived from the Alleged Harm to
                                          Harvestar.......................................... 12

                                   B.     Second *Tooley* Prong:  Harvestar would
                                          Benefit from any Recovery or other Remedy
                                          Resulting from the Alleged Harm to
                                          Harvestar.......................................... 16

                     b.     Alternatively, Plaintiff has Not Alleged an Injury in Fact,
                            and His Claims are Based upon the Legal Rights and
                            Interests of Third-Parties.............................................. 17

      2.      Alternatively, Plaintiff's Causes of Action are Not Ripe. ...................... 19

B.      Alternatively, Plaintiff's Amended Complaint Must be Dismissed under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim. .......................... 20

      1.      Plaintiff's Breach of Contract Claims in Counts I & II Fail as a Matter of Law Because Plaintiff has Not Alleged a Breach of Section 14 of the Shareholders Agreement............................... 21

      2.      Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law. .................................... 22

      3.      Plaintiff Fails to State a Claim for Breach of Fiduciary Duty. ............... 24

IV.      CONCLUSION............................................................................................. 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*3M Co. v. Neology, Inc.*,
  No. N18C-07-089, 2019 WL 2714832 (Del. Super. Ct. June 28, 2019) ...............................22

*Agostino v. Hicks*,
  845 A.2d 1110 (Del. Ch. 2004)...........................................................................13, 14, 16

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011)...................................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................20

*Backus v. U3 Advisors, Inc.*,
  No. 1:16-cv-8990, 2017 WL 3600430 (S.D.N.Y. Aug. 18, 2017) .........................9, 11, 14, 15

*Blaustein v. Lord Baltimore Cap. Corp.*,
  84 A.3d 954 (Del. 2014) ....................................................................................22

*Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*,
  906 A.2d 827 (Del. Ch. 2006)...............................................................................24

*BP1, LLC v. Coventry Real Estate Fund II, LLC*,
  Nos. 312579, 314876, 2014 WL 4723146 (Mich. Ct. App. Sept. 23, 2014) ..........................15

*Carter v. HealthPort Tech., LLC*,
  822 F.3d 47 (2d Cir. 2016)....................................................................................4

*Chevron Corp. v. Donziger*,
  833 F.3d 74 (2d Cir. 2016)....................................................................................5

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*,
  790 F.3d 411 (2d Cir. 2015)...................................................................................5

*Davis v. Fed. Election Comm'n*,
  554 U.S. 724 (2008).............................................................................................5

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)...........................................................................4, 5, 19

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
  No. 2017-0500, 2018 WL 2727542 (Del. Ch. June 6, 2018).........................................22

*El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff,*
   152 A.3d 1248 (Del. 2016) ........................................................................... *passim*

*Feldman v. Cutaia,*
   951 A.2d 727 (Del. 2008) ...................................................................................16

*FS Parallel Fund L.P. v. Ergen,*
   No. 19853, 2004 WL 3048751 (Del. Ch. Nov. 3, 2004) .......................................15

*Gale v. Bershad, No. CIV. A. 15714,*
   *1998 WL 118022 (Del. Ch. Mar. 4, 1998)* .........................................................24

*Kramer v. W. Pac. Indus., Inc.,*
   546 A.2d 348 (Del. 1988) ....................................................................................13

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ..............................................................................................5

*Madison Realty Partners 7, LLC v. Ag ISA, LLC,*
   No. CIV.A. 18094, 2001 WL 406268 (Del. Ch. Apr. 17, 2001) ...........................24

*In re Massey Energy Co. Deriv. and Class Litig.,*
   160 A.3d 484 (Del. Ch. 2017).....................................................................6, 12, 16

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.,*
   118 A.3d 175 (Del. 2015) ...........................................................................6, 7, 8, 9

*Nat'l Org. for Marriage, Inc. v. Walsh,*
   714 F.3d 682 (2d Cir. 2013)...........................................................................19, 20

*Nat'l Park Hospitality Ass'n v. Dept. of Interior,*
   538 U.S. 803 (2003).............................................................................................19

*Nemec v. Shrader,*
   991 A.2d 1120 (Del. 2010) .....................................................................22, 23, 24

*Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC,*
   202 A.3d 482 (Del. 2019) ...................................................................................23

*Parker Madison Partners v. Airbnb, Inc.,*
   283 F.Supp.3d 174 (S.D.N.Y. 2017).....................................................................20

*Rajamin v. Deutsche Bank Nat'l Tr. Co.,*
   757 F.3d 79 (2d Cir. 2014)..............................................................................5, 19

*Schiff v. ZM Equity Partners, LLC,*
   No. 19-cv-4735, 2020 WL 5077712 (S.D.N.Y. Aug. 27, 2020).................9, 10, 11

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ................................................................................ *passim*

*Warth v. Seldin*,
    422 U.S. 490 (1975) .......................................................................................... 4, 5

**Statutes**

Hong Kong Companies Ordinance ............................................................................ 1, 2

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 1, 4

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 20

Defendant, Brightstar Asia, Ltd. ("Brightstar Asia"), hereby submits this memorandum of law in support of its motion to dismiss Plaintiff's First Amended Complaint ("Amended Complaint") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and states as follows:

## I.    INTRODUCTION

In the Amended Complaint, Plaintiff, a minority shareholder of Harvestar Solutions Limited ("Harvestar"), asserts four (4) purported causes of action against Brightstar Asia, the majority shareholder of Harvestar, for breach of contract (Counts I & II), breach of the implied covenant of good faith and fair dealing (Count III), and breach of fiduciary duty (Count IV). This Court lacks subject matter jurisdiction over Plaintiff's claims for two primary reasons. First, Plaintiff does not have standing because: (1) Plaintiff's claims are derivative claims, not direct claims, under Delaware law; and (2) Plaintiff has not alleged an injury in fact and his claims are based upon the legal rights and interests of third-parties.  Second, even if Plaintiff somehow has standing to bring these causes of action, the claims are not ripe for adjudication.

Alternatively, the Amended Complaint fails to state a claim.  Plaintiff's claim in Counts I and II that Brightstar Asia breached Section 14 of the Shareholders Agreement fails because he has not alleged a breach of that provision.  Plaintiff's implied covenant claim fails because: (1) it is duplicative of the breach of contract claim, and (2) it seeks to imply terms in the Shareholders Agreement that were anticipated by the parties at the time of contracting and could have been provided for but were not.  Plaintiff's fiduciary duty claim fails because it is based upon the same facts and conduct underlying Plaintiff's claims for breach of contract and implied covenant.

## II.    BACKGROUND

### A.    Operations of Harvestar and Brightstar Corp.

In August 2016, Plaintiff and Omar Elmi formed and incorporated Harvestar as a private company limited by shares under the Hong Kong Companies Ordinance.  (Amend. Compl., ¶¶ 4,

9.)  Harvestar's business principally consisted of purchasing from various sources used mobile phones traded-in by consumers, refurbishing the used phones to "like new" condition at Harvestar's facility in the Philippines, and then wholesaling the refurbished phones to distributors and retailers that sell used mobile phones to consumers.  (*Id.*, ¶ 10.)

Brightstar Corp., based in Miami, Florida, is one of the largest distributors of mobile phones in the world and was a significant customer of Harvestar.  (*Id.*, ¶¶ 11.)  Brightstar Corp. purchases millions of used mobile devices that are traded-in at Apple and Softbank retail stores and uses third-party vendors, such as Harvestar, to repair and refurbish the used devices, which Brightstar Corp. then wholesales into the consumer market.  (*Id.*, ¶ 12.)  Through its subsidiary, Brightstar Device Protection, LLC ("Brightstar Device"), which is based in Alpharetta, Georgia, Brightstar Corp. also acquires damaged mobile devices from consumers who purchased a Brightstar Corp. device protection plan.  (*Id.*, ¶ 13.)  Brightstar Corp., through third-party vendors, repairs the damaged devices and redeploys the devices back to the consumers.  (*Id.*)

### B.    Brightstar Asia Acquires Majority Stake in Harvestar.

On April 9, 2018, Brightstar Asia, a private company limited by shares incorporated under the Hong Kong Companies Ordinance, purchased a 51% controlling stock interest in Harvestar from Plaintiff and Omar Elmi pursuant to the terms of a Share Purchase Agreement. (Amend. Compl., ¶¶ 2, 15.)  The transaction left Plaintiff and Mr. Elmi each owning a 24.5% minority interest in Harvestar.  (*Id.*, ¶ 15.)  In connection with the stock purchase transaction, Brightstar Asia, Plaintiff, and Mr. Elmi also executed the Shareholders Agreement, dated April 9, 2018, defining the rights, duties, and obligations of the parties thereunder.  (*Id.*, ¶ 17 & Ex. 1.)

### C.    Brightstar Asia's Alleged Mismanagement of Harvestar.

Plaintiff alleges that, upon Brightstar Asia acquiring its majority stake in Harvestar, it "mismanaged" the company.  (Amend. Compl., ¶¶ 21, 25.)  Specifically, as the bases for his four

causes of action in the Amended Complaint, Plaintiff alleges that Brightstar Asia "mismanaged" Harvestar in two respects.   First, Brightstar Asia allegedly caused Harvestar to engage in "conflict transactions" by causing Harvestar to repair more than 200,000 mobile devices for Brightstar Device (an alleged "insurance affiliate" of Brightstar Asia) at a price that was $50 lower per device than Brightstar Asia could have obtained in a comparable arm's-length transaction.   (*Id.*, ¶¶ 21, 27, 33–35, 42, 50, 61.)   Second, Brightstar Asia allegedly caused Harvestar not to receive for repair and refurbishment used mobile devices in the volumes that were allegedly "contemplated" and the "basis for" Brightstar Asia's April 9, 2018 purchase of the majority stake in Harvestar.  (*Id.*, ¶¶ 19–20, 51, 62.)

Plaintiff alleges that, as a result of this mismanagement, Brightstar Asia harmed Harvestar in two respects.   First, Brightstar Asia allegedly caused Harvestar's revenues to be $10 million less than they would have been had Brightstar Asia not caused Harvestar to repair the 200,000 devices for Brightstar Device at the below market price per phone. (*Id.*, ¶¶ 37, 45, 50, 61.)   Second, Brightstar Asia allegedly caused Harvestar's EBIT (*i.e.*, earnings before interest and taxes) for the trailing twelve months to decrease to a negative number.   (*Id.*, ¶ 54.)

Plaintiff alleges, in turn, that these alleged harms to Harvestar's revenues and EBIT decreased the value of his stock in Harvestar.   Specifically, Plaintiff alleges that the alleged "conflict transaction" between Harvestar and Brightstar Device caused the value of his 24.5% stock interest in Harvestar to be $2,450,000 less than it would have been had Harvestar not entered that transaction, and he requests a judgment for that amount.  (*Id.*, ¶¶ 37, 52, 63.)   He further alleges that the alleged harm to Harvestar's EBIT decreased the value of his purported "put" right (*i.e.*, right to sell his shares to Brightstar Asia on certain conditions) under Section 10 of the Shareholders Agreement.  (*Id.*, ¶¶ 28, 38, 53–55, 63.)   Plaintiff alleges that, had Brightstar

Asia not mismanaged Harvestar and caused Harvestar's EBIT to decrease, the price at which he would be able to "put" his shares of stock to Brightstar Asia would be $6,125,000. (*Id.*, ¶ 54.)[1]

## III.   ARGUMENT

### A.   Plaintiff's Complaint Must be Dismissed under Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction.

This Court lacks subject matter jurisdiction over Plaintiff's causes of action in the Amended Complaint for two primary reasons: (1) no standing, and (2) not ripe. "A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the "Pleading"), the plaintiff has no evidentiary burden," and "[t]he task of the district court is to determine whether the Pleading 'alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue.'" *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). Brightstar Asia's motion presents a facial attack to this Court's subject matter jurisdiction over the Amended Complaint.

#### 1.   Plaintiff Lacks Standing to Assert his Causes of Action in the Complaint.

Standing "is 'the threshold question in every federal case, determining the power of the court to entertain the suit.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). When a complaint is dismissed for lack of standing, "[s]uch a dismissal is one for lack of subject matter jurisdiction." *Carter*, 822 F.3d at 55 (collecting cases).

---

[1] As discussed *infra*, Plaintiff does not have an individual "put" right under the Shareholders Agreement. Rather, Section 10 of the Shareholders Agreement explicitly provides that the "Put Right" must be exercised by the "Executives" "acting jointly only." Plaintiff has not alleged that the Executives have jointly exercised the "Put Right". Moreover, the Executives are not even entitled to exercise the "Put Right" at the present time and will not be able to do so until April 2021. Thus, even if Plaintiff's claims are somehow not derivative (which they clearly are), he lacks Article III standing to assert those claims (*i.e.*, no "injury in fact"), and the claims are not ripe.

"To meet the Article III standing requirement, a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Denney*, 443 F.3d at 263 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The plaintiff bears the burden of 'alleging facts that affirmatively and plausibly suggest that it has standing to sue.'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (citation omitted). Standing is determined based upon the plaintiff's position at the time he filed the complaint. *Chevron Corp. v. Donziger*, 833 F.3d 74, 122 (2d Cir. 2016) (citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

A plaintiff must also establish prudential standing. "The 'prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves.'" *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (quoting *Warth*, 420 U.S. at 509). To satisfy this requirement, "'[t]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Id.* (quoting *Warth*, 420 U.S. at 499).

Here, Plaintiff lacks standing to assert the causes of action in his Amended Complaint for two reasons: First, Plaintiff's causes of action against Brightstar Asia are derivative claims, not direct claims, under Delaware law. Second, even if Plaintiff's causes of action are somehow direct claims, Plaintiff has not alleged an "injury in fact," and his claims are based upon the legal rights and interests of third parties.

### a.      *Plaintiff's Causes of Action are Derivative Claims, Not Direct Claims, under Delaware Law*.

Plaintiff lacks standing to individually assert the four (4) causes of action in the Amended Complaint because those causes of action are derivative claims, not direct claims, under

Delaware law.[2]  In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), the Delaware Supreme Court adopted the test for determining whether a claim is derivative or direct. The inquiry "'must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).'" *In re Massey Energy Co. Deriv. and Class Litig.*, 160 A.3d 484, 502 (Del. Ch. 2017) (quoting *Tooley*, 845 A.2d at 1033).  "[T]he stockholder's 'claimed direct injury must be independent of any alleged injury to the corporation,' and . . . the stockholder 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"  *Id.* (quoting *Tooley*, 845 A.2d at 1039).

       In its motion to dismiss Plaintiff's original Complaint, Brightstar Asia clearly demonstrated that Plaintiff's claims in this action are derivative, not direct, under the *Tooley* test. (Dkt. 22, pp. 7–11.)  In his response to the motion, Plaintiff did not attempt to oppose Brightstar Asia's analysis under *Tooley*.  Rather, Plaintiff argued that *Tooley* is inapplicable because, under the Delaware Supreme Court's decision in *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015), his claims in the Amended Complaint[3] are direct, not derivative, as a matter of law.  (Dkt. 25, pp. 9–11.)  Plaintiff is simply wrong.

       As discussed below, Plaintiff's reliance on the *NAF Holdings* decision was expressly addressed and rejected by the Delaware Supreme Court in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016).  Under *El Paso*, this Court must apply the *Tooley* test to determine whether Plaintiff's claims are derivative or direct, and, as demonstrated below, Plaintiff's claims are clearly derivative under both *Tooley* prongs.

---

[2] Section 26 of the Shareholders Agreement contains a Delaware choice of law provision.
[3] Plaintiff filed his response in opposition to Brightstar Asia's first motion to dismiss after he filed his Amended Complaint, and he incorporated his allegations and causes of action from the Amended Complaint into his response.

       **i.**      **Under *El Paso*, *NAF Holdings* is Inapposite, and the Court Must Apply *Tooley* to Determine whether Plaintiff's Claims are Derivative or Direct.**

In *NAF Holdings*, the Delaware Supreme Court responded to a certified question from the U.S. Second Circuit Court of Appeals regarding whether *Tooley* applies when a party to a "commercial contract" sues to enforce "its own contractual rights" under that contract. *NAF Holdings*, 118 A.3d at 176, 179. The court began by noting that: "[*Tooley*] and its progeny deal with the distinct question of when a cause of action for breach of fiduciary duty **or to enforce rights belonging to the corporation itself** must be asserted derivatively. That body of law has no bearing on whether a party with **its own rights** as a signatory to a commercial contract may sue directly to enforce those rights." *Id.* (emphasis added). The court stated that the "initial question to be answered" in the derivative/direct analysis is: "does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?" *Id.* at 180. The court noted that "it is of course true that [the plaintiff] cannot bring direct contractual claims belonging only to [third-party companies]," but the plaintiff may bring a direct claim "as to contract claims [the plaintiff] itself possesses." *Id.* The court answered the certified question by holding that "a suit by a party to a commercial contract to enforce ***its own* contractual rights** is not a derivative action under Delaware law." *Id.* at 182 (emphasis added).

Here, Plaintiff argues that, because he is bringing claims alleging breach of the Shareholders Agreement, to which he is a party, and for breach of fiduciary duties allegedly owed by Brightstar Asia to Plaintiff, under the *NAF Holdings* decision, the *Tooley* test is inapplicable, and he may simply bring those claims as direct claims. Plaintiff is wrong.

As an initial point, Plaintiff's suggestion that *Tooley* is inapplicable to whether his breach of fiduciary duty claim in Count IV is derivative or direct is directly contrary to *NAF Holdings* (not to mention *Tooley* and its progeny). The court made clear in *NAF Holdings* that *Tooley*

governs, *inter alia*, "the distinct question of when a cause of action for breach of fiduciary duty . . . must be asserted derivatively. *NAF Holdings*, 118 A.3d at 176. Thus, this Court must apply *Tooley* to determine whether Plaintiff's fiduciary duty claim is derivative or direct.

Plaintiff's remaining causes of action (*i.e.*, Counts I–III) contain his purported contractual claims against Brightstar Asia under the Shareholders Agreement. In Counts I and II, Plaintiff alleges an identical claim that Brightstar Asia breached Section 14 of the Shareholders Agreement (but Plaintiff seeks different remedies in each count), and, in Count III, Plaintiff alleges that Brightstar Asia breached the implied covenant of good faith and fair dealing under the Shareholders Agreement. While it is true that those purported claims sound in contract and that Plaintiff is a party to Shareholders Agreement, Plaintiff is not entitled, as a matter of law, to simply bring those claims as direct claims under the holding in *NAF Holdings*, and without application of *Tooley*. That reading of *NAF Holdings* was expressly addressed and rejected by the Delaware Supreme Court in *El Paso*.

In *El Paso*, a limited partner sued the general partner for breach of the limited partnership agreement ("LPA"), alleging that the general partner caused the partnership to make a $171 million overpayment for the purchase of assets from the general partner's parent company, which allegedly violated the conflict of interest provisions in the LPA. *El Paso*, 152 A.3d at 1250. The Chancery Court, relying on *NAF Holdings*, found that *Tooley* did not apply to "contract rights" and, thus, held that the limited partner could challenge the overpayment transaction as a direct claim for breach of the LPA. *Id.* at 1258.

The Delaware Supreme Court disagreed and reversed. *Id.* at 1260–65. The court held that the Chancery Court (like Plaintiff in this case) had "read[] *NAF Holdings* too broadly" to suggest that *Tooley* does not apply where the alleged harm involves contract rights. *Id.* at 1259.

The court clarified its holding in *NAF Holdings*, stating that: "*NAF Holdings* does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*. Nor does it mean that [the plaintiff's] status as a limited partner and party to the LPA enable[s] him to litigate directly every claim arising from the LPA." *Id.* (original emphasis). On the latter point, the court held that the Chancery Court had incorrectly treated the LPA as a "separate commercial contract," rather than the "constitutive contract" of the partnership. *Id.* at 1260.

The court held that, when the plaintiff's claim "sounds in breach of a contractual duty owed to the [company]," then the court must apply the *Tooley* test to determine whether the claim is derivative or direct. *Id.* at 1260; *see also Backus v. U3 Advisors, Inc.*, No. 1:16-cv-8990, 2017 WL 3600430, at *16 (S.D.N.Y. Aug. 18, 2017) (recognizing that the *El Paso* decision "clarified that '*NAF Holdings* does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*' and that when a claim 'sounds in breach of a contractual duty' owed to the company," the court must apply *Tooley* to determine whether the contractual claim is derivative or direct); *Schiff v. ZM Equity Partners, LLC*, No. 19-cv-4735, 2020 WL 5077712, at *10 (S.D.N.Y. Aug. 27, 2020) (same). Here, as discussed below, Plaintiff's contractual claims in Counts I–III sound in breach of a contractual duty allegedly owed to Harvestar under the Shareholders Agreement. Therefore, under *El Paso*, this Court must apply the *Tooley* test to determine whether those claims are derivative or direct.

      ii.      **Plaintiff's Contractual Claims in Counts I–III Sound in Breach of a Contractual Duty Allegedly Owed to Harvestar under the Shareholders Agreement.**

As noted above, Counts I–III contain Plaintiff's contractual claims against Brightstar Asia under the Shareholders Agreement. In Counts I and II, Plaintiff asserts an identical claim

for breach of Section 14 of the Shareholders Agreement[4], and, in Count III, he asserts a claim for breach of the implied covenant of good faith and fair dealing under the Shareholders Agreement. As demonstrated below, these three claims all sound in breach of a contractual duty allegedly owed to Harvestar (*i.e.*, the company), not the shareholders, under the Shareholders Agreement.

Regarding Counts I and II, Section 14 of the Shareholders Agreement is for the benefit of Brightstar Asia.  It provides that the "Investor" (*i.e.*, Brightstar Asia) is permitted to invest in or have business relationships with companies other than Harvestar (referred to as an "Other Business"), including companies that are involved in the same business as, or competitive with, Harvestar.  (Shareholders Agreement, § 14.)  Section 14 further provides that Harvestar and the other Shareholders waive any claims against Brightstar Asia arising from Brightstar Asia's involvement with any "Other Business", including any claims for breach of fiduciary duty or that such involvement constitutes a conflict of interest.  (*Id.*)  Plaintiff argues, however, that the following bolded language in Section 14 constitutes an exception to that provision:

> The parties hereto expressly authorize and consent to the involvement of the Investors [*i.e.*, Brightstar Asia] and their Affiliates in any Other Business; **provided, that any transactions between the Company** or the Subsidiaries thereof, **on the one hand**, **and an Investor or an Other Business, on the other hand**, **will be on terms no less favorable to the Company** or the Subsidiaries thereof **than would be obtainable in a comparable arm's-length transaction**.

(*Id.*) (emphasis added).  In Counts I and II, Plaintiff alleges that Brightstar Asia breached the above-emphasized language by causing Harvestar to enter into transactions with Brightstar Device, an alleged "insurance affiliate" of Brightstar Asia, on terms less favorable to Harvestar than could have been obtained in a comparable arm's length.  (Amend. Compl., ¶¶ 34, 42.)  Specifically, Plaintiff alleges that Brightstar Asia caused Harvestar to repair more than 200,000

---

[4] The sole difference between the Counts I and II is that Plaintiff seeks different remedies for the alleged breach in each count.  (*See* Amend. Compl., ¶¶ 36–38, 45.)

mobile devices for Brightstar Device at a price that was $50 lower per device than could have been obtained in a comparable arm's-length transaction.  (*Id.*, ¶¶ 21, 27, 33–35, 42, 50, 61.)

Plaintiff asserts this alleged breach of Section 14 as a direct claim in Counts I and II.[5] However, the alleged contractual duty[6] to enter transactions "on terms no less favorable to the Company [*i.e.*, Harvestar]" than could have been obtained "in a comparable arm's-length transaction" is owed, if at all, to Harvestar, not Plaintiff.  *El Paso* is controlling.

In *El Paso*, the court examined the provisions in the LPA that were allegedly breached by the general partner.  *Id.* at 1257–58.  The LPA provided that, whenever the general partner or the conflicts committee took action for the partnership, it had to take such action in "good faith."  *Id.* The LPA defined "good faith" as a person taking action with the belief that such action was in the "best interests of the Partnership."  *Id.* at 1258.  The court concluded that contractual duty under these provisions to act in good faith was owed to the partnership, not the limited partners. *Id.* at 1258–59; *see also Backus*, 2017 WL 3600430, at *16 (shareholder brought direct claim against other shareholders for breaching a provision in the stockholder agreement requiring the shareholders to devote substantially all of their professional time to the company, *Held*, under *El Paso*, claim sounded in breach of a contractual duty owed to the company, not the shareholder).

Like the contractual duty of the general partner to take action "in the best interests *of the Partnership*" in *El Paso*, the contractual duty alleged by Plaintiff is that, if the "Investor" (*i.e.*, Brightstar Asia) or the Shareholders enter a transaction for Harvestar, then they must do so "on terms no less favorable **to the Company [*i.e.*, Harvestar]**" than could have been obtained "in a

---

[5] Plaintiff suggests that the Shareholders Agreement is a "commercial contract."  (Dkt. 25, p. 2.)  However, the *El Paso* Court made clear that a "constitutive contract" of a company, like the Shareholders Agreement, is not a "separate commercial contract."  *El Paso*, 152 A.3d at 1260; *see also Schiff*, 2020 WL 5077712, at *10 (applying *El Paso* and holding that "the LLC Agreement is not a commercial contract" (citing *El Paso*, 152 A.3d at 1260)).

[6] Brightstar Asia does not acknowledge or concede that the cited language from Section 14 of the Shareholders Agreement creates an exception or imposes an affirmative obligation or duty on Brightstar Asia

comparable arm's length transaction." Therefore, pursuant to the holding in *El Paso*, the alleged contractual duty under Section 14 of the Shareholders Agreement is owed, if at all, to Harvestar, not the individual shareholders.

Next, in Count III of the Amended Complaint, Plaintiff attempts to assert a direct claim against Brightstar Asia for breach of the implied covenant under the Shareholders Agreement. Specifically, Plaintiff alleges that Brightstar Asia breached the implied covenant in two respects: (1) by causing Harvestar to enter the alleged "conflict transactions" with Brightstar Device on terms less favorable to Harvestar than could have been obtained in a comparable arm's-length transaction; and (2) by causing Harvestar not to receive for repair and refurbishment used mobile devices in the volumes allegedly contemplated as part of Brightstar Asia's April 9, 2018 purchase of the majority stake in Harvestar. Under the reasoning in *El Paso*, to the extent that Brightstar Asia owes a duty or obligation under the implied covenant to enter into transactions on certain terms **for Harvestar** or to provide used devices in certain volumes **to Harvestar**, any such alleged duty or obligation is clearly owed to Harvestar, not to the individual shareholders.

For these reasons, Plaintiff's claims in Counts I–III sound in breach of a contractual duty allegedly owed to Harvestar under the Shareholders Agreement. *See El Paso*, 152 A.3d at 1260. Therefore, under *El Paso*, this Court must apply the *Tooley* test to determine whether Plaintiff's claims are derivative or direct. As demonstrated below, Plaintiff's claims are clearly derivative under both prongs of *Tooley*.

      iii.   **Plaintiff's Causes of Action in the Amended Complaint are Derivative under Both Prongs of *Tooley*.**

      A.   **First *Tooley* Prong: Plaintiff's Claims are Derived from the Alleged Harm to Harvestar.**

The first *Tooley* prong is "who suffered the alleged harm (the corporation or the suing stockholders, individually)." *In re Massey Energy*, 160 A.3d at 502. "Delaware courts have long

recognized that actions charging 'mismanagement which depress the value of stock allege a wrong to the corporation; *i.e.*, stockholders collectively, to be enforced by a derivative action.'" *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988); *see Agostino v. Hicks*, 845 A.2d 1110, 1123 (Del. Ch. 2004) (plaintiff's claim was "nothing more than a claim of mismanagement that, 'if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders,'" and, thus, "'the wrong alleged is entirely derivative in nature'"). Thus, "where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of the alleged director mismanagement, his cause of action is derivative in nature." *Kramer*, 546 A.2d at 353.

That is exactly what Plaintiff is alleging in this action: mismanagement of Harvestar by Brightstar Asia causing a decrease in the value of Harvestar's stock and, in turn, of Plaintiff's stock in Harvestar. Specifically, as the basis for the alleged "breach" in all four Counts (*i.e.*, breach of contract, implied covenant, and fiduciary duty), Plaintiff alleges that Brightstar Asia "mismanaged" Harvestar in two respects. First, Brightstar Asia allegedly caused Harvestar to engage in "conflict transactions" with Brightstar Device. (Amend. Compl., ¶¶ 21, 27, 33–35, 42, 50, 61.) Second, Brightstar Asia allegedly caused Harvestar not to receive for repair and refurbishment used mobile devices in the volumes that were allegedly "contemplated" in and the "basis for" Brightstar Asia's April 9, 2018 purchase of the majority stake in Harvestar. (*Id.*, ¶¶ 19–20, 51, 62.)

Plaintiff alleges that, as a result of this mismanagement, Brightstar Asia harmed Harvestar in two respects:

**First**, Brightstar Asia allegedly caused **Harvestar's revenues** to be $10 million less than they would have been had Brightstar Asia not caused Harvestar to enter into the "conflict

transactions" with Brightstar Device.  (*Id.*, ¶¶ 37, 45, 50, 61.)  In *El Paso*, the limited partner alleged that the general partner had violated the conflict of interest provisions in the LPA by approving a $171 million overpayment by the partnership for the purchase of assets from the general partner's parent company.  *El Paso*, 152 A.3d at 1250, 1253.  Thus, like Brightstar Device's alleged underpayment to Harvestar for repair services resulting in $10 million less revenues for Harvestar, the alleged overpayment in *El Paso* had left the partnership "$171 million poorer".  *Id.* at 1261.

Applying the first prong of *Tooley*, the court held that the alleged harm was solely to the partnership, and the alleged injury to the limited partner was "only in terms of the alleged harm to the [p]artnership." *Id.* at 1260.  The court stated that such corporate overpayment claims are regarded as derivative because, "[i]n *Tooley* terms, the harm is to the corporation, because such claims 'naturally assert that the corporation's funds have been wrongfully depleted, which, though harming the corporation directly, harms the stockholders only derivatively so far as their stock loses value." *Id.* at 1261.  The court held that "[a]ny economic harm to [the limited partner] devolved upon him as an equity holder [in the partnership] in the form of the proportionately reduced value of his units—a classically derivative injury." *Id.*

Accordingly, under *Tooley* (and *El Paso*), the alleged harm to Harvestar's revenues caused by Brightstar Asia's alleged mismanagement was suffered by Harvestar.  *See, e.g.*, *Agostino*, 845 A.2d at 1124 (where board's mismanagement caused the company to receive inadequate monetary consideration for issued stock warrants, *Held*, minority shareholder's claim was derivative because "[t]he injury suffered by plaintiff, a devaluation of his stock, was a natural and expected consequence of the injury initially borne by the [c]ompany; the injury thus is not individual in nature"); *Backus*, 2017 WL 3600430, at *16 (applying Delaware law; alleged

harm to shareholder was derivative where controlling shareholders' mismanagement of the company in breach of the stockholders agreement resulted in lower revenues for the company).

**Second**, Brightstar Asia's alleged mismanagement of Harvestar allegedly caused **Harvestar's EBIT** (*i.e.*, earnings before interest and taxes), which includes **Harvestar's revenues**, for the trailing twelve months to decrease to a negative number. (*Id.*, ¶ 54.) Under *Tooley* and the authorities above, this alleged harm to Harvestar's earnings was also clearly suffered by Harvestar. *See, e.g.*, *FS Parallel Fund L.P. v. Ergen*, No. 19853, 2004 WL 3048751, at *3 (Del. Ch. Nov. 3, 2004) (alleged harm to the shareholders was derivative where the controlling shareholders/directors mismanaged and failed to further develop the company, which caused the company's value and prospects to decline resulting in the company's bankruptcy and the cancellation of the shareholders' common stock).

Plaintiff alleges, in turn, that these alleged harms to Harvestar's revenues and EBIT decreased the value of his stock in Harvestar. Specifically, Plaintiff alleges that the alleged "conflict transaction" between Harvestar and Brightstar Device caused the value of his 24.5% stock interest in Harvestar to be $2,450,000 less than it would have been had Harvestar not entered that transaction. (*Id.*, ¶¶ 37, 52, 63.) He further alleges that the harm to Harvestar's EBIT allegedly harmed the value of his purported "put" right under Section 10 of the Shareholders Agreement. (*Id.*, ¶¶ 28, 38, 53–55, 63.) Plaintiff alleges that, had Brightstar Asia not mismanaged Harvestar and caused Harvestar's EBIT to decrease, the price at which he would be able to "put" (*i.e.*, sell) his shares of stock to Brightstar Asia would be $6,125,000. (*Id.*, ¶ 54.) *See BP1, LLC v. Coventry Real Estate Fund II, LLC*, Nos. 312579, 314876, 2014 WL 4723146, at *9 (Mich. Ct. App. Sept. 23, 2014) (applying Delaware law and holding that the

alleged harm to the minority member's "put option" under the LLC agreement caused by the managing member's mismanagement was derivative of the harm to the company).

However, this alleged injury to Plaintiff (*i.e.*, decrease in the value of his Harvestar stock) is alleged "only in terms of the alleged harm to [Harvestar]." *El Paso*, 152 A.3d at 1260. The injury is "a natural and expected consequence of the injury initially borne by [Harvestar]." *Agostino*, 845 A.2d at 1124. It is not independent of the alleged injury to Harvestar. *See In re Massey Energy*, 160 A.3d at 502 ("the stockholder's 'claimed direct injury must be independent of any alleged injury to the corporation'"). Rather, the alleged "economic harm" to Plaintiff "devolved upon him as an equity holder [in Harvestar] in the form of proportionally reduced value of his units—a classically derivative injury." *El Paso*, 152 A.3d at 1261. Therefore, under the first prong of *Tooley*, Plaintiff's causes of action are derivative.

        **B.**    **Second *Tooley* Prong: Harvestar would Benefit from any Recovery or other Remedy Resulting from the Alleged Harm to Harvestar.**

Plaintiff's claims are also derivative under the second prong of *Tooley*, which asks: "who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).'" *In re Massey Energy*, 160 A.3d at 502. When the alleged harm is to the value of the company's stock, "[t]he recovery—'restoration of the improperly reduced value'—flows to the corporation." *El Paso*, 152 A.3d at 1261 (citation omitted). Further, "'[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature.'" *Id.* (quoting *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008)).

In *El Paso*, the court applied the second *Tooley* prong and held that the benefit of any recovery on the limited partner's claim for breach of the LPA based upon the alleged overpayment "must flow solely to the [p]artnership." *Id.* at 1264. The court reasoned that:

"Were [the limited partner] to recover directly for the alleged decrease in value of the [p]artnership's assets, the damages would be proportionate to his ownership interest. The necessity of pro rata recovery to remedy the alleged harm indicates that his claim is derivative." *Id.* (citation omitted). The *El Paso* Court's reasoning is controlling in this case.

Here, any recovery for the alleged harm to the value of Harvestar's stock from Brightstar Asia's alleged mismanagement must flow to Harvestar. Were Plaintiff to recover directly for the alleged harm to Harvestar's revenues and EBIT, the damages would be proportionate to his ownership interest in the company. The necessity of such a *pro rata* recovery to remedy the alleged harm to Harvestar demonstrates that Plaintiff's claims are derivative.[7] Accordingly, Plaintiff's claims are derivative under the second prong of *Tooley*.

For the foregoing reasons, Plaintiff's causes of action in the Amended Complaint are clearly derivative. Thus, Plaintiff lacks standing to bring those causes of action as direct claims against Brightstar Asia, and the Court must dismiss Plaintiff's Amended Complaint.

### b.   *Alternatively, Plaintiff has Not Alleged an Injury in Fact, and His Claims are Based upon the Legal Rights and Interests of Third-Parties.*

Even if Plaintiff's claims are somehow direct claims, Plaintiff has not alleged an injury in fact and, thus, lacks Article III standing. As discussed above, Plaintiff alleges two purported injuries in support of his claims. First, Plaintiff alleges that Brightstar Asia's mismanagement of Harvestar caused Harvestar's EBIT for the trailing twelve months to decrease to a negative number, which, in turn harmed the value of Plaintiff's purported "put" right (*i.e.*, right to sell his shares to Brightstar Asia on certain conditions) under Section 10 of the Shareholder Agreement.

---

[7] In Count II, Plaintiff requests equitable remedies, including (1) enjoining Brightstar Asia from causing Harvestar to enter transactions on terms less favorable to Harvestar than could be obtained in a comparable arm's-length transaction; (2) reformation of the alleged agreement between Harvestar and Brightstar Device to contain an arm's-length price per phone; and (3) an order requiring Brightstar Asia to disgorge an estimated $10 million to Harvestar. (Amend. Compl., ¶ 45.) The benefit of recovering any of these equitable remedies clearly flows to Harvestar only.

(Amend. Compl., ¶¶ 28, 38, 53–55, 63.)  Plaintiff requests a judgment for the alleged lost value of his "put" right (*i.e.*, $6,125,000). Second, Plaintiff alleges that the "conflict transaction" between Harvestar and Brightstar Device caused Harvestar's revenues to be $10 million less than they would have been had Brightstar Asia not caused Harvestar to repair the 200,000 devices for Brightstar Device at the below market price per phone.  (*Id.*, ¶¶ 37, 45, 50, 61.)  This, in turn, allegedly caused Plaintiff's 24.5% stock interest in Harvestar to be $2,450,000 less than it would have been, and Plaintiff seeks a judgment for that amount.  (*Id.*, ¶¶ 37, 52, 63.)

As an initial point, the alleged injury to Plaintiff's 24.5% stock interest resulting from Harvestar allegedly receiving $10 million less in revenues is not a separate and distinct injury from the alleged injury to the value of Plaintiff's purported "put" right.  Revenue is a component of EBIT, which is a component of the formula to calculate the sale price of the "Put Shares" under Section 10 of the Shareholders Agreement.  Plaintiff already alleges that Brightstar Asia caused Harvestar's EBIT (which includes Harvestar's revenues) to decrease to a negative number.  Plaintiff has no right under the Shareholders Agreement to be paid his ownership percentage (24.5%) of Harvestar's gross revenues, much less to be paid such revenues on top of any "put" right (which is calculated, in part, from revenues).  Rather, the only mechanism by which Plaintiff may realize the value of his Harvestar shares is by exercising the "Put Right" in accordance with Section 10.  Thus, the only injury that Plaintiff has alleged in this action is the alleged harm to the value of purported "put" right.

However, Plaintiff does not have an individual "put" right under the Shareholders Agreement.  Rather, the Shareholders Agreement explicitly provides that the "Put Right" must be exercised by the "Executives" "**acting jointly only**".  Plaintiff has not alleged that the

Executives have jointly exercised the "Put Right".  Moreover, the Executives are not even entitled to exercise the "Put Right" at present and will not be able to do so until April 2021.

Therefore, because Plaintiff does not have an individual "put" right under the Shareholders Agreement, he has not suffered an injury to any individual right or interest.  Thus, Plaintiff has not alleged an "injury in fact" as required to establish Article III standing.  *Denney*, 443 F.3d at 263.  Moreover, under the prudential standing rule, Plaintiff "cannot rest his claim on the legal rights or interests of third parties" (*i.e.*, the Executives), which is what Plaintiff is attempting to do in this case.  *Rajamin*, 757 F.3d at 86.  Overall, Plaintiff is not entitled to individually recover a judgment for the value of a "put" right that he has no individual right to exercise and which has not been (and cannot currently be) exercised by the Executives jointly.  Accordingly, Plaintiff lacks standing to bring the causes of action in the Amended Complaint.

## 2. Alternatively, Plaintiff's Causes of Action are Not Ripe.

Even if Plaintiff somehow has standing to assert his causes of action, his claims are not ripe.  "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003) (citation and internal quotation marks omitted).  To be ripe, a claim "must present a real, substantial controversy, not a mere hypothetical question."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citation omitted).  "Ripeness is peculiarly a question of timing, and "[a] claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all.  *Id.*

As discussed above, the only distinct injury that Plaintiff has alleged in this action is the alleged harm to the value of his purported "put" right. By virtue of that, however, Plaintiff's claims are not ripe for two clear reasons.  First, the "Executives" have not exercised the "Put Right" right under Section 10 of the Shareholders Agreement.  As discussed above, Section 10

provides that the "Put Right" must be exercised by the "Executives" "**acting jointly only**". Plaintiff does not allege in the Amended Complaint that the Executives exercised the "Put Right" or that they intend to do so in the future.  Thus, Plaintiff seeks to recover the value of a "Put Right" that has not been, and may never be, exercised.  Such a claim is not ripe for adjudication.

Second, the Executives do not currently have the right to exercise the "Put Right". Rather, Section 10 makes clear that, commencing on the second anniversary of the date of the Shareholders Agreement, and "**on only one occasion per calendar year**. . . . [t]he Executives may, acting jointly only, elect to sell the Put Shares by delivering written notice (the 'Put Notice') to Brightstar . . . **by no later than 60 days after the applicable anniversary date of this Agreement** . . ." (Shareholders Agreement, § 10(a), (b)) (emphasis added).  The second anniversary date was April 9, 2020, and 60 days after that date was June 8, 2020.

Accordingly, because the Executives' 60-day period to exercise the "Put Right" has now expired, they are not legally entitled to exercise the "Put Right" until the third anniversary date of the Shareholders Agreement on April 9, 2021.  Thus, Plaintiff's claims to recover the value of the "put" right do not present a "real" controversy, but rather present the very type of "hypothetical question" that this Court should avoid adjudicating prematurely under the ripeness doctrine.  *Nat'l Org. for Marriage*, 714 F.3d at 687.  These claims must be dismissed.

**B.   Alternatively, Plaintiff's Amended Complaint Must be Dismissed under Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim.**

"To survive a motion to dismiss under [Rule 12(b)(6)], 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Parker Madison Partners v. Airbnb, Inc.*, 283 F.Supp.3d 174, 178 (S.D.N.Y. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

1.    **Plaintiff's Breach of Contract Claims in Counts I & II Fail as a Matter of Law Because Plaintiff has Not Alleged a Breach of Section 14 of the Shareholders Agreement.**

In Counts I and II, Plaintiff alleges an identical claim for breach of Section 14 of the Shareholders Agreement (but requesting different remedies). Plaintiff alleges that Brightstar Asia breached Section 14 by causing Harvestar to enter transactions with Brightstar Device (alleged "insurance affiliate" of Brightstar Asia) "on terms less favorable to Harvestar than Brightstar Asia could obtain in a comparable arm's-length transaction." (Amend. Compl., ¶¶ 33–35, 42.) Even assuming for argument's sake that this language of Section 14 imposes a contractual obligation, Plaintiff has not alleged a breach thereof by Brightstar Asia.

The pertinent clause of Section 14 only applies, if at all, to "transactions between the Company [*i.e.*, Harvestar] or the Subsidiaries thereof, on the one hand, and an Investor or an Other Business, on the other hand." (Shareholders Agreement, § 14.) The "Investor" under the Shareholders Agreement is Brightstar Asia. (*Id.*, p. 1.) Section 14 defines "Other Business" as "entities other than the Company [*i.e.*, Harvestar] or any Subsidiary thereof that are engaged in the business of the Company or any Subsidiary thereof, or that are or may be competitive with the Company or any Subsidiary thereof". (*Id.*, § 14.)

Plaintiff alleges that Brightstar Device is an "insurance affiliate" of Brightstar Asia. Plaintiff does not allege that Brightstar Device is engaged in Harvestar's business (*i.e.*, repair and refurbishment of used mobile devices) or that Brightstar Device is a competitor of Harvestar. To the contrary, Plaintiff alleges that Harvestar repairs mobile devices for Brightstar Device as a customer. Thus, the alleged transaction between Harvestar and Brightstar Device is not a transaction between Harvestar, on the one hand, and the "Investor" or "Other Business", on the other hand. Accordingly, Plaintiff has failed to state a claim for breach of Section 14.

2.      **Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails as a Matter of Law.**

In Count III, Plaintiff alleges that Brightstar Asia breached the implied covenant of good faith and fair dealing under the Shareholders Agreement in two respects: (1) by causing Harvestar to enter the alleged "conflict transactions" with Brightstar Device; and (2) by "caus[ing] Harvestar not to receive for repair and refurbishment the 40,000 mobile devices per month that had been the basis for the April 9, 2018, stock purchase." (Amend. Compl., ¶¶ 50, 51.) Both grounds fail as a matter of Delaware law.

The first alleged ground for breach of the implied covenant is entirely duplicative of Plaintiff's claim for breach of Section 14 of the Shareholders Agreement (as evidenced by the fact that Plaintiff incorporated his numbered allegations from Count I-Breach of Contract into Count III). "[I]f the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable." *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. 2017-0500, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018) (dismissing duplicative implied covenant claim); *see also 3M Co. v. Neology, Inc.*, No. N18C-07-089, 2019 WL 2714832, at *10 (Del. Super. Ct. June 28, 2019) ("Simply mirroring the factual allegations that support a breach of contract claim is insufficient to state a claim for breach of the [implied covenant]"). Thus, Plaintiff's first ground clearly fails as a matter of law.

Plaintiff's second ground also fails as a matter of law. "The implied covenant . . . involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). It is a "limited and extraordinary legal remedy." *Id.* at 1128. "The [implied covenant] cannot be employed to impose new contract terms that could have been bargained for but were not." *Blaustein v. Lord Baltimore Cap. Corp.*, 84 A.3d 954, 959 (Del.

2014).   A court analyzing an implied covenant claim "must assess the parties' reasonable expectations at the time of contracting and not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. The court "'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" *Oxbow Carbon & Minerals Hold., Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (citation omitted).

Count III presents a blatant example of a plaintiff attempting to renegotiate and rewrite its fully integrated contract under the guise of a breach of the implied covenant.  Plaintiff alleges that Brightstar Asia caused Harvestar not to receive for repair and refurbishment the 40,000 mobile devices per month that was the basis for April 9, 2018 stock purchase transaction. However, the Shareholders Agreement does not require Brightstar Asia to provide used mobile devices to Harvestar, much less a certain volume of devices. Thus, Plaintiff is asking the Court to rewrite the Shareholders Agreement and require Brightstar Asia not only to provide used mobile devices to Harvestar, but also to provide a certain volume of used mobile devices per month to Harvestar.  This request must be denied as a matter of law.

Plaintiff explicitly alleges in the Amended Complaint that the alleged volume requirement was "contemplated" in the "agreements" executed by the parties in connection with Brightstar's April 9, 2018 purchase of the majority stake in Harvestar and was the "basis for" that transaction.  (Amend. Compl., ¶¶ 17, 19, 20, 51.)  Based upon those express allegations, the alleged volume requirement was not only "anticipated" and specifically "contemplated" at the time of contracting, but was allegedly the "basis for" the April 9, 2018 transaction.  Therefore, if that requirement was agreed upon, as Plaintiff alleges, then "the [Shareholders Agreement] could easily have been drafted to expressly provide for it." *Oxbow Carbon*, 202 A.3d at 507.  Plaintiff

is not entitled to invoke the implied covenant "to rewrite a contract he now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126.  Accordingly, Plaintiff's second ground for breach of the implied covenant fails as a matter of law.

### 3. Plaintiff Fails to State a Claim for Breach of Fiduciary Duty.

Plaintiff's claim for breach of fiduciary duty in Count IV fails as a matter of law for two primary reasons.  First, that claim is entirely duplicative of, and is based upon the same verbatim facts and conduct as, Plaintiff's claims for breach of contract (Counts I and II) and breach of the implied covenant (Count III) under the Shareholders Agreement.  It is well-settled under Delaware law that, "where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim," and "any fiduciary duty claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec*, 991 A.2d at 1129.  Based upon this rule, a claim for breach of fiduciary duty that arises from the same alleged facts and underlying conduct as the breach of contract claim must be dismissed. *See, e.g.*, *Blue Chip Capital Fund II Ltd. P'ship v. Tubergen*, 906 A.2d 827, 833 (Del. Ch. 2006) (dismissing fiduciary duty claim because it arose from the same facts and underlying conduct as the breach of contract/implied covenant claim); *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, No. CIV.A. 18094, 2001 WL 406268, at *6 (Del. Ch. Apr. 17, 2001) (finding that "the contract and fiduciary claims overlap completely since they are based upon the same underlying conduct" and that "the complaint uses identical conduct as the basis for both legal claims" and dismissing the fiduciary duty claim for failure to state a claim).

This rule is equally applicable where the fiduciary duty claims arises from the same facts and underlying conduct as a claim for breach of the implied covenant.  *See, e.g.*, *Blue Chip*, 906 A.2d at 833; *Gale v. Bershad, No. CIV. A. 15714, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998)* (dismissing the "superfluous" fiduciary duty claim that arose from same facts and conduct

as implied covenant claim).  Accordingly, because Plaintiff's fiduciary duty claim is based upon the same facts and conduct that underlie his breach of contract and implied covenant claims (*compare* Amend. Compl., ¶¶ 60–62 to ¶¶ 31–35, 41–43, 47–51), the fiduciary duty claim is "foreclosed as superfluous" and must be dismissed as a matter of Delaware law.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Brightstar Asia respectfully requests that the Court grant its motion and enter an Order dismissing Plaintiff's First Amended Complaint in its entirety.

**Dated**: October 26, 2020

Respectfully submitted,

/s/ *Kristina A. Reliford*

Kristina A. Reliford
Peter C. Sales (*Admitted Pro Hac Vice*)
Frankie N. Spero (*Admitted Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: (615) 252-3573
F: (615) 252-6380
kreliford@bradley.com
psales@bradley.com
fspero@bradley.com
*Attorneys for Brightstar Asia, Ltd.*