USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/26/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TYLER MILLER,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Plaintiff,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:　　**REPORT AND**
　　　　　-against-　　　　　　　　　　　　:　　**RECOMMENDATION**
　　　　　　　　　　　　　　　　　　　　　　:
BRIGHTSTAR ASIA, LTD.,　　　　　　　　　　:　　20-CV-4849 (GBD) (JLC)
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　Defendant.　　　　　　　　:
---------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable George B. Daniels, United States District Judge:**

　　　　Tyler Miller brought this case against Brightstar Asia, Ltd. alleging breach of contract and other claims related to a shareholders agreement. Brightstar Asia has moved to dismiss Miller's claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. As is discussed below, all of Miller's claims are properly characterized as derivative under Delaware law and this Court therefore lacks subject matter jurisdiction because Miller lacks standing to bring his causes of action as direct claims. Accordingly, I recommend that the motion be granted and the amended complaint be dismissed.

## I.  BACKGROUND

　　　　The following facts, taken as true for purposes of the motion, are drawn from the amended complaint and the documents relied upon therein. *See, e.g.*, *Binn v. Bernstein*, No. 19-CV-6122 (GHW) (SLC), 2020 WL 4550312, at *1 (S.D.N.Y. July

1

13, 2020) (citing *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013), *adopted by* 2020 WL 4547167 (Aug. 6, 2020). In 2016, Miller and Omar Elmi formed Harvestar Solutions Limited ("Harvestar"). Amended Complaint ("Compl."), Dkt. No. 24 ¶ 9. Harvestar is a Hong Kong-based company that purchases used mobile telephones, refurbishes them, and then sells them to distributors and retailers. *Id.* ¶¶ 9–10. Brightstar Corporation is a Miami-based company that purchases millions of used mobile devices, resells them, and through third-party vendors (including Harvestar), also repairs and refurbishes old devices for resale. *Id.* ¶¶ 11–12. Brightstar Device Protection, LLC, a Delaware-based limited liability company wholly owned by Brightstar Corporation, also acquires thousands of damaged mobile devices. *Id.* ¶ 13. On April 9, 2018, Brightstar Asia, Ltd. ("Brightstar Asia"), an affiliate of Brightstar Corporation, purchased from Miller and Elmi a 51% controlling stock interest in Harvestar, leaving Miller and Elmi each owning a 24.5% minority interest in the company. *Id.* ¶ 15. In connection with the purchase, Brightstar Asia, Miller, and Elmi executed a shareholders agreement (the "Shareholders Agreement"), dated April 9, 2018, defining the parties' rights, duties, and obligations. *Id.* ¶ 17 & Ex. 1.

In his amended complaint, Miller alleges that Brightstar Asia "mismanaged" Harvestar, in part, through "self-dealing" "conflict transactions" by causing Harvestar to repair more than 200,000 mobile devices at a price $50 lower per device than Brightstar Asia could have obtained in comparable arm's-length

2

transactions. *Id.* ¶¶ 21–29. In addition, Miller alleges that Brightstar Asia prevented Harvestar from receiving volumes of used mobile devices that were "contemplated" and the "basis for" Brightstar Asia's purchase of its majority stake in Harvestar. *Id.* ¶ 20. Miller further alleges that as a result of its alleged "self-dealing" and "mismanagement," Brightstar Asia caused Harvestar's earnings before interest and taxes ("EBIT") to decrease to a negative number. *Id.* ¶ 54. Based on these allegations, Miller asserts four causes of action: breach of contract (Counts I & II) (*Id.* ¶¶ 30–45), breach of the implied covenant of good faith and fair dealing (Count III) (*Id.* ¶¶ 46–55), and breach of fiduciary duty (Count IV) (*Id.* ¶¶ 56–63).

After Brightstar Asia moved to dismiss (Dkt. No. 21), Miller amended his complaint on September 30, 2020 (Dkt. No. 24). Brightstar Asia then moved to dismiss the amended complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on October 26, 2020, arguing that Miller does not have standing and, even if he did have standing, his claims are not ripe for adjudication. Defendant's Memorandum of Law in Support of Its Motion to Dismiss ("Def. Mem."), Dkt. No. 31, at 4–19. In the alternative, Brightstar Asia contended that Miller failed to state a claim. *Id.* at 20–25. Miller responded on November 6, 2020. Plaintiff's Response to Motion to Dismiss ("Pl. Resp."), Dkt. No. 32. Briefing on the motion to dismiss was completed on November 18, 2020, with Brightstar Asia's reply. Defendant's Reply in Support of Motion to Dismiss ("Def. Reply"), Dkt. No. 34. On December 18, 2020, the Court stayed discovery until it resolved the motion to dismiss. Dkt. No. 38.

## II. DISCUSSION

### A. Applicable Law

Brightstar Asia has moved to dismiss the amended complaint under Rule 12(b)(1) for lack of subject matter jurisdiction and, in the alternative, under Rule 12(b)(6) for failure to state a claim. "In deciding both types of motions, the Court generally must accept the factual allegations in the complaint as true." *White v. White*, No. 12-CV-200 (GBD) (JLC), 2012 WL 3041660, at *7 (S.D.N.Y. July 20, 2012) (citing *Lam v. United States Postal Service*, No. 06-CV-0268 (JG), 2006 WL 2729199, at *2 (E.D.N.Y. Sept. 25, 2006)), *adopted by* 2013 WL 1340145 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 556 F. App'x 10 (2d Cir. 2014). "When the defendant moves for dismissal under Rule 12(b)(1) as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Williams v. Novoa,* No. 19-CV-11545 (PMH), 2021 WL 431445, at *3 (S.D.N.Y. Feb. 5, 2021) (internal quotation and alteration omitted) (quoting *Saint-Amour v. Richmond Org., Inc.*, 388 F. Supp. 3d 277, 286 (S.D.N.Y. 2019)).

#### 1. Rule 12(b)(1) Motions

"Under Article III, federal courts may exercise subject matter jurisdiction only over actual cases and controversies." *Kofinas v. Fifty-Five Corp.*, No. 20-CV-7500 (JSR), 2021 WL 603294, at *3 (S.D.N.Y. Feb. 16, 2021) (citing *Carter v.*

*HealthPort Technologies, LLC,* 822 F.3d 47, 55 (2d Cir. 2016)). "Rule 12(b)(1) requires dismissal of an action when the district court lacks the statutory or constitutional power to adjudicate it." *Williams*, 2021 WL 431445, at *3 (internal quotation omitted) (quoting *Schwartz v. Hitrons Sols., Inc.*, 397 F. Supp. 3d 357, 364 (S.D.N.Y. 2019)). "The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists." *Id.* (quoting *Hettler v. Entergy Enters., Inc.*, 15 F. Supp. 3d 447, 450 (S.D.N.Y. 2014)); *see also White*, 2012 WL 3041660, at *7 (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

"When deciding a motion to dismiss under Rule 12(b)(1) at the pleadings stage, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Williams,* 2021 WL 431445, at *3 (internal quotation omitted) (quoting *Hettler*, 15 F. Supp. 3d at 450). In addition, the Court "may consider affidavits and other material beyond the pleading to resolve jurisdictional questions." *Kraiem v. JonesTrading Institutional Servs. LLC.*, No. 19-CV-5160 (ALC), 2020 WL 5819557, at *4 (S.D.N.Y. Sept. 30, 2020) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

"A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly, is properly brought under Fed. R. Civ. P. 12(b)(1)." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020) (citing *Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016)). "When a motion under Rule 12(b)(1) is based solely on the complaint and the

5

attached exhibits, the plaintiff bears no evidentiary burden, and the district court must evaluate whether those documents allege facts that plausibly suggest that the plaintiff has standing to sue." *Id.* (citing *Carter*, 822 F.3d at 56). "Standing refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance, and the question of derivative standing is a threshold issue that the Court must decide." *Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14-CV-6498 (LTS) (MHD), 2017 WL 1215753, at *5 (S.D.N.Y. Mar. 31, 2017) (citing *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016)).

### 2. Rule 12(b)(6) Motions

Under Rule 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Williams*, 2021 WL 431445, at *3 (internal quotation omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). The Court may consider "not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the

pleadings or in documents incorporated by reference." *Kraiem*, 2020 WL 5819557, at *4 (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)).

## B.  Application

### 1. Miller's Claims Sound in Breach of a Duty Owed to Harvestar

"Article III, Section 2 of the Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *SM Kids, LLC*, 963 F.3d at 211 (citing *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019)). "The standing doctrine, which emerges from Article III, is designed 'to ensure that federal courts do not exceed their authority as it has been traditionally understood.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "The doctrine imposes three requirements: '[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo*, 136 S. Ct. at 1547)).

Brightstar Asia argues that Miller lacks standing because (1) his claims are derivative claims, not direct claims under Delaware law, (2) he has failed to allege an injury in fact, and (3) his claims are based on the legal rights and interests of third parties. Def. Mem. at 4–17.[1] In the alternative, Brightstar Asia argues that

---

[1] The parties both briefed the issues under Delaware law. "Where the parties' briefs assume that a particular jurisdiction's law applies, such 'implied consent . . . is sufficient to establish choice of law.'" *In re SKAT Tax Refund Scheme Litig.*, No. 18-CV-5053 (LAK), 2020 WL 7059843, at *3, n.28 (S.D.N.Y. Dec. 2, 2020) (quoting

7

even if Miller does have standing, his claims are not ripe for adjudication. *Id.* at 19–20.

Brightstar Asia's contention that Miller's claims are derivative hinges on an interpretation of Delaware law, and more specifically on whether *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), the seminal case relating to whether a claim is direct or derivative, applies here.[2] The parties dispute *Tooley*'s application, and their disagreement stems principally from their differing interpretations of two Delaware Supreme Court cases, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015), and *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016). In *NAF Holdings*, the Delaware Supreme Court explained that *Tooley* and its progeny "deal with the . . . question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively" and that this

---

*Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)). Moreover, Section 26 of the Shareholders Agreement specifies that it should be construed and enforced in accordance with Delaware law. Shareholders Agreement, at 19. Thus, the Court will apply Delaware law as well.

[2] Under *Tooley*, whether a shareholder's claim is direct or derivative "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033. Brightstar Asia contends that under *Tooley*'s two-part inquiry, Miller's claims would be properly characterized as derivative because the breach of contractual duty that he alleges is owed to Harvestar, and any recovery from the alleged harm would flow to Harvestar. Def. Mem. at 6–17.

"body of law has no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights." 118 A.3d at 176. Thus, under *NAF Holdings*, "a suit by a party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law." *Id.* at 182. However, in *El Paso*—which concerned the attempt of a limited partner, Brinckerhoff, to enforce a duty to act in good faith under a Limited Partnership Agreement ("LPA")—the court clarified that "*NAF Holdings* does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*." 152 A.3d at 1259. It further elucidated that when a claim "sounds in breach of a contractual duty" owed to the company, the *Tooley* analysis applies to determine whether the claim "must be asserted derivatively." *Id.* at 1260. The *El Paso* court then found that Brinkerhoff's claim sounded in breach of a contractual duty owed to the partnership and thus applied the *Tooley* test. *Id.*

The parties agree that under *NAF Holdings*, "a party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law." *NAF Holdings*, 118 A.3d at 182. Although Miller asserts that Brightstar implies in its motion papers that *El Paso* overruled *NAF Holdings* (Pl. Mem. at 7, n.1), *El Paso* did not do so. *See El Paso*, 152 A.3d at 1259 ("[W]hen a plaintiff asserts a claim based upon the plaintiff's own right, such as a claim for breach of a commercial contract, *Tooley* does not apply."). Nonetheless, the parties dispute the applicability of *El Paso*'s reading of *NAF Holding* that:

9

> *NAF Holdings* does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*. Nor does it mean that Brinckerhoff's status as a limited partner and party to the LPA enable him to litigate directly every claim arising from the LPA. Such a rule would essentially abrogate *Tooley* with respect to alternative entities merely because they are creatures of contract.

*El Paso*, 152 A.3d at 1259–60.

Miller argues that *El Paso* does not apply here—and therefore *Tooley* cannot apply—because, in his view, *El Paso* is only relevant "when the contract in question is the constitutive contract of an alternative entity." Pl. Mem. at 10. He further contends that if "the contract is a commercial contract and the plaintiff seeks to enforce his own contractual rights, then the plaintiff's claim is direct as the Delaware Supreme Court held in *NAF Holdings, LLC*." *Id*. As discussed below, however, the Court is of the view that the *Tooley* test applies in the circumstances presented here. Furthermore, while Miller's latter observation is accurate, because he is not advancing his own contractual rights, the holding in *NAF Holdings* does not save his claims.

Miller does not cite any authority supporting his proposed narrowing of *El Paso*, nor has the Court found any support for his position. While it is correct, as Miller observes, that "Delaware courts cite to *El Paso* more for its analysis of dual-natured claims and its limitation of *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006) to its facts than for its clarification of *NAF Holdings, LLC*," (Pl. Mem. at 10 n.2), the Delaware Supreme Court—or any court for that matter—has not limited *El Paso* to

10

apply only to the "constitutive contract of an alternate entity." Moreover, there is nothing in *El Paso* to suggest that the Delaware Supreme Court intended to limit its decision to constitutive contracts and if anything, the decision itself suggests the contrary.

As quoted above, in its narrowing of *NAF Holdings*, the *El Paso* court observed that merely being a signatory of a contract does not give a party a right to enforce every right in the contract. *See El Paso*, 152 A.3d at 1259–60 (*NAF Holdings* does not "mean that Brinckerhoff's status as a limited partner and party to the LPA enable him to litigate directly every claim arising from the LPA"). Rather than asserting that this proposition only applies to LPAs, the court, in a footnote, simply clarified that "[l]imited partnership agreements are a type of contract." *Id.* at 1260 n.50 (quoting *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)). Thus, without more—and Miller has provided nothing more—the Court agrees that *El Paso* applies to the Shareholders Agreement.[3]

This determination is consistent with how another court in this District applied *El Paso*. In *Backus v. U3 Advisors, Inc.,* No. 16-CV-8990 (GHW), 2017 WL 3600430 (S.D.N.Y. Aug. 18, 2017), the plaintiff brought an action alleging a breach of a contractual duty for the shareholders to devote substantially all of their

---

[3] Because whether or not the Shareholders Agreement is a constitutive contract does not change the application of *El Paso* and *Tooley*, the Court does not need to address the parties' arguments on how to define the Shareholders Agreement. Pl. Resp. at 10–11; Def. Reply at 3–4.

11

professional time to the company. *Id.* at *16. The plaintiff argued that because she signed the stockholder agreement individually, she could bring the claim directly. *Id.* The court disagreed, finding that under *El Paso*, it had to determine whether the claim "sounds in breach of a contractual duty to [the company]." *Id.* It then concluded that the duty was owed to the company and not the individual signatory and therefore applied the *Tooley* test.[4] *Id.*

Thus, although Miller has a right to enforce his own contract claims under the Shareholders Agreement, the Court must still determine if the rights he is attempting to enforce belong to him or to Harvestar; simply being a signatory does not give him free rein with respect to all the rights in the Shareholders Agreement. *See, e.g.*, *El Paso*, 152 A.3d at 1260 ("Because [plaintiff's] claim sounds in breach of a contractual duty owed to the [company], we employ the two-pronged *Tooley* analysis to determine whether the claim 'to enforce the [company's] own rights must be asserted derivatively.'"); *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1127 (Del. 2016) ("Before evaluating a claim under *Tooley*, 'a more important initial question has to be answered: does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?'"). Miller can only enforce his own rights, not Harvestar's rights. Finding otherwise would "essentially abrogate *Tooley*" and its progeny. *El Paso*, 152 A.3d at 1259.

---

[4] Instead of addressing the court's decision in *Backus* in any detail, Miller simply dismisses it as an "anomaly." Pl. Resp. at 12 n.4.

Thus, to determine if the *Tooley* test applies to Miller's contract claims, the Court must first establish if Miller is attempting to enforce his own rights under the Shareholders Agreement. Count I and II both allege breach of Section 14 of the Shareholders Agreement. Compl. ¶¶ 32, 41. Count III alleges a breach of implied covenant of good faith and fair dealing. *Id.* ¶¶ 47–49.

Section 14 of the Shareholders Agreement provides:

> The parties hereto expressly authorize and consent to the involvement of the Investors [*i.e.*, Brightstar Asia] and their Affiliates in any Other Business; provided, that any transactions between the Company or the Subsidiaries thereof, on the one hand, and an Investor or an Other Business, on the other hand, will be on terms no less favorable to the Company or the Subsidiaries thereof than would be obtainable in a comparable arm's-length transaction.

Shareholders Agreement at 16. Miller argues that Brightstar Asia breached Section 14 by causing Harvestar to enter into transactions with Brightstar Device on terms less favorable to Harvestar than could have been obtained in a comparable arm's length transaction. Compl. ¶¶ 34, 42. Brightstar Asia counters that the alleged contractual duty to enter transactions "on terms no less favorable to the Company" is owed to Harvestar, not Miller. Def. Mem. at 11. In response, Miller draws the Court's attention to "the parties hereto" language at the beginning of Section 14, and argues that because it was the parties who "authorized Brightstar Asia to own and operate other entities engaged in 'the business of the Company,'" Miller "as one of the parties" has the right to limit Brightstar Asia's "exercise of

13

those benefits." Pl. Resp. at 12–13. He also points to the waiver at the end of Section 14, which provides:

> The parties hereto expressly waive, to the fullest extent permitted by applicable Law, any rights to assert any claim that such involvement contemplated pursuant to this Section breaches any fiduciary or other duty or obligation owed to the Company or any Shareholder or to assert such involvement constitutes a conflict of interest by such Persons with respect to the Company [or] any Shareholder.

Shareholders Agreement at 16–17. Miller argues that both he and Harvestar have direct claims against Brightstar Asia for a breach of any portion of Section 14. Pl. Resp. at 14 n.5. In its reply, Brightstar Asia maintains that the specific clause within Section 14 that spawned this action, *i.e.*, entering "terms no less favorable to the Company," belongs to Harvestar solely, not to Miller. Def. Reply at 5.

The Court agrees with Brightstar Asia's comparison of the alleged contractual duty to enter transactions "on terms no less favorable to the Company," to the contractual duty of the general partner in *El Paso* to take action "in the best interests of the Partnership," 152 A.3d at 1258, and the contractual duty of the shareholders in *Backus* to devote substantially all of their professional time to the company, 2017 WL 3600430, at *16. Def. Reply at 5. Moreover, the plaintiff's argument that was rejected in *Backus*—that because she signed the contract, she was owed the duty individually—is strikingly similar to Miller's argument here. By directing the Court to the "parties herein" language, Miller diverts the analysis from the actual duty that he claims is being infringed: to enter into transactions

"on terms no less favorable." That the signatories agreed does not change the fact that the alleged duty is owed to Harvestar. Therefore, *Tooley* applies to Brightstar Asia's alleged breach of Section 14 under Counts I and II.

Under Count III, Miller alleges that the Shareholders Agreement contains an implied covenant of good faith and fair dealing which required "that Brightstar Asia refrain from engaging in, or causing Harvestar to engage in, conflict transactions to the detriment of Harvestar or plaintiff." Compl. ¶¶ 47–48. Miller requests that the Court apply the implied covenant of good faith and fair dealing to "fill the gap" should it find that the Shareholders Agreement does not expressly prohibit Harvestar's alleged conflict transactions. Pl. Resp. at 15. He maintains that *El Paso* does not apply to the implied covenant because it would require the Court to "prejudge this case solely on the Amended Complaint and determine that any application of the implied covenant the Court might make would only affect the rights of Harvestar." *Id.* In response, Brightstar Asia argues that under Delaware law, a claim for breach of an implied covenant sounds in contract and cites to cases where Delaware courts have applied *El Paso* to claims for breach of implied covenant claims. *See* Def. Reply at 5 n.4 (citing *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member*, LLC, 50 A.3d 434, 439 & n.1 (Del. Ch. 2012) (collecting cases explaining breach of implied covenant clams sound in contract), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013); *Sehoy Energy LP v. Haven Real Estate Group, LLC,* No. 12387, 2017 WL 1380619, at *8 (Del. Ch. Apr. 17, 2017)

15

(applying *El Paso* to breach of implied covenant); and *Schiff v. ZM Equity Partners, LLC*, No. 19-CV-4735 (WHP), 2020 WL 5077712, at *11 (S.D.N.Y. Aug. 27, 2020) (same)).

Because the alleged duty to refrain from engaging in conflict transactions is the same duty pled in Counts I and II, and Miller concedes as much (Pl. Resp. at 15), the Court does not see why determining whether the duty belongs to Miller or Harvestar would amount to "prejudging" the case, and finds that this duty, if it exists, applies to Harvestar as well. Thus, assuming the implied covenant exists to conflict transactions, the enforcement of that duty belongs to Harvestar. *See, e.g.*, *Schiff*, 2020 WL 5077712, at *11 ("[Plaintiff's] claim for breach of the implied covenant of good faith and fair dealing under [the agreement] parallels his breach of contract claim and is similarly dismissed."). Because the contractual rights Miller asserts in Counts I, II, and III all belong to Harvestar, the Court must apply the *Tooley* test.

Lastly, as *Tooley* and its progeny developed out of breach of fiduciary duty claims, *Tooley* applies to Count IV as well. *See, e.g.*, *NAF Holdings,* 118 A.3d at 176 ("The case law under *Tooley v. Donaldson, Lufkin & Jenrette* and its progeny deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively."). Miller does not explain why the breach of fiduciary duty belongs to him and not to Harvestar. In response to Brightstar Asia's argument that the Court apply *Tooley*,

16

Miller refers to the Amended Complaint in a footnote and argues without elaborating that the fiduciary duty is owed to him individually.  Pl. Resp. at 14 n.6. But the Amended Complaint alleges only that "Brightstar Asia owed plaintiff a duty not to violate the reasonable expectations of Harvestar's minority shareholders." Compl. ¶ 58.  Miller later argues that Brightstar Asia's fiduciary duty "does not arise from the parties' contractual relationship" and that Brightstar Asia has a duty specific to Miller as "Harvestar's majority shareholder."  Pl. Resp. at 25.  Because Miller fails to establish that Brightstar Asia owes him a fiduciary duty, the Court will apply *Tooley* to Count IV as well.

> 2. **Miller's Claims are Derivative under *Tooley* and Therefore He Lacks Standing**

Under *Tooley*, whether a shareholder's claim is direct or derivative "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  845 A.2d at 1033.  "Put differently, 'the test may be stated as follows: Looking at the body of the complaint and considering the nature of the wrong alleged and the relief requested, has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?'"  *Alpha Founders Holding, LLC v. Magellan Health, Inc.*, No. 17-CV-6225 (DLI) (RER), 2018 WL 1247405, at *7 n.4 (E.D.N.Y.

17

Mar. 9, 2018) (internal quotation omitted) (quoting *Citigroup Inc.*, 140 A.3d at 1138 n.68).[5]

Under *Tooley*'s first prong, it is Harvestar that would suffer from the alleged harm. Miller's claims amount to claims of mismanagement of Harvestar (Def. Mem. at 13), which under *Tooley* and its progeny, are classically understood as harm to the company. *See, e.g.*, *In re Goldman Sachs Mut. Funds*, No. 04-CV-2567 (NRB), 2006 WL 126772, at *5 (S.D.N.Y. Jan. 17, 2006) (collecting cases). As Brightstar Asia points out (Def. Mem. at 13), the basis for the alleged breaches in all four of Miller's claims can be summarized as the mismanagement of Harvestar in two ways: Brightstar Asia allegedly caused Harvestar to engage in conflict transactions with Brightstar Device (Compl. ¶¶ 21, 27, 33–35, 42, 50, 61), and Brightstar Asia allegedly prevented Harvestar from receiving the volume of mobile devices that were the basis for the purchase of the majority stake in Harvestar. *Id.* ¶¶ 19–20, 51, 62. The alleged mismanagement resulted in two alleged harms: Harvestar's revenue was 10 million dollars less than if it had not engaged in transactions with Brightstar Device (*Id.* ¶¶ 37, 45, 50, 61), and there was a decrease in its EBIT. *Id.* ¶ 54. Both of these harms are to Harvestar directly, and to Miller derivatively. *See, e.g.*, *El Paso*, 152 A.3d at 1261 ("In *Tooley* terms, the harm is to the corporation, because such claims naturally assert that the corporation's funds have been

---

[5] Notably, Miller never refutes the idea that if the *Tooley* test applies, his claims must be considered derivative.

18

wrongfully depleted, which, though harming the corporation directly, harms the stockholders only derivatively so far as their stock loses value." (internal quotation omitted)).

Under *Tooley*'s second prong, any remedy for the alleged harms will flow to Harvestar. As the *El Paso* court found, any remedy for the "restoration of the improperly reduced value" would "flow to the corporation." *Id*. Any equitable relief, such as enjoining Brightstar Asia from causing Harvestar to enter into unfavorable transactions, reformation of the contract, or an order requiring Brightstar Asia to disgorge an estimated ten million dollars to Harvestar (Compl. ¶45), would also flow to Harvestar.

Because all four of Miller's claims are derivative under *Tooley*, Miller lacks standing to bring these causes of action as direct claims, and this Court therefore lacks subject matter jurisdiction. *See, e.g.*, *El Paso*, 152 A.3d 1257 ("[T]he question of derivative standing is 'properly a threshold question that the [c]ourt may not avoid.'" (quoting *Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013)). The rest of the parties' arguments are therefore "moot and do not need to be determined.'" *White*, 2012 WL 3041660, at *8 (quoting *Klein v. City of New York*, No. 10-CV-9568 (PAE) (JLC), 2011 WL 5248169, at * 6 (S.D.N.Y. Oct. 28, 2011)).

19

### III. CONCLUSION

For the foregoing reasons, I recommend that the motion to dismiss for lack of subject matter jurisdiction be granted and the amended complaint be dismissed.

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to such objections, shall be filed with the Clerk of Court. Any requests for an extension of time for filing objections must be directed to Judge Daniels.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Dated: May 26, 2021
     New York, New York

_____
JAMES L. COTT
United States Magistrate Judge