21-2301
*Miller v. Brightstar Asia, Ltd.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Aug 03 2022

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

_____

August Term 2021
No. 21-2301

**Tyler Miller,**
*Plaintiff-Appellant,*

v.

**Brightstar Asia, Ltd.,**
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

Argued: April 11, 2022
Decided: August 3, 2022

_____

Before:    Kearse, Sack, and Menashi, *Circuit Judges.*

Plaintiff-Appellant Tyler Miller appeals the dismissal of his direct suit against Defendant-Appellee Brightstar Asia, Ltd. In connection with the sale of his company, Harvestar, to Brightstar Asia, Miller entered into a contract with Brightstar Asia, Harvestar, and his co-founder. The contract provided that conflicted transactions

CERTIFIED COPY ISSUED ON 08/03/2022

between Brightstar Asia and Harvestar must be on "terms no less favorable to" Harvestar than those of an arm's-length transaction. It also provided that Miller would have options rights to sell Harvestar shares to—or to buy Harvestar shares from—Brightstar Asia. Miller alleged in his complaint that Brightstar Asia engaged in conflicted transactions that rendered his options rights worthless. Those actions, according to Miller, breached both the express terms of the contract and the implied covenant of good faith and fair dealing. The district court (Daniels, J.) dismissed his complaint for raising claims that could be brought only in a derivative suit. We agree that Miller can bring a claim for breach of the express conflicted-transactions provision only in a derivative suit. However, we hold that Miller may bring a direct suit for breach of the covenant of good faith and fair dealing because that covenant is based on his individual options rights. Accordingly, we **AFFIRM** in part and **VACATE** in part the district court's judgment.

———————

PAUL J. KROG, Bulso PLC, Brentwood, TN, *for Plaintiff-Appellant*.

PETER C. SALES (Frankie N. Spero, Kristina A. Reliford, *on the brief*), Bradley Arant Boult Cummings LLP, Nashville, TN, *for Defendant-Appellee*.

———————

MENASHI, *Circuit Judge*:

Tyler Miller, the plaintiff-appellant in this case, and Omar Elmi formed Harvestar, a cellphone refurbishment company, in 2016. About two years later, they sold a controlling stake in Harvestar to

Brightstar Asia, Ltd., the defendant-appellee, and concurrently entered into a shareholders agreement with Brightstar Asia and Harvestar. That agreement included a contractual standard of conduct for conflicted transactions. It also granted call and put options to Miller and Elmi to buy and sell shares at prices that depended on such variables as the number of cellphones Harvestar refurbished, Harvestar's indebtedness, and Harvestar's earnings before interest and taxes ("EBIT").

According to Miller, Brightstar Asia violated the shareholders agreement when it mismanaged Harvestar such that Miller's options rights lost all value. He filed a diversity action in federal district court alleging breach of the written terms of—and the implied covenant in—the shareholders agreement. The district court dismissed the case because, in the district court's view, his claims could be brought only in a derivative action. That prompted this appeal.

The district court was only partially correct. We agree with the district court that the contractual duty created by the conflicted-transactions provision is owed to Harvestar, and therefore Miller's claim for breach of that provision must be brought in a derivative suit. However, the district court erred when it held that the implied duty based on Miller's own options rights was owed to Harvestar as well. We affirm in part and vacate in part the district court's judgment.

## BACKGROUND

On August 1, 2016, Tyler Miller and Omar Elmi formed Harvestar, and they were the only stockholders and officers of the company. Harvestar's main business involved buying used cellphones, refurbishing the phones in laboratories in the Philippines, and then reselling the phones at a profit. It also provided its repair

services to other vendors, restoring used cellphones for those vendors to resell.

Brightstar Corporation was one such vendor. As a Harvestar customer, Brightstar Corporation used Harvestar's services to restore damaged cellphones to "like new" condition before reintroducing the phones to the market. App'x 119-20. According to Miller's complaint, Brightstar Corporation "became familiar with the quality, professionalism and efficiency of Harvestar and its experienced team of technicians" through these business dealings. *Id.* at 120.

In April 2018, Brightstar Asia, a Brightstar Corporation affiliate based in Hong Kong, bought from Miller and Elmi a 51 percent stake in Harvestar for $4 million, leaving the two founders each with a 24.5 percent stake in Harvestar. In connection with that transaction, Brightstar Asia, Harvestar, Miller, and Elmi entered into a Shareholders Agreement ("Agreement"), which provides that it was "made under, and shall be construed and enforced in accordance with, the laws of the state of Delaware." *Id.* at 152.

The Agreement contains two provisions important to this appeal. First, Paragraph 14 of the Agreement authorizes transactions between Brightstar Asia's other companies and Harvestar despite the conflict of interest, with one caveat: "[A]ny transactions between the Company or the Subsidiaries thereof, on the one hand, and an Investor or an Other Business, on the other hand, will be on terms no less favorable to the Company or the Subsidiaries thereof than would be obtainable in a comparable arm's-length transaction." *Id.* at 149.[1]

---

[1] The Agreement specifies that "Company" refers to Harvestar and that "Investors" includes Brightstar Asia. "Other Business[es]" are Brightstar

Second, the Agreement provides for put and call rights. Paragraph 10 provides the put right: after the second anniversary of the Agreement, "the Executives and their Permitted Transferees shall have the right, but not the obligation, … to sell to Brightstar … a portion of the Ordinary Shares … held by such Persons." App'x 146.[2] Paragraph 11 provides the call right: "the Executives shall have the right but not the obligation, … to purchase from Brightstar and its Permitted Transferees … all of the Ordinary Shares held by such Persons." App'x 148. The prices at which these shares could be bought or sold would be calculated according to a contractual formula specific to each right. The sale price of the put shares depends on the indebtedness of Harvestar, Harvestar's EBIT, and other factors such as sales volume. *Id.* at 146. The sale price of the call shares is the greater of the fair market value of the shares multiplied by the ownership percentage of Brightstar or the total amount of cash and other property invested by Brightstar minus $2 million. *Id.* at 148.[3]

---

Asia's or its affiliates' "investments or other business or strategic relationships, ventures, agreements or other arrangements with entities" other than Harvestar or Harvestar's subsidiaries that are "engaged in the business of [Harvestar]" or "may be competitive with [Harvestar]." App'x 134, 149.

[2] The Agreement refers to Miller and Elmi collectively as the "Executives." App'x 134.

[3] The Agreement defines the terms in the formulas in an attached exhibit. "Indebtedness" includes, among other things, "all obligations for borrowed money or in respect of loans, deposits, or advances of any kind." App'x 161. "Ownership Percentage" means, "for any Shareholder, such Person's Ownership Percentage as set forth from time to time on the Schedule of Shareholders." *Id.* at 161.

According to Miller, Brightstar Asia began to mismanage Harvestar "[a]lmost immediately upon obtaining majority control." App'x 122. Among other things, Brightstar Asia "placed millions of dollars in intercompany loans and other obligations on Harvestar's balance sheet," "cancelled all repair services Harvestar was formed to provide to its customers, except the repair work that Harvestar provides to Brightstar Asia's insurance affiliate," and "caused … Harvestar to repair handsets for its insurance affiliate at a cost of $50 per device less than that company was paying to an unrelated, third party vendor." *Id.* at 122-23.

Miller filed a complaint in federal district court on June 24, 2020, and amended it on September 30 of the same year. *Id.* at 7, 117. His complaint—which he brought as a direct suit—included four counts: three breach of contract claims, and one breach of fiduciary duty claim. In Count I, Miller claimed that Brightstar Asia breached Paragraph 14 of the Agreement by deflating the repair prices Harvestar charged to Brightstar Asia's affiliate. In Count II, Miller sought specific performance to enforce Paragraph 14 as well as disgorgement. In Count III, Miller alleged that Brightstar Asia violated the "implied covenant of good faith and fair dealing" by suppressing Harvestar's prices and business, which "caused [Miller's] 'put' rights pursuant to Paragraph 10 of the Shareholders Agreement and [Miller's] 'call' rights pursuant to Paragraph 11 of the Shareholders Agreement to be rendered worthless." *Id.* at 128. In Count IV, Miller claimed Brightstar Asia violated the fiduciary duty it owed Miller as a minority shareholder.

Brightstar Asia moved to dismiss Miller's complaint under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, 12(b)(6).

Brightstar Asia argued that the district court lacked subject-matter jurisdiction over Miller's claims for three reasons. First, it asserted that Miller had alleged only "derivative claims, not direct claims, under Delaware law." *Id.* at 226-27. Second, Brightstar Asia contended that Miller could exercise his put rights "only" by "acting jointly" with Elmi, meaning that Miller cannot plead an injury-in-fact without alleging that the put rights were "jointly exercised." *Id.* at 239-40. Third, Brightstar Asia argued that, because Miller could not at the time of the complaint have exercised the put rights, his claim was not ripe.

A magistrate judge agreed with Brightstar Asia on the first point and recommended to the district court that the case be dismissed on the ground that Miller's complaint alleged only derivative claims. *Miller v. Brightstar Asia, Ltd.*, No. 20-CV-4849, 2021 WL 2133385, at *1 (S.D.N.Y. May 26, 2021). The magistrate judge determined that Counts I through IV all alleged breaches of duties owed to Harvestar, not to Miller. According to the magistrate judge, Paragraph 14—on which Counts I and II were based—described a contractual duty owed to Harvestar. *Id.* at *6. He additionally determined that Count III described a breach of a duty to Harvestar because, "assuming the implied covenant exists to conflict[ed] transactions, the enforcement of that duty belongs to Harvestar." *Id.* at *7. Last, the magistrate judge determined that the fiduciary duty under Count IV was owed to Harvestar because, in his view, "Miller d[id] not explain why the breach of fiduciary duty belongs to him." *Id.* Because he held that the duties underlying Miller's claims were owed to Harvestar, the magistrate judge applied *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), and concluded that Miller's claims were derivative. *Id.* at *7-8.

7

Over Miller's timely objections, the district court (Daniels, J.) adopted the magistrate judge's report and recommendation. *Miller v. Brightstar Asia, Ltd.*, No. 20-CV-4849, 2021 WL 4148896, at *1 (S.D.N.Y. Sept. 13, 2021). It began by holding that clear error review applies to the report and recommendation because "the issue raised in [Miller's] objections … is the exact same issue that was fully considered and analyzed by" the magistrate judge. *Id.* at *3. The district court agreed with the magistrate judge that the breaches alleged in the complaint were of duties owed to Harvestar, and it concluded that under Delaware law Miller's claims were "derivative in nature." *Id.* at *4. The district court granted Brightstar Asia's motion to dismiss the case. *Id.* at *5. Miller timely appealed.

## DISCUSSION

Before this court, Miller challenges the dismissals only of Counts I and III of his complaint. He raises two principal arguments on appeal. First, Miller contends that, because of the put and call rights conferred on him in the contract, both Paragraph 14 and the alleged covenant of good faith and fair dealing describe a contractual duty owed to him. Second, Miller argues in the alternative that, even if the contractual duties described in Counts I and III belong to Harvestar, his claims are direct under *Tooley*. After considering these arguments, we affirm in part and vacate in part the district court's judgment.

## I

First, however, we must decide what standard of review applies to Miller's claims. It is well settled that "[w]here a district court grants a defendant's Rule 12(b)(1) motion to dismiss, an appellate court will review the district court's factual findings for

8

clear error and its legal conclusions *de novo*." *Aurecchione v. Schoolman Transp. Sys.*, 426 F.3d 635, 638 (2d Cir. 2005). Nevertheless, Brightstar Asia argues that we should review the district court's legal conclusions only for "clear or plain error." Appellee's Br. 13-14. According to Brightstar Asia, we are constrained by the standard the district court applied when it decided to adopt the report and recommendation over Miller's objections.

Federal Rule of Civil Procedure 72(b) provides that when a magistrate judge gives a recommendation on a dispositive motion "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). The rule also describes what constitutes a proper objection: "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file *specific* written objections to the proposed findings and recommendations." *Id.* 72(b)(2) (emphasis added). We have interpreted that language to mean that "[m]erely referring the court to previously filed papers or arguments does not constitute an adequate objection under … Fed. R. Civ. P. 72(b)." *Mario v. P & C Food Mkts.*, 313 F.3d 758, 766 (2d Cir. 2002). And although Rule 72 applies only to the *district court's* review of a report and recommendation, this court has "adopted the rule that 'when a party fails to object timely to a magistrate's recommended decision, it waives any right to further judicial review of that decision.'" *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988) (alteration omitted) (quoting *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir. 1983)).

We disagree with Brightstar Asia's argument that because the district court reviewed the magistrate judge's recommendation for

clear or plain error, so must this court. As an initial matter, it is unclear that the district court was correct to hold that Miller's objections were improper. In deciding that the clear error standard applied, the district court relied on the rule that when "the party makes only conclusory or general objections, or simply reiterates his original arguments, the [district court] reviews the Report and Recommendation only for clear error." *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009) (quoting *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 366 (S.D.N.Y. 2007)). Normally that principle is applied when the objections are nonspecific or "merely perfunctory responses … argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition." *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346-47 (S.D.N.Y. 2006) (internal quotation marks omitted).[4] That does not describe Miller's objections, which took issue with a specific legal conclusion in the report and recommendation. Miller objected to the magistrate judge's

---

[4] *See, e.g., Rodriguez v. Colvin*, No. 12-CV-3931, 2014 WL 5038410, at *4 (S.D.N.Y. Sept. 29, 2014) ("Because these objections ignore the Report and simply reiterate arguments made to [the magistrate judge], they are not proper objections, and are reviewed only for clear error."); *McDonaugh v. Astrue*, 672 F. Supp. 2d 542, 548 (S.D.N.Y. 2009) ("Insofar as Plaintiff objects to the weight that the ALJ assigned to the opinion of Dr. Gair, Plaintiff does not raise a new argument and thus is not entitled to *de novo* review on the basis of this objection."); *Edwards*, 414 F. Supp. 2d at 347 ("Petitioner does not expressly object to the Report's recommendation that his Fourteenth Amendment claims be denied. This Court finds no clear error in that recommendation and therefore adopts it in its entirety.") (footnote omitted); *Nelson v. Smith*, 618 F. Supp. 1186, 1190 (S.D.N.Y. 1985) ("[T]hose portions of the Report to which petitioner has not specifically objected will be adopted by the Court absent a finding of 'clear error' on the face of the record.").

determination that "Section 14 mirrors the contractual duties in *El Paso* [*Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016),] and *Backus* [*v. U3 Advisors, Inc.*, No. 16-CV-8990, 2017 WL 3600430 (S.D.N.Y. Aug. 18, 2017)]," which led the magistrate judge to recommend applying *Tooley*. App'x 329. The district court held that Miller's "objection is improper as it seeks to relitigate an issue that was fully argued in the original briefs to the magistrate judge." *Miller*, 2021 WL 4148896, at *3 (internal quotation marks omitted). To the extent that the objection sought to revisit an issue already argued, it was only because, in Miller's view, the magistrate judge's specific error was a fundamental one. As far as we can tell, however, Miller timely filed "specific written objections to the proposed findings and recommendations" and therefore properly objected. Fed. R. Civ. P. 72(b)(2).

Regardless, even if the rule applicable to the district court required it to review Miller's objections only for clear error, that same standard does not apply to this court's review. *See* Fed. R. Civ. P. 1 (noting that the rules govern "proceedings in the United States district courts"). Rule 72 does not dictate the standard of review for a court of appeals when a party objects to a magistrate report and recommendation. To be sure, as noted above we have adopted a rule that "fail[ure] to object timely" operates as a waiver of any further judicial review. *Wesolek*, 838 F.2d at 58 (quoting *McCarthy*, 714 F.2d at 237). But that rule is a *waiver* rule, "enforced under our supervisory powers," and a "nonjurisdictional … provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile*, 121 F.3d 34, 39 (2d Cir. 1997).

11

The rule Brightstar Asia urges us to follow is more than a waiver rule. The district court held that Miller's objection to the magistrate report and recommendation was improper and subject to clear error review because the magistrate judge had already rejected Miller's argument. Brightstar Asia argues that we must also apply clear or plain error review. That rule would effectively accord more deference to magistrate judges than we do to Article III district court judges. Had the proceedings in this case happened before the district court without the assistance of a magistrate judge, there would be no question that we would review the very same legal conclusions *de novo*. *Aurecchione*, 426 F.3d at 638. We do not think the involvement of a magistrate judge alters the standard of review on appeal.

Miller has argued that his complaint raised direct rather than derivative claims at every stage of this litigation—before the magistrate judge, in objections to the district court, and before this court. Whether he is correct is a question of law, and we review it *de novo*.

## II

Miller challenges the dismissals only of Counts I and III of his complaint. Those counts allege breaches of Paragraph 14 of the contract and of the covenant of good faith and fair dealing, respectively. The district court dismissed his complaint for bringing derivative claims in a direct suit.

The district court's holding turned on the distinction between derivative suits and direct—or individual—suits. The shareholders' derivative suit is a creature of equity, developed "so that the shareholder could enforce a corporate right or claim (that is, one derived from the corporation) and thereby indirectly protect his

investment in the corporation." Harry G. Henn, Handbook of the Law of Corporations and Other Business Enterprises 559 (1961). "[T]he derivative action is unique, for the plaintiff-shareholder does not sue for his own direct benefit or in his own direct right but rather as a guardian *ad litem* for the corporation." *Id.* at 560. Because derivative suits are brought on behalf of the corporation, only shareholders may bring such suits, *Schoon v. Smith*, 953 A.2d 196, 201-02 (Del. 2008), and "the recovery, if any, must go to the corporation," *Tooley*, 845 A.2d at 1036.

Although Miller is a shareholder, he has not brought a derivative action in this case. Instead, he brought his suit as a direct action, which must allege "injuries affecting his … legal rights" that are "distinct from an injury caused to the corporation alone." *Id.* at 1036. "In such individual suits, the recovery or other relief flows directly to the stockholders, not to the corporation." *Id.* Additionally, a plaintiff bringing a direct action need not comply with Delaware's requirements for derivative actions, namely that the stockholder (1) "retain ownership of the shares throughout the litigation," (2) "make presuit demand on the board," and (3) "obtain court approval of any settlement." *Id.*

We agree with the district court that Count I of Miller's complaint may be brought only in a derivative suit. However, because we hold that Count III states a direct claim belonging to Miller, we vacate in part the district court's judgment.

**A**

In Count I, Miller alleges that "[a]s a direct and proximate result of Brightstar Asia['s] violation of Paragraph 14 of the Shareholders Agreement, plaintiff has been damaged in at least two respects"—

13

diminution of the value of his Harvestar shares, and harm to his options rights. App'x 125.[5] The district court held that this claim could be properly brought only in a derivative action. We agree.

"The leading Delaware Supreme Court case on the direct/derivative dichotomy is widely acknowledged to be *Tooley*." *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015). "[T]o plead a direct claim under *Tooley*, a stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1266 (Del. 2021) (internal quotation marks omitted). However, the Delaware Supreme Court has clarified that "when a plaintiff asserts a claim based on the plaintiff's own right, such as a claim for breach of a commercial contract, *Tooley* does not apply." *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1139-40 (Del. 2016). Thus, in *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, that court held that "a suit by a party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law," 118 A.3d 175, 182 (Del. 2015), despite the fact that "NAF cannot demonstrate its injury without showing an injury to the corporation in which it owns stock," *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 744 (2d Cir. 2014).

*Tooley* applies to Count I of Miller's complaint because the right Miller claims was breached was not his "*own* contractual right[]." *NAF Holdings*, 118 A.3d at 182. In *El Paso*, the Delaware Supreme Court applied *Tooley* to a claim that the general partner of a limited

---

[5] Miller does not appeal the district court's dismissal of Count I insofar as it relates to the diminution in value of his Harvestar shares.

14

partnership failed to comply with a provision of the limited partnership agreement requiring that for every action the general partner "must believe that the determination or other action is in the best interests of the Partnership." *El Paso*, 152 A.3d at 1258 (quoting the limited partnership agreement). Because that provision required that actions be believed to be in the "best interests *of the Partnership*," the court held that "the contractual duty of good faith was owed to the Partnership." *Id.* at 1258-59. Similarly, the contractual provision which Miller claims Brightstar Asia breached in Count I provides that any conflicted transactions "will be on terms no less favorable *to the Company* … than would be obtainable in a comparable arm's-length transaction." App'x 149 (emphasis added). As in *El Paso*, the contractual duty at issue in Count I is owed to the corporation, not to the plaintiff.

Applying *Tooley*, we agree with the district court that Count I is a derivative claim. A claim is direct only if the plaintiff "can prevail without showing an injury to the corporation." *Brookfield*, 261 A.3d at 1266.[6] In this case, Miller's success on Count I is predicated on an injury to Harvestar. Count I alleges that Brightstar Asia "entered into numerous transactions with Harvestar on terms less favorable to Harvestar than Brightstar Asia could obtain in a comparable arm's-

---

[6] *See also Tooley*, 845 A.2d at 1038 ("[T]o bring a direct action, the stockholder must allege something other than an injury resulting from a wrong to the corporation."); Daniel S. Kleinberger, *Direct Versus Derivative and the Law of Limited Liability Companies*, 58 Baylor L. Rev. 63, 88-104 (2006) (characterizing *Tooley* as adopting the "direct harm approach," under which "mismanagement by the entity's managers gives rise to only a derivative claim because the owners' loss in value—no matter how real and substantial—is a consequence of a prior injury to the entity").

length transaction" in violation of a duty owed to Harvestar. App'x 124. Although the impact on Harvestar's EBIT, productivity, and indebtedness negatively affected the value of Miller's options rights, that effect depends on an injury to Harvestar. Thus, Miller cannot pursue his claim that Brightstar Asia breached Paragraph 14 of the Agreement in a direct suit.

**B**

Count III is different. Count III alleges a "breach of the implied covenant of good faith and fair dealing." *Id.* at 128. According to Miller, the "implied covenant of good faith and fair dealing" "fill[s] 'gaps' left in the Shareholders Agreement pertaining to the[] variables [in the put and call price formulas] and impose[s] an obligation flowing to the Plaintiff." Appellant's Br. 28. Miller argues that Brightstar Asia violated the implied covenant by engaging in conflicted transactions and by unreasonably manipulating Harvestar's indebtedness and the number of handset units processed.

The district court saw no difference between the duty alleged in Count III and the duty alleged in Count I, and it concluded that "any alleged contractual duty"—including the duty of good faith and fair dealing—"belongs to Harvestar and not Plaintiff individually." *Miller*, 2021 WL 4148896, at *4. We disagree.

Under Delaware law, "[t]he implied covenant [of good faith and fair dealing] is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal quotation marks omitted). The implied covenant "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which

16

has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotation marks omitted). "[P]arties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id*. (internal quotation marks omitted).

The implied covenant is at once pervasive and limited. "[I]mplied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document." *Id.* at 441 (internal quotation marks, alteration, and footnote omitted). "Parties have a right to enter into good and bad contracts, the law enforces both." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). In other words, the implied covenant cannot override what the contract expressly provides. Instead, the covenant applies when "the express terms of the agreement can be reasonably read to imply certain other conditions, or leave a gap, that would prescribe certain conduct, because it is necessary to vindicate the apparent intentions and reasonable expectations of the parties." *Dieckman*, 155 A.3d at 367.

In this case, Miller alleges an implied covenant of good faith and fair dealing that creates a contractual duty owed to him, not to Harvestar. The options rights described in Paragraphs 10 and 11 are individual rights; both paragraphs provide that "the Executives shall have the right" to sell shares to or purchase shares from Brightstar Asia. App'x 146 (Paragraph 10), 148 (Paragraph 11). Those express contractual terms imply that Brightstar Asia will not engage in

17

"arbitrary or unreasonable conduct" to destroy the value of Miller's options rights. *See Dunlap*, 878 A.2d at 442.

Miller alleges that sort of misconduct in his complaint. According to Miller, Brightstar Asia's misconduct includes "plac[ing] millions of dollars in intercompany loans and other obligations on Harvestar's balance sheet" and "cancel[ling] all repair services Harvestar was formed to provide to its customers, except the repair work that Harvestar provides to Brightstar Asia[]." App'x 122-23. By operation of the formulas described in Paragraphs 10 and 11, "the price at which [Miller] has the right to 'put' the purchase of his shares to Brightstar Asia is currently $0" while "the price at which [Miller] has the right to 'call' the purchase of Brightstar Asia's majority interest in Harvestar is … a prohibitively expensive and unreasonable amount." *Id.* at 128-29. In sum, Count III alleges that "Brightstar Asia has caused plaintiff's 'put' rights pursuant to Paragraph 10 of the Shareholders Agreement and plaintiff's 'call' rights pursuant to Paragraph 11 of the Shareholders Agreement to be rendered worthless." *Id.* at 128. That conduct, according to the complaint, violated the "implied covenant" that "required, *inter alia*, that Brightstar Asia refrain from engaging in, or causing Harvestar to engage in, conflict[ed] transactions to the detriment of Harvestar *or plaintiff*." *Id.* at 127 (emphasis added). Because Miller alleges a violation of an implied contractual duty owed to himself, he may bring Count III in a direct suit.

Brightstar Asia contended before the district court that, even if Miller's claim for breach of the implied covenant could be brought in a direct suit, Miller cannot state a claim based on conflicted transactions. *Id.* at 243. Brightstar Asia pointed to the principle that

when "the contract at issue expressly addresses a particular matter, an implied covenant claim respecting that matter is duplicative and not viable." *Id.* (quoting *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. 2017-0500, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018)). According to Brightstar Asia, Miller's claim for breach of the implied covenant based on conflicted transactions "is entirely duplicative of [Miller's] claim for breach of [Paragraph] 14" and for that reason fails as a matter of law. *Id.*

We again disagree. Brightstar Asia is correct that, under Delaware law, the implied covenant of good faith and fair dealing "does not apply when the contract addresses the conduct at issue." *Nationwide Emerging Managers, LLC v. NorthPointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015). That principle, however, recognizes that "implied good faith cannot be used to *circumvent* the parties' bargain." *Id.* at 896 n.72 (quoting *Dunlap*, 878 A.2d at 441); *see also Dunlap*, 878 A.2d at 441 ("[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement."). It does not override the court's function of "implying contract terms to ensure the parties' reasonable expectations are fulfilled." *Id.* at 442 (internal quotation marks omitted). In cases such as *NorthPointe Holdings* and *Edinburgh Holdings*, the courts held that express contractual provisions between two parties ruled out an implied covenant between those parties covering identical ground. *See NorthPointe Holdings*, 112 A.3d at 896; *Edinburgh Holdings*, 2018 WL 2727542, at *9. In this case, by contrast, the alleged implied covenant arises between Brightstar Asia and Miller while Paragraph 14 arises between Brightstar Asia and Harvestar. An implied covenant between Brightstar Asia and Miller to avoid conduct that would unreasonably undermine the value of

Miller's options rights would not "circumvent" a bargain between Brightstar Asia and Harvestar to avoid conflicted transactions. *Dunlap*, 878 A.2d at 441. Thus, Paragraph 14 does not render Miller's implied covenant claim impermissibly duplicative.

We hold that the district court erred when it determined that the implied duty alleged in Count III "belong[ed] to Harvestar and not Plaintiff individually." *Miller*, 2021 WL 4148896, at *4. Miller adequately pleaded that Brightstar Asia engaged in "arbitrary or unreasonable conduct" that "prevent[ed] [Miller] from receiving the fruits of the bargain" in Paragraphs 10 and 11. *Dunlap*, 878 A.2d at 442 (internal quotation marks omitted). Such a claim may be brought in a direct suit. Accordingly, we vacate the district court's judgment as to Count III.

## CONCLUSION

When the district court determined that Miller brought only derivative claims, it dismissed his case for lack of subject-matter jurisdiction. *Miller*, 2021 WL 4148896, at *4. That decision stemmed from the Delaware courts' practice of referring to the ability to bring a derivative claim as "[d]erivative standing." *El Paso*, 152 A.3d at 1256. But, as the Supreme Court has noted, the term "standing" is often "misleading" because courts sometimes use the term to refer to requirements that "do[] not implicate subject-matter jurisdiction." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014). Here, the inquiry into whether a claim is direct, and a plaintiff therefore has "standing" to bring it, is not an Article III standing inquiry.[7] Even if the district court were right that Miller's

---

[7] That is, it is not an inquiry into whether the plaintiff suffered an "injury in fact," whether there is a "causal connection between the injury and the

claims had to be brought in a derivative suit, it should have dismissed the complaint for failure to state a claim. *See Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016) ("When the district court later concluded that Culverhouse was wrong and that his claims were derivative, its ruling should have been on the merits.").[8]

"A dismissal for lack of jurisdiction must be without prejudice rather than with prejudice. Dismissals for failure to state a claim, on the other hand, are generally with prejudice." *Donnelly v. CARRP*, 37 F.4th 44, 57 (2d Cir. 2022) (internal quotation marks and citation omitted). It is nevertheless permissible to dismiss for failure to state a claim without prejudice, for example to enable a party to seek to amend its complaint. *See, e.g.*, *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1015 (2d Cir. 1973) (observing that cases may be disposed of "on

---

conduct complained of," and whether the injury is redressable. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

[8] Because whether Miller properly stated a direct claim was not a jurisdictional question, the district court should have considered Brightstar Asia's arguments that the district court lacked subject-matter jurisdiction before proceeding to the merits. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). For reasons similar to those that lead us to conclude that Miller states a direct claim, we conclude that the district court had subject-matter jurisdiction to hear this case. An option "is itself a valuable property right," and rendering the option valueless is a "legally cognizable injury-in-fact." *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 141-42 (3d Cir. 2009); *see also In re MTBE Prods. Liability Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) ("In most cases, that a plaintiff has Article III standing is enough to render its claim constitutionally ripe."). To the extent Brightstar Asia argued that prudential considerations required dismissal, the district court may consider those arguments for the first time on remand. *See Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 607 (2d Cir. 2007) ("In general, a federal appellate court refrains from passing on issues not raised below.").

the merits" in "dismissals with or without prejudice for failure to state a claim"). Accordingly, although the district court erred in characterizing its holding as jurisdictional, we **AFFIRM** its judgment of dismissal as to Count I. As to Count III, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

22