UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TYLER MILLER,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )          Case No: 1:20-cv-4849
                                 )
BRIGHTSTAR ASIA, LTD,            )          District Judge George B. Daniels
                                 )          Magistrate Judge James L. Cott
        Defendant.               )


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
# SECOND MOTION TO DISMISS FIRST AMENDED COMPLAINT

Kristina A. Reliford
Peter C. Sales (*Admitted Pro Hac Vice*)
Frankie N. Spero (*Admitted Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
P: (615) 252-3573
F: (615) 252-6380
kreliford@bradley.com
psales@bradley.com
fspero@bradley.com
*Attorneys for Likewize Hong Kong Limited f/k/a Brightstar Asia, Ltd.*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................................... ii

I.      INTRODUCTION ...................................................................................................... 1

II.     RELEVANT BACKGROUND ................................................................................. 3

        A.      Operations of Harvestar Solutions and Brightstar Corp. ........................... 3

        B.      Brightstar Asia Acquires Majority Stake in Harvestar Solutions. .......... 4

        C.      Ancillary Agreements Executed with the Share Purchase Agreement. ............... 4

        D.      Brightstar Asia's Alleged Conduct in Breach of the Implied Covenant of
                Good Faith and Fair Dealing under the Shareholders Agreement. ................ 6

III.    ARGUMENT ............................................................................................................. 7

        A.      Legal Standard ........................................................................................... 7

        B.      Count III of the Amended Complaint Fails to State a Claim for Breach of
                the Implied Covenant of Good Faith and Fair Dealing under Delaware
                Law. ........................................................................................................... 7

                1.      Plaintiff's Implied Covenant Claim is Barred under Section 29(a)
                        of the Shareholders Agreement. ................................................. 8

                2.      Plaintiff's Implied Covenant Claim Fails Because He Seeks to
                        Imply Pricing and Volume Obligations under the Shareholders
                        Agreement that are Specifically Addressed in, and would Override
                        the Express Terms of, the Services Agreement and the SOW ............... 8

                3.      Plaintiff's Implied Covenant Fails Because there is No Gap in the
                        Shareholders Agreement to be Filled regarding Pricing for Repair
                        Services and the Supply of Volumes of Mobile Devices. ............... 13

                4.      Plaintiff's Implied Covenant Claim Fails because the Obligations
                        He seeks to Imply in the Shareholders Agreement were Clearly
                        Contemplated at the Time of Contracting and, thus, the
                        Shareholders Agreement could have been Drafted to Include such
                        Obligations. ................................................................................. 16

IV.     CONCLUSION ........................................................................................................ 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Airborne Health, Inc. v. Squid Soap, LP*,
    984 A.2d 126 (Del. Ch. 2009) ................................................................................14

*Allen v. El Paso Pipeline GP Co., L.L.C.*,
    113 A.3d 167 (Del. Ch. 2014) .........................................................................13, 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...............................................................................................7

*Blaustein v. Lord Baltimore Cap. Corp.*,
    84 A.3d 954 (Del. 2014) .......................................................................................16

*Dunlap v. State Farm Fire and Cas. Co.*,
    878 A.2d 434 (Del. 2005) ............................................................................9, 13, 14

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009) ........................................................................7, 9, 13

*Lonergan v. EPE Holdings, LLC*,
    5 A.3d 1008 (Del Ch. 2010) ..................................................................................14

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ...............................................................................7, 14

*Oxbow Carbon & Minerals Hold., Inc. v. Crestview-Oxbow Acquisition, LLC*,
    202 A.3d 482 (Del. 2019) ............................................................................. *passim*

*Parker Madison Partners v. Airbnb, Inc.*,
    283 F.Supp.3d 174 (S.D.N.Y. 2017) .........................................................................7

*Pearson Capital Partners LLC v. James River Ins. Co.*,
    151 F.Supp.3d 392 (S.D.N.Y. 2015) .........................................................................4

**Statutes**

Hong Kong Companies Ordinance ...............................................................................3, 4

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................1, 4, 5, 7

Defendant, Likewize Hong Kong Limited f/k/a Brightstar Asia, Ltd. ("Brightstar Asia")[1], hereby submits this memorandum of law in support of its second motion to dismiss Plaintiff's First Amended Complaint ("Amended Complaint") (Doc. 24) pursuant to Fed. R. Civ. P. 12(b)(6) and states as follows:

## I.      INTRODUCTION

On remand from the U.S. Second Circuit Court of Appeals, Plaintiff has one cause of action remaining in his Amended Complaint:  his purported claim in Count III for breach of the implied covenant of good faith and fair dealing under the Shareholders Agreement dated April 9, 2018 (the "Shareholders Agreement").  Brightstar Asia now moves this Court to dismiss Count III for failure to state a claim.

Originally, Plaintiff's Amended Complaint contained four Counts alleging causes of action for breach of the Shareholders Agreement (Counts I and II), breach of the implied covenant under the Shareholders Agreement (Count III), and breach of fiduciary duty (Count IV).  On October 26, 2020, Brightstar Asia moved to dismiss the Amended Complaint, *inter alia*, for lack of subject matter jurisdiction asserting that Plaintiff lacked standing to assert his claims because the claims were derivative under Delaware law.  (Doc. 30 & 31.)  On May 26, 2021, Magistrate Judge Cott issued a Report and Recommendation holding that all four Counts in the Amended Complaint are derivative claims under Delaware law and recommending dismissal. (Doc. 39.)  On September 13, 2021, Judge Daniels issued an Order adopting the Report and Recommendation and dismissing Plaintiff's First Amended Complaint for lack of subject matter jurisdiction.  (Doc. 43.)  Plaintiff appealed the District Court's judgment.

---

[1] On or about September 6, 2021, Brightstar Asia, Ltd. changed its name to Likewize Hong Kong Limited.  To maintain consistency with the record in this case, this memorandum will continue to refer to the Defendant as Brightstar Asia.

On appeal, Plaintiff did not appeal the District Court's dismissal of his claims in Counts II and IV of the Amended Complaint, but rather he only appealed the dismissal of his breach of contract and implied covenant claims in Counts I and III.  (*See* Stipulation, ¶ 3, Doc. 49.)  On August 3, 2022, the U.S. Second Circuit Court of Appeals issued an Opinion in which it affirmed the District Court's dismissal as to Plaintiff's breach of contract claim in Count I because it is derivative claim, but vacated the District Court's dismissal of Plaintiff's implied covenant claim in Count III finding that Plaintiff may assert that claim directly.  The Second Circuit remanded the case to this Court for further proceedings consistent with the Opinion.

Therefore, on remand, Plaintiff's only remaining cause of action is his claim for breach of the implied covenant under the Shareholders Agreement.  In that claim, Plaintiff seeks to use the implied covenant to rewrite the Shareholders Agreement to impose obligations regarding the pricing to be paid for repairs of mobile devices and minimum volumes of mobile devices to be supplied.  This claim fails as a matter of law for at least four reasons.

First, the claim is barred under Section 29(a) of the Shareholders Agreement. Second, alternatively, the pricing and volume obligations that Plaintiff seeks to imply under the Shareholders Agreement are specifically addressed in and governed by the express terms of the Amended and Restated Master Services Agreement (the "Services Agreement") and the accompanying Statement of Work #1 (the "SOW") dated April 9, 2018 that were executed contemporaneously with the Shareholders Agreement and as part of the subject share purchase transaction.  Third, even if the Services Agreement and the SOW somehow do not control, there is no gap in the Shareholders Agreement regarding pricing and volumes to be filled by the implied covenant, and to impose such obligations would create free-floating duties that are inconsistent with the terms of the Shareholders Agreement.  Fourth, and last, even if the Court finds a gap in

the Shareholders Agreement, the pricing and volume obligations that Plaintiff seeks to impose were, by Plaintiff's own admission, contemplated at the time of contracting, and, thus, Plaintiff cannot use the implied covenant to now rewrite the Agreement to impose such obligations. For these reasons, Count III fails to state a claim for breach of the implied covenant.

## II.   RELEVANT BACKGROUND

### A.   Operations of Harvestar Solutions and Brightstar Corp.

In August 2016, Plaintiff and Omar Elmi formed and incorporated Harvestar Solutions Limited ("Harvestar Solutions") as a private company limited by shares under the Hong Kong Companies Ordinance. (Amend. Compl. ¶¶ 4, 9, Doc. 24.) Plaintiff alleges that Harvestar Solutions' business principally consisted of purchasing from various sources used mobile phones traded-in by consumers, refurbishing the used phones to "like new" condition at Harvestar Solutions' facility in the Philippines, and then wholesaling the refurbished phones to distributors and retailers that sell used mobile phones to consumers. (*Id.* ¶ 10.)

Plaintiff alleges that Brightstar Corp.[2] is one of the largest distributors of mobile phones in the world and was a significant customer of Harvestar Solutions. (*Id.* ¶ 12.) Brightstar Corp. purchases millions of used mobile devices that are traded-in at Apple and Softbank retail stores and uses third-party vendors, such as Harvestar Solutions, to repair and refurbish the used devices, which Brightstar Corp. then wholesales into the consumer market. (*Id.*) Through its subsidiary, Brightstar Device Protection, LLC ("Brightstar Device")[3], which was based in Georgia, Brightstar Corp. also acquires damaged mobile devices from consumers who purchased a Brightstar Corp.

---

[2] In June 2021, Brightstar Corp., as part of a rebranding of the company, changed its name to Likewize Corp., which is a Delaware corporation with its principal office located in Southlake, Texas. To maintain consistency with the record in this case, this memorandum will continue to use the name Brightstar Corp.

[3] As part of Brightstar Corp.'s name change to Likewize Corp., Brightstar Device Protection, LLC changed its name to Likewize Device Protection, LLC, which has its principal office located in Southlake, Texas. To maintain consistency with the record in this case, this brief will continue to use the name Brightstar Device.

device protection plan.  (*Id.* ¶ 13.)  Brightstar Corp., through third-party vendors, repairs the damaged devices and redeploys the devices back to the consumers.  (*Id.*)

**B.     Brightstar Asia Acquires Majority Stake in Harvestar Solutions**.

On April 9, 2018, Brightstar Asia, a private company limited by shares incorporated under the Hong Kong Companies Ordinance, purchased a 51% controlling stock interest in Harvestar Solutions from Plaintiff and Omar Elmi pursuant to a Share Purchase Agreement dated April 9, 2018 (the "Share Purchase Agreement").  (Amend. Compl. ¶¶ 2, 15.)  (A copy of the Share Purchase Agreement was filed in this action at Doc 23-1.)[4]  The transaction left Plaintiff and Mr. Elmi each owning a 24.5% minority interest in Harvestar Solutions.  (*Id.* ¶ 15.)

**C.     Ancillary Agreements Executed with the Share Purchase Agreement.**

Plaintiff alleges that, in connection with the Share Purchase Agreement, "the parties executed numerous other documents that outlined the relationship of the parties moving forward." (Amend. Compl. ¶ 16.)  Consistent with this allegation, the Share Purchase Agreement required that certain "Ancillary Agreements" be executed and delivered at the closing of the transaction. (*See* Share Purchase Agreement, §§ 1.1, 2.3.)  Further, the integration clause in the Share Purchase Agreement provides that the "[Share Purchase] Agreement and the Ancillary Agreements . . . constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to such subject matter."  (*Id.* § 8.4.)

---

[4] Because Plaintiff explicitly references and relies upon the terms of the Share Purchase Agreement in the Amended Complaint, that Agreement is deemed to be included in the Amended Complaint and may be considered by this Court (along with the exhibits thereto) in ruling on Brightstar Asia's Rule 12(b)(6) motion to dismiss. "[A]ny written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as any matters of which judicial notice may be taken, are deemed included in the complaint and may be considered without converting the motion to dismiss into a motion for summary judgment." *Pearson Capital Partners LLC v. James River Ins. Co.*, 151 F.Supp.3d 392, 400 (S.D.N.Y. 2015). "Additionally, even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.*

One "Ancillary Agreement" was the Shareholders Agreement, executed by Brightstar Asia, Plaintiff, Omar Elmi, and Harvestar Solutions. (Amend. Compl. ¶ 17 & Ex. 1.)  The Shareholders Agreement sets forth the rights and duties of the shareholders to Harvestar Solutions (*i.e.*, Brightstar Asia, Plaintiff, and Elmi), including corporate governance of Harvestar Solutions and disposition of shares.  (*Id.*)  However, the Shareholders Agreement is not a services agreement or a statement of work and, thus, does not contain terms detailing services for the repair and refurbishment mobile devices.  Consistent with this, the Shareholders Agreement does not contain any obligations for Brightstar Asia to supply used mobile devices to Harvestar Solutions or to pay pricing to Harvestar Solutions for repair services, and it does not contain any obligations for Harvestar Solutions to perform services for the repair of mobile devices for Brightstar Asia. Simply put, such obligations are not the subject and purpose of the Shareholders Agreement.  Yet, as discussed herein, Plaintiff is seeking to improperly use the implied covenant to imply such inconsistent obligations into the Shareholders Agreement.

Instead, the terms governing the repair and refurbishment of mobile devices were set forth in another "Ancillary Agreement" to the Share Purchase Agreement:  the Services Agreement and the accompanying SOW, executed and entered into between Brightstar Corp. and Harvestar Technologies, Inc. ("HTI"), a wholly-owned subsidiary of Harvestar Solutions.  (Amend. Compl. ¶ 16.)  (A copy of the Services Agreement and the SOW is attached as Exhibits A and B to the contemporaneously-filed Declaration of Frankie N. Spero.)[5]  Plaintiff signed the Services Agreement and the SOW on behalf of HTI.  The recitals to the Services Agreement state that the Services Agreement was executed as "a condition of the transactions contemplated by [the] Share

---

[5] Because Plaintiff explicitly references and relies upon the terms of the Services Agreement and the SOW in the Amended Complaint, those documents are deemed to be included in the Amended Complaint and may be considered by this Court in ruling on Brightstar Asia's Rule 12(b)(6) motion to dismiss.  *See* Footnote 5, *supra*.

Purchase Agreement and Shareholders Agreement." (Servs. Agr., p. 1.)

The Services Agreement and the SOW set forth the terms and conditions by which HTI will provide services to Brightstar Corp. and its "affiliates"[6] for the repair of mobile devices supplied by Brightstar Corp. and its affiliates to HTI. (*See* Servs. Agr., §§ 1, 12; SOW, §§ 1, 4, 7–10.) Included in the terms of the Services Agreement and the SOW are specific provisions governing the forecasting and supply of volumes of mobile devices to HTI and the pricing to be paid to HTI by Brightstar Corp. and its affiliates for HTI's repair and refurbishment services. (*See* Servs. Agr., §§ 1, 4.b, 9.a; SOW, §§ 1, 2.1–2.3, 12.2.)

### D.  Brightstar Asia's Alleged Conduct in Breach of the Implied Covenant of Good Faith and Fair Dealing under the Shareholders Agreement.

Plaintiff alleges that, after Brightstar Asia acquired the majority stake in Harvestar Solutions, it engaged in conduct that breached the implied covenant of good faith and fair dealing under the Shareholders Agreement. Specifically, in Count III of the Amended Complaint, Plaintiff alleges that Brightstar Asia breached the implied covenant under the Shareholders Agreement in "two respects": (1) by allegedly causing Harvestar Solutions to repair more than 200,000 mobile devices for Brightstar Device for a price per device that was allegedly $50 below market value; and (2) "caus[ing] Harvestar [Solutions] not to receive for repair and refurbishment the 40,000 mobile devices per month that had been the alleged basis for the April 9, 2018, stock purchase." (Amend. Compl. ¶¶ 50, 51.)

---

[6] Section 1.c of the Services Agreement provides that the agreement is also entered into for the benefit of Brightstar Corp.'s "affiliates," defined as "any other company in the Brightstar group of companies including any holding company or any subsidiary of that holding company or subsidiary of that subsidiary." Section 1.c provides that "Brightstar Affiliates may request Products and/or Services and/or deliverables from [HTI] under this Agreement" and that the affiliate requesting HTI's repair services shall be responsible for paying HTI's fees for such services.

### III.  **ARGUMENT**

#### A.  **Legal Standard**

"To survive a motion to dismiss under [Rule 12(b)(6)], 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Parker Madison Partners v. Airbnb, Inc.*, 283 F.Supp.3d 174, 178 (S.D.N.Y. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

#### B.  **Count III of the Amended Complaint Fails to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing under Delaware Law.**

Under Delaware law, "[t]he implied covenant . . . involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps **that the asserting party pleads neither party anticipated**."  *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (emphasis added). "The implied covenant cannot be invoked to override the express terms of contract." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). It is a "limited and extraordinary legal remedy," *Nemec*, 991 A.2d at 1128, and "[c]onsistent with its narrow purpose, the implied covenant is only rarely invoked successfully." *Kuroda*, 971 A.2d at 888.

Plaintiff alleges in Count III that Brightstar Asia breached the implied covenant under the Shareholders Agreement in "two respects": (1) by allegedly causing Harvestar Solutions to repair more than 200,000 mobile devices for Brightstar Device for a price per device that was allegedly $50 below market value; and (2) "caus[ing] Harvestar [Solutions] not to receive for repair and refurbishment the 40,000 mobile devices per month that had been the alleged basis for the April 9, 2018, stock purchase."  (Amend. Compl. ¶¶ 50, 51.)

Thus, despite the express terms of the Services Agreement and the SOW governing pricing for repairs and the supply of volumes of mobile devices, and the clear lack of any "gap" in the Shareholders Agreement regarding pricing and volumes, Plaintiff is attempting to use the implied

covenant to rewrite the Shareholders Agreement to impose pricing and volume obligations thereunder that are unattached from and inconsistent with the terms of the Shareholders Agreement as a whole.  As demonstrated below, Plaintiff's implied covenant fails as a matter of law for at least four reasons.

### 1.   Plaintiff's Implied Covenant Claim is Barred under Section 29(a) of the Shareholders Agreement.

Section 29(a) of the Shareholders Agreement provides, in relevant part, as follows:

> To the maximum extent permitted by applicable law, no Shareholder (solely in its capacity as such), any of their respective Affiliates or officers or employees shall owe any duty (including any fiduciary duty) to the Company or to any other Shareholder other than a duty to act in accordance with the implied contractual covenant of good faith and fair dealing. **The parties hereto acknowledge and agree that any Shareholder acting in accordance with this Agreement shall (a) be deemed to be acting in compliance with such implied contractual covenant, and (b) not be liable to** the Company, to **any other Shareholder** or to any other Person that is a party to or is otherwise bound by (or is a beneficiary of) this Agreement for its reliance on the provisions of this Agreement. . . .

(emphasis added).  Plaintiff does not allege in the Amended Complaint that Brightstar Asia breached or failed to act in accordance with any provision of the Shareholders Agreement with respect to Plaintiff. Accordingly, pursuant to Section 29(a), Brightstar Asia (*i.e.*, a "Shareholder") is deemed to be in compliance with the implied covenant of good faith and fair dealing and is not liable to Plaintiff in his capacity as a Shareholder.  Therefore, Plaintiff fails to state a claim for breach of the implied covenant under the Shareholders Agreement.

### 2.   Plaintiff's Implied Covenant Claim Fails Because He Seeks to Imply Pricing and Volume Obligations under the Shareholders Agreement that are Specifically Addressed in, and would Override the Express Terms of, the Services Agreement and the SOW.

Under Delaware law, "[t]he implied covenant 'does not apply when the contract addresses the conduct at issue.'" *Oxbow Carbon & Minerals Hold., Inc. v. Crestview-Oxbow Acquisition,*

*LLC*, 202 A.3d 482, 507 (Del. 2019) (citation omitted).  Thus, "[t]he implied covenant cannot be invoked to override the express terms of contract." *Kuroda*, 971 A.2d at 888 (citation omitted); *see also Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control, . . . such that implied good faith cannot be used to circumvent the parties' bargain . . . ." (citation omitted)).  Here, Plaintiff seeks to imply terms and obligations under the Shareholders Agreement that are specifically addressed in and would override the express terms of the Services Agreement and the SOW.

Plaintiff alleges that, in connection with the execution of the Share Purchase Agreement and the Shareholders Agreement, "the parties executed numerous other documents that outlined the relationship of the parties moving forward."  (Amend. Compl. ¶¶ 15, 16.)  Such documents included the Services Agreement and the SOW entered into between Brightstar Corp. and HTI.  (*Id.* ¶ 16.)  The recitals in the Services Agreement state that Brightstar Corp. and HTI entered into the Agreement as "a condition of the transaction contemplated under [the] Share Purchase Agreement and Shareholders Agreement."  (Servs. Agr., p. 1.)

The Services Agreement and the SOW set forth the terms and conditions by which HTI will provide services to Brightstar Corp. and its affiliates for the repair of mobile devices supplied to HTI.  Included in the terms of the Services Agreement and the SOW are specific provisions governing the forecasting and supply of volumes of mobile devices to HTI and the pricing to be paid to HTI for its repair services.  However, in Count III, Plaintiff seeks to improperly use the implied covenant to override and contradict the Services Agreement and the SOW by imposing obligations into the Shareholders Agreement regarding the pricing to be paid for repair services and the supply of volumes of mobile devices for repair.

As the first basis for his implied covenant claim, Plaintiff alleges that Brightstar Asia caused Harvestar Solutions to repair more than 200,000 mobile devices for Brightstar Device for a price per device that was allegedly $50 below market value.  Thus, Plaintiff seeks to impose obligations into the Shareholders Agreement for the pricing to be paid for the repair of mobile devices.  However, the terms and procedures for the pricing to be paid by Brightstar Corp. and its affiliates (including Brightstar Device) for the repair of mobile devices is specifically addressed and governed by the Services Agreement and the SOW.

Specifically, Section 4 of the Services Agreement states that "[a]ll pricing for Services will be stated in an applicable SOW."  (Servs. Agr., § 4.b.)  Section 9 of the Services Agreement, entitled "Payment," provides that the rates, fees, and charges to be charged by HTI to Brightstar Corp. and its affiliates, and to be paid by Brightstar Corp. and its affiliates to HTI, are set forth in applicable SOWs, and HTI agreed that "there are no other applicable rates and charges."  (*Id.* § 9.a.)  Section 9.a further provides that HTI may propose changes to the pricing and that any pricing changes must be memorialized in a Change Order to the SOW signed by both parties.  (*Id.*)  Section 9.a also provides that "[HTI] and Brightstar agree to perform regular reviews of the rates, fees, and charges for the Services."  (*Id.*)

Turning to the SOW, Section 1(b) of the SOW provides that: "[I]n consideration of [HTI's] Services, Brightstar shall pay to [HTI] fees as agreed by the Parties and set forth on [HTI's] Brightstar rate card.  The Brightstar rate card may be updated from time to time if mutually agreed. Both parties agree to have monthly pricing review to optimize the opportunities to increase the refurbishment traffic." (SOW, § 1(b).)  Further, Section 6 of the SOW, entitled "Pricing," provides that "Pricing (and the rate card) shall be revised quarterly to meet fair market on material and labor."  (*Id.* § 6.1.)

Accordingly, the pricing to be paid by Brightstar Corp. and its affiliates to HTI for the repair and refurbishment of mobile devices, including the procedures for reviewing and changing such pricing, is specifically addressed in and governed by the Services Agreement and the SOW.

As the second basis for his implied covenant claim, Plaintiff alleges that Brightstar Asia "caused Harvestar [Solutions] not to receive for repair and refurbishment the 40,000 mobile devices per month that had been the alleged basis for the April 9, 2018, stock purchase." (Amend. Compl. ¶ 51.)  Thus, Plaintiff seeks to impose obligations under the Shareholders Agreement requiring Brightstar Asia to supply minimum monthly volumes of mobile devices to Harvestar Solutions for repair.  However, like the pricing terms, the terms by which Brightstar Corp. and its affiliates supply mobile devices for repair and the volumes of devices to be supplied are specifically addressed in and governed by the Services Agreement and the SOW.

Specifically, Section 1 of the Services Agreement provides that, during the term of the agreement, Brightstar Corp. and its affiliates may request services from HTI for the repair of mobile devices pursuant to the terms of the Services Agreement and the SOW.  (Servs. Agr., §§ 1.a, 1.c.)  Section 1(a) of the SOW provides that, at the request of Brightstar Corp. and its affiliates, HTI will receive from Brightstar Corp. and its affiliates certain used mobile devices (referred to as "Products") for repair and refurbishment.  (SOW, § 1(a).)

Section 2 of the SOW is entitled "Forecasting & Operational Planning."  Section 2.1 states that Brightstar will provide forecasts to HTI of the volumes of mobile devices to be supplied by Brightstar to HTI "for thirty (30), sixty (60), and 90 day production supply outlook."  (*Id.* § 2.1.)  Section 2.1 further states that "Brightstar will submit a supply forecast to [HTI] at least (15) days prior to production month."  (*Id.*)  Section 2.2 provides that, upon HTI's receipt of Brightstar's supply forecasts, HTI must submit weekly production plans, and HTI's "production plan should

align with the supply forecast volumes submitted." (*Id.* § 2.2.)  Finally, Section 2.3 provides that "[HTI] shall collect or Brightstar will ship all available devices from Brightstar as advised to [HTI] and [HTI] shall receive supply shipments weekly." (*Id.* § 2.3.)

However, neither Section 2 of the SOW, nor any other provision of the SOW or the Services Agreement, imposes any requirement or commitment on Brightstar Corp. or its affiliates to supply a minimum volume of mobile devices to HTI for repair or refurbishment.  Instead, Section 12.2 of the SOW provides that:

> [K]ey account management team members from [HTI] and Brightstar will meet on a quarterly basis . . . for a formal review of program service level and quality performance metrics for the previous quarter's operation against agreed upon [Service Level Agreement] indices. The meeting will include, at a minimum, a review of the operational performance, **volumes**, and cycle count results, . . . **forecasts for the coming quarter**, . . . .

(SOW, § 12.2) (emphasis added).  In addition, Section 9.a of the Services Agreement provides that "[HTI] may propose pricing updates within the duration of this [Services] Agreement to adjust for **changes in repair volume** or device mix." (Servs. Agr., § 9.a) (emphasis added).

Accordingly, the terms and procedures for supply forecasting and the volumes of mobile devices to be supplied by Brightstar Corp. and its affiliates to HTI for repair are specifically addressed in and governed by the Services Agreement and the SOW.

Finally, the pricing and volume terms that Plaintiff seeks to imply under the Shareholders Agreement would require the pricing be paid to Harvestar *Solutions* for repairs and the minimum volumes of mobile devices to be supplied to Harvestar *Solutions* for repair. (*See* Amend. Compl. ¶¶ 34, 35, 50, 51.)  However, the entity that performs the repair and refurbishment of mobile devices for Brightstar Corp. and its affiliates is HTI (*i.e.*, Harvestar Technologies, Inc.), not Harvestar Solutions.  Further, HTI (not Harvestar Solutions) is the entity that entered into the

Services Agreement and the SOW with Brightstar Corp., and HTI is the entity that Brightstar Corp. and its affiliates agreed to supply with mobile devices and to pay for repair services. Thus, to impose obligations under the Shareholders Agreement for pricing to be paid and mobile devices to be supplied to Harvestar *Solutions* (rather than HTI), would clearly contradict and override the express terms of the Services Agreement and the SOW entered into with HTI.

For these reasons, the pricing to be paid by Brightstar Corp. and its affiliates for repair services and the supply of volumes of mobile devices by Brightstar Corp. and its affiliates for repair, are specifically addressed in and governed by the Services Agreement and the SOW. *See Oxbow Carbon*, 202 A.3d at 507 (implied covenant does not apply when the contract addresses the conduct at issue). As Plaintiff acknowledges, the Services Agreement and the SOW were executed in connection with the Share Purchase Agreement and the Shareholders Agreement, and the Services Agreement and the SOW are part of the documents outlining the parties' relationship going forward. (Amend. Compl. ¶¶ 15–17.) Thus, any alleged claims challenging the pricing paid for HTI's repairs or the volumes of mobile devices supplied by Brightstar Corp. or its affiliates must be brought and resolved under the terms of the Services Agreement and the SOW. Plaintiff's attempt to use the implied covenant to impose pricing and volume terms in the Shareholders Agreement, which override the express terms of the Services Agreement and the SOW, fails as a matter of Delaware law. *See Kuroda*, 971 A.2d at 888; *Dunlap*, 878 A.2d at 441. Therefore, Count III fails to state a claim for breach of the implied covenant.

### 3. Plaintiff's Implied Covenant Fails Because there is No Gap in the Shareholders Agreement to be Filled regarding Pricing for Repair Services and the Supply of Volumes of Mobile Devices.

Under Delaware law, when a court is presented with an implied covenant claim, it must first determine whether there is a contractual gap that needs to be filled. *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014). The implied covenant only applies "'when

the contract is truly silent with respect to the matter at hand.'" *Id.* (citation omitted).  Further, "the covenant exists to fulfill the reasonable expectations of the parties, and thus the implied obligation must be consistent with the terms of the agreement as a whole." *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009).  The implied covenant cannot be used "to create a free-floating duty unattached to the underlying legal documents,'" *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1017 (Del Ch. 2010) (quoting *Dunlap*, 878 A.2d at 441), or to "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126.  Thus, if the court finds no gap in the contract, then the implied covenant does not apply. *Oxbow Carbon*, 202 A.3d at 507.

Here, even if the Court finds that express terms of the Services Agreement and the SOW do not control the matters alleged by Plaintiff (which they clearly do), Plaintiff's implied covenant claim nonetheless fails because there is no gap in the Shareholders Agreement that needs to be filled.  Plaintiff seeks to impose obligations under the Shareholders Agreement regarding the pricing to be paid for repair services and the volumes of mobile devices to be supplied for repair. However, such obligations are not the subject or purpose of the Shareholders Agreement and implying such obligations under the Shareholders Agreement would not be "consistent with the terms of the agreement as a whole." *Airborne Health*, 984 A.2d at 146.

The Shareholders Agreement sets forth the rights and duties of the shareholders to Harvestar Solutions, including terms relating to the corporate governance of the company and the disposition of shares.  It is not a services agreement or a statement of work and, thus, does not contain terms detailing services for the repair and refurbishment mobile devices.  Consistent with this, the Shareholders Agreement does not contain any obligations for Brightstar Asia to supply used mobile devices to Harvestar Solutions or to pay pricing to Harvestar Solutions for repairs,

and it does not contain any obligations for Harvestar Solutions to repair and refurbish mobile devices or perform any other services for Brightstar Asia.[7]  Consequently, the Shareholders Agreement does not specify such terms as, how mobile devices will be supplied for repair, supply forecasting, operational planning, the methods and standards for repairing and refurbishing used devices, inventory management, quality control, testing and delivery of repaired devices, pricing to be paid for repair services, and invoicing for repair services.

Instead, such terms are appropriately contained within a services agreement and/or statement of work, which, as discussed above, is exactly what occurred here.  In connection with and as "Ancillary Agreements" to the Share Purchase Agreement, Brightstar Corp. and HTI entered into the Services Agreement and the SOW setting forth the terms by which mobile devices would be supplied to and repaired by HTI, including terms addressing the pricing for repairs and volumes of devices to be supplied for repair.

Accordingly, there is no gap in the Shareholders Agreement to be filled regarding pricing for repairs or the supply of volumes of mobile devices.  To impose such obligations under the Shareholders Agreement would require the Court to rewrite the Agreement and convert it into a statement of work, which would clearly be inconsistent with subject and purpose of the Shareholders Agreement as a whole (not to mention override the express terms of the Services Agreement and the SOW).  Further, imposing such pricing and volume obligations would create "free-floating" duties for Brightstar Asia that are unattached to the Shareholders Agreement. Therefore, Plaintiff's implied covenant fails as a matter of Delaware law and must be dismissed.

---

[7] Moreover, mobile devices would not be supplied to and pricing would not be paid to Harvestar *Solutions*, nor would Harvestar *Solutions* be repairing devices.  As discussed above, HTI is the entity that performs repairs of mobile devices, and HTI is the entity that entered into the Services Agreement and the SOW with Brightstar Corp.

**4.      Plaintiff's Implied Covenant Claim Fails because the Obligations He seeks to Imply in the Shareholders Agreement were Clearly Contemplated at the Time of Contracting and, thus, the Shareholders Agreement could have been Drafted to Include such Obligations.**

"The implied covenant . . . cannot be employed to impose new contract terms that could have been bargained for but were not." *Blaustein v. Lord Baltimore Cap. Corp.*, 84 A.3d 954, 959 (Del. 2014). The implied covenant "'is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, . . . later adversely affected one party to a contract.'" *Oxbow Carbon*, 202 A.3d at 507 (citation omitted). The court "'should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.'" *Id.* (citation omitted).

Here, even if the Court finds that there is a gap in the Shareholders Agreement regarding pricing for repairs and volumes of mobile devices (which there clearly is not), Plaintiff's implied covenant claim still fails as a matter of Delaware law because the pricing and volume obligations that Plaintiff seeks to imply were clearly and admittedly contemplated at the time of contracting. Thus, the Shareholders Agreement could have been drafted to include such obligations.

First, Plaintiff explicitly alleges in the Amended Complaint that the alleged minimum volume requirement and the pricing for repair services were contemplated at the time the parties executed the Shareholders Agreement. Specifically, Plaintiff alleges that, "**[a]t the time of the [April 9, 2018 share purchase] transaction**, Brightstar Corp. forecast that, beginning on the first anniversary of the transaction, it would provide a minimum of 500,000 mobile telephones per year to Harvestar to repair and refurbish." (Amend. Compl. ¶ 19) (emphasis added). Plaintiff further alleges that "[t]he agreements the parties executed **contemplated** that Harvestar would repair such **500,000 mobile telephones per year** for Brightstar Corp. at a **price** of cost plus $10 per phone" and that "[t]his arrangement was **the basis for, and an integral part of**, the buy-sell transaction

executed April 9, 2018." (*Id.* ¶ 20) (emphasis added).  Finally, Plaintiff alleges that Harvestar receiving 40,000 mobile devices per month for repair and refurbishment was "the **basis for** the April 9, 2018, stock purchase [transaction]." (*Id.* ¶ 51) (emphasis added).

Based upon Plaintiff's express allegations, the alleged minimum volume and pricing obligations that Plaintiff now seeks to imply under the Shareholders Agreement were not only specifically "contemplated" at the time of contracting, but were allegedly the "basis for" and "an integral part" of the April 9, 2018 transaction. Thus, if such obligations were "contemplated," the "basis for," and "an integral part" of the transaction, then "the [Shareholders Agreement] could easily have been drafted to expressly provide for it." *Oxbow Carbon*, 202 A.3d at 507.

In addition, in connection with the execution of the Share Purchase Agreement and the Shareholders Agreement, Brightstar Corp. and HTI executed the Services Agreement and the SOW detailing the repair services to be provided by HTI to Brightstar Corp. and its affiliates. (Amend. Compl. ¶ 16; Servs. Agr., § 1; SOW, § 1.)  As discussed above, the Services Agreement and the SOW specifically address and govern the pricing to be paid to HTI for repair services and the supply of volumes of mobile devices to HTI for repair.  Thus, those documents are further proof that pricing for repairs and volumes of mobile devices were matters that were clearly anticipated and contemplated at the time of the execution of the Shareholders Agreement. Accordingly, the Shareholders Agreement could easily have been drafted to include the pricing and minimum volume requirements that Plaintiff now seeks to improperly imply thereunder.

For these reasons, the pricing and minimum volume obligations that Plaintiffs seeks to imply into the Shareholders Agreement were contemplated at the time of contracting and could have been included in the Agreement.  As a matter of Delaware law, Plaintiff cannot invoke the implied covenant to rewrite the Shareholders Agreement to now impose such obligations.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Brightstar Asia respectfully requests that the Court grant its

motion and enter an Order dismissing Plaintiff's Amended Complaint with prejudice.

**Dated**: September 23, 2022

Respectfully submitted,

/s/ *Frankie N. Spero*
Kristina A. Reliford
Peter C. Sales (*Admitted Pro Hac Vice*)
Frankie N. Spero (*Admitted Pro Hac Vice*)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
(615) 252-2365
kreliford@bradley.com
psales@bradley.com
fspero@bradley.com
*Attorneys for Likewize Hong Kong Limited f/k/a
Brightstar Asia, Ltd.*